1              UNITED STATES DISTRICT COURT
                MIDDLE DISTRICT OF FLORIDA
2                   FORT MYERS DIVISION

3   UNITED STATES OF AMERICA,      ) Fort Myers, Florida
                                   )
4                                  ) No. 2:15-cr-149-FtM-38MRM
        Plaintiff,                 )
5                                  )
             vs.                   ) April 6, 2016
6                                  )
    NORRIS WILLIAMS,               ) 8:30 a.m. to 4:41 p.m.
7                                  )
                                   ) Courtroom 5D
8   Defendant.                     )
    _____) Volume 1 of 3
9

10          TRANSCRIPT OF JURY TRIAL – DAY 1
       BEFORE THE HONORABLE SHERI POLSTER CHAPPELL
11            UNITED STATES DISTRICT JUDGE

12

    **GOVERNMENT COUNSEL:**
13
            **CHARLES SCHMITZ, Assistant U.S. Attorney**
14          United States Attorney's Office
            2110 First Street
15          Room 3-137
            Fort Myers, Florida 33901
16          (239) 461-2221

17  **DEFENSE COUNSEL:**

18          **DAVID JONATHON JOFFE, ESQ.**
            Joffe & Joffe, PA
19          1 East Broward Boulevard
            Fort Lauderdale, FL 33301
20          (239) 263-6161

21                          *Official Court Reporter:*
                            *Lori L. Bundy, RMR, CRR, FPR*
22                          *2110 First Street*
                            *Fort Myers, FL  33901*
23                          *Telephone:  (239) 461-2064*

24
    *(Proceedings reported by Stenotype; Transcript produced*
25  *by computer-aided transcription.)*

1                                    **INDEX**

2        **WITNESS:**                                              **PAGE:**

3     SAMUEL GONZALEZ
        DIRECT EXAMINATION                                          157
4       BY MR. SCHMITZ:
        CROSS-EXAMINATION                                           190
5       BY MR. JOFFE:
        REDIRECT EXAMINATION                                        203
6       BY MR. SCHMITZ:
      MARK STRANG
7       DIRECT EXAMINATION                                          204
        BY MR. SCHMITZ:
8       CROSS-EXAMINATION                                           219
        BY MR. JOFFE:
9       REDIRECT EXAMINATION                                        235
        BY MR. SCHMITZ:
10    CARLOS DIAZ
        DIRECT EXAMINATION                                          240
11      BY MR. SCHMITZ:
      VOIR DIRE EXAMINATION                                         244
12       BY MR. JOFFE
        CONTINUED DIRECT EXAMINATION                                247
13      BY MR. SCHMITZ:
        CROSS-EXAMINATION                                           250
14      BY MR. JOFFE:
        REDIRECT EXAMINATION                                        255
15      BY MR. SCHMITZ:
      DEEPA VANMALI
16      DIRECT EXAMINATION                                          256
        BY MR. SCHMITZ:
17    VOIR DIRE EXAMINATION                                         261
         BY MR. JOFFE
18      CONTINUED DIRECT EXAMINATION                                267
        BY MR. SCHMITZ:
19      CROSS-EXAMINATION                                           270
        BY MR. JOFFE:
20    ALEXANDRA GONGORA
        DIRECT EXAMINATION                                          274
21      BY MR. SCHMITZ:
      VOIR DIRE EXAMINATION                                         280
22       BY MR. JOFFE
        CONTINUED DIRECT EXAMINATION                                281
23      BY MR. SCHMITZ:
        CROSS-EXAMINATION                                           283
24      BY MR. JOFFE:

25                              * * * * *

1

## ADMITTED EXHIBITS

PAGE:

2

3
Government's Exhibit Number 1 and 1E          165
Government's Exhibit Number 1A                166
Government's Exhibit Number 3                 176
Government's Exhibit Number 3A                177
Government's Exhibit Number 5 and 5E          184
Government's Exhibit Number 5A                184
Government's Exhibit Number 2A1               207
Government's Exhibit Number 4A1               211
Government's Exhibit Number 10A3              219
Government's Exhibit Number 2                 247
Government's Exhibit Number 4                 267
Government's Exhibit Number 6                 281

4

5

6

7

8

9                          * * * * *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      * * * P R O C E E D I N G S * * *

2            COURTROOM DEPUTY:  Calling case

3      2:15-cr-149-FTM-38MRM, United States of America versus

4      Norris Williams.

5            MR. SCHMITZ:  Good morning, Your Honor,

6      Charles Schmitz representing the United States.

7            MR. JOFFE:  Your Honor, good morning, David

8      Joffe on behalf of Norris Williams who is present

9      before the Court.

10           THE COURT:  We have more or less a final

11     pretrial conference scheduled for this morning just to

12     go over a few things in regard to the case.  I have

13     received the witness list from the government, voir

14     dire questions, proposed jury instructions, proposed

15     verdict form.  Mr. Joffe, I believe you indicated you

16     had no additional witnesses other than those listed by

17     the government?

18           MR. JOFFE:  That's correct, Your Honor.

19           THE COURT:  And no objection to the voir dire

20     questions that the government submitted, as well as the

21     verdict form.

22           MR. JOFFE:  That's correct, Your Honor.

23           THE COURT:  We'll go through the verdict form

24     and the proposed jury instructions at a later time.  I

25     don't believe there were any other -- any motions in

1  limine that were filed; is that correct?

2         MR. SCHMITZ:  That's correct, Your Honor.

3         MR. JOFFE:  That's correct, Your Honor.

4         THE COURT:  And there are no stipulations

5  that the Court has to concern itself with at this time?

6         MR. SCHMITZ:  That's also correct, Your

7  Honor.

8         MR. JOFFE:  That's correct, Your Honor.

9         THE COURT:  The trial is still supposed to

10  last probably throughout this week, so if I tell the

11  jurors two to three days, is that --

12         MR. SCHMITZ:  Yes, Your Honor.

13         MR. JOFFE:  That sounds right, Your Honor.

14         THE COURT:  All right.  So I'll indicate to

15  them today, tomorrow, and Friday.  Obviously this is a

16  criminal case.  Mr. Williams has been indicted on a

17  four-count indictment.  If you want to look at the

18  screen, I have Count 1 and Count 2 on this slide and

19  then the other two counts on the next slide.  So if you

20  want to look to make sure that this is accurate.

21         MR. JOFFE:  It appears to be, Your Honor.

22         MR. SCHMITZ:  Yes, Your Honor.

23         THE COURT:  Counts 3 and 4 on the next slide.

24         MR. JOFFE:  It appears to be accurate, Your

25  Honor.

1    MR. SCHMITZ:  Yes, Your Honor, that's

2  accurate.

3    THE COURT:  All right.  It doesn't appear

4  that there's going to be any interruptions in the

5  trial, so we'll go straight through, through Friday or

6  whenever the jury would get the case.  Counts in the

7  indictment we've reviewed based upon the slide.  It's

8  my understanding that there's not going to be an issue

9  with the forfeiture.  At this point we're not

10  discussing anything with the forfeiture during the

11  course of the trial; correct?

12    MR. SCHMITZ:  That's correct, Your Honor, we

13  have redacted that from the indictment.

14    MR. JOFFE:  That is correct, Your Honor.

15    THE COURT:  All right.  Both parties have

16  been with the Court for voir dire examination, you'll

17  get brief follow-up questions after the Court has asked

18  the voir dire questions.  Any objection to the jurors

19  taking notes?

20    MR. SCHMITZ:  No objection, Your Honor.

21    MR. JOFFE:  No, Your Honor.

22    THE COURT:  All right.  Mr. Joffe, would you

23  like the defendant not testifying preliminary

24  instruction?

25    MR. JOFFE:  Yes, Your Honor.

1          THE COURT:  Okay.  I have received, I

2   believe, the government's electronic exhibit binder.

3   Any joint exhibits?

4          MR. SCHMITZ:  No, Your Honor.

5          MR. JOFFE:  No, Your Honor.

6          THE COURT:  Okay.  How long does the

7   government need for its opening statement?

8          MR. SCHMITZ:  15 minutes, Your Honor.

9          THE COURT:  Mr. Joffe?

10          MR. JOFFE:  That's sufficient, Your Honor.

11          THE COURT:  All right.  I don't believe we

12   need interpreters for any of the witnesses, unless

13   something has changed.  It doesn't seem that we do.

14   Any other issues we need to discuss then that we have

15   not discussed?

16          MR. SCHMITZ:  Your Honor, just a couple

17   issues here.  In terms of, I wanted to inform the Court

18   and opposing counsel that we have made some redactions.

19   The first one I want to tell the Court about was -- the

20   backstory is the first three counts in the indictment

21   were controlled purchases from the defendant in this

22   case.  There was actually a controlled purchase that

23   occurred before the first count in the indictment.

24   During that transaction, the defendant fronted some

25   drugs to the undercover.  During the first charged

1  transaction in November, the undercover paid

2  essentially for the drugs he was fronted.  There's

3  reference to that.

4          We have actually redacted out a portion of

5  the transcript that refers to the previous deal.  We

6  don't believe the previous deal is relevant, and it may

7  well be prejudicial.  But we've redacted that out.

8  Now, I intend to ask the witness if the transcript is

9  true and accurate.  I've instructed the witness not to

10  say that the transcript has been redacted, and I just

11  wanted to front that issue to the Court and to defense

12  counsel, just in case there was any objection to that.

13          THE COURT:  Mr. Joffe?

14          MR. JOFFE:  I'm sorry, Your Honor.

15          THE COURT:  Sure.  Go ahead.

16          MR. JOFFE:  Your Honor, I would agree with

17  the government's assessment.

18          THE COURT:  All right.  Then maybe prior to

19  when we're going to play that particular excerpt, if

20  you want to even just show Mr. Joffe just so it's

21  clear.  But it sounds like there should be no objection

22  to that being redacted because clearly that could be

23  prejudicial to the defendant.

24          MR. SCHMITZ:  Right.  And we have disclosed

25  the transcript in its redacted form to defense counsel

1    before today.

2           THE COURT:  Okay.  Thank you.

3           MR. SCHMITZ:  In addition, there's an

4    additional redaction.  During the Count 4 there were

5    several -- first there was a meeting at the wing house,

6    then there was a flash, and then there are a bunch of

7    telephone calls.  On one of these telephone calls, the

8    defendant mentioned something about doing something

9    with his bail bondsman.  We have redacted that

10   transcript as well to eliminate the reference to his

11   bail bondsman.

12          THE COURT:  Okay.

13          MR. SCHMITZ:  So the same thing, we wanted to

14   front that to the Court and to defense counsel just in

15   case there's any objection now, and we have also

16   instructed the witness not to mention that redaction

17   when we ask him if the transcript is a true and

18   accurate transcription.

19          THE COURT:  Mr. Joffe, any objection to that?

20          MR. JOFFE:  No, Your Honor.

21          THE COURT:  Clearly that would also be

22   prejudicial to the defendant, so that should be

23   redacted.

24          MR. SCHMITZ:  Okay.  And then one last

25   matter -- or I guess two last matters.  I believe the

1    Court is going to go over the verdict form, and we'll

2    discuss the verdict form at a later date.  We filed an

3    amended verdict form.  In addition, we just wanted to

4    note up front that the government proposed the

5    entrapment instruction in its proposed jury

6    instructions.  We don't believe that jury instruction

7    should be given here.  We'll make the argument when the

8    time is appropriate that it should not be given here.

9    We want to front the issue that we do not believe that

10   that entrapment instruction is warranted under the law

11   or the facts.

12           THE COURT:  Okay.  All right.  And that will

13   be something we will have a charge conference, and if

14   the facts appear to support that, then the Court will

15   give it.  If not, then the Court will not give that

16   instruction.  Certainly I'll listen to arguments of

17   both counsel prior to that time.

18           MR. SCHMITZ:  One more issue, Your Honor,

19   agent Mark Strang from the DEA, we intend to have him

20   at counsel table, notwithstanding whether or not the

21   rule is invoked here.

22           THE COURT:  All right.  Mr. Joffe, any

23   objection as he is the case agent?

24           MR. JOFFE:  I think the rules allow him to be

25   present, Your Honor.

1            THE COURT:  They do.  All right.  Thank you.

2   Any other issues from the government?

3            MR. SCHMITZ:  Your Honor, we have copies of

4   the redacted indictment.  May I approach and provide

5   those to the Court?

6            THE COURT:  Yes, thank you.

7            And that will go back with the jury,

8   obviously.  If we get to that point, the redacted

9   indictment goes back with the jury instructions and the

10  verdict form.

11           MR. SCHMITZ:  Your Honor, may we explain the

12  redactions for the Court and for the record?

13           THE COURT:  Yes.

14           MR. SCHMITZ:  Assistant United States

15  Attorney David Lazarus, who is also assigned to this

16  case, has joined me at counsel table, as well as Mark

17  Strang from the DEA.

18           MR. LAZARUS:  Good morning, Your Honor, if I

19  may.  I prepared the redactions of this.  What I did

20  was I took Document 12, which is the filed indictment

21  here, and at the top of each page ordinarily to the

22  right of the date that says filed 10/28/15 there are

23  some unique identifiers that give away the number of

24  pages, basically, so I redacted those just for

25  continuity on every page.  And then more in terms of

1  substance what I did was there had been a page

2  containing forfeiture allegations, I took that page

3  out.  There was some -- the forfeiture allegations that

4  spilled over onto the last page of the indictment, the

5  page with the foreperson and the United States

6  Attorney's Office signatures, so I just redacted that

7  in white, so it does not, at least in my opinion, even

8  appear as though anything has been redacted.

9          It was only a few lines on that page, so it

10 doesn't look odd to my eye, anyway.  And certainly

11 counsel is free to weigh in if he sees it differently.

12 But it doesn't look like a redacted indictment, that's

13 what I tried to do.

14         On the last page which contains the

15 violations listed, right now the last violation is 21

16 U.S.C. Section 846.  Immediately below that was the

17 section for the forfeiture, and so I redacted that as

18 well.  In looking at this now I see on the first page

19 it does still say 21853 forfeiture on the very first

20 page.  We don't intend to make reference to that.  We

21 can either redact it before it goes back, if the Court

22 prefers, or proceed however anybody would like.  It's

23 easy enough to redact that before the jury gets this,

24 if that's the Court's preference.

25         THE COURT:  Mr. Joffe, do you have a

1    preference?

2            MR. JOFFE:  Your Honor, I've reviewed the

3    redacted indictment.  It appears to be sufficient.  I

4    would just ask that the portion that references

5    forfeiture on the top be removed before it goes to the

6    jury, but we have some time for that.

7            THE COURT:  Then, Mr. Lazarus, if you would

8    go ahead and take that provision off under the case

9    number, everything else appears to be good.

10           MR. LAZARUS:  And I'll circulate additional

11   copies to everybody.

12           THE COURT:  Okay.  Perfect.  Anything else

13   that we need to discuss from the government's

14   standpoint?

15           MR. LAZARUS:  Nothing more from the

16   government, Your Honor.

17           THE COURT:  Mr. Joffe, anything from the

18   defense?

19           MR. JOFFE:  Your Honor, I think for purposes

20   of the appellate record I should reraise my issue of my

21   request for a continuance based on the government's

22   late notice of filing its expert witness notice.  The

23   Court has already ruled on that, but I'll reraise that

24   issue.

25           THE COURT:  All right.  The Court took note

1    of the defense objection, the government filed a

2    response.  The Court is in agreement with the

3    government's response that these witnesses were not

4    surprise witnesses, they had been listed on the witness

5    list based upon what the government indicated they were

6    going to elicit from the officers, it does not appear

7    that that was expert testimony, and, therefore, the

8    Court did not find that a continuance was warranted

9    under the circumstances, so that would be denied.

10            Mr. Williams, let me just advise you that

11   during the course of the voir dire examination, after

12   the Court does the voir dire examination, counsel is

13   going to have an opportunity to do follow-up

14   questioning.  Then after that we'll have an opportunity

15   to do any challenges, either challenges for cause or

16   peremptory challenges because you just don't want a

17   certain person on the jury.  You have an opportunity,

18   if you would like, to come up to sidebar with your

19   attorney to exercise those challenges, but you don't

20   have to.  Certainly he's going to discuss with you who

21   you think you want on your jury versus who you don't

22   want, so you can either let him come to sidebar and

23   make that determination further.  He is welcome to come

24   back and forth to counsel table if you want to stay

25   there, or you can come up for the sidebar of voir dire

1    challenges.  It's up to you.

2              THE DEFENDANT:  All right, ma'am.

3              THE COURT:  We'll wait for the jury to come

4    up, unless someone has anything else.

5              MR. JOFFE:  Nothing further from the defense,

6    Your Honor.

7              THE COURT:  We'll be in recess until the

8    jurors come up.  It should be about 9:00 hopefully.

9              (A break was taken.)

10             THE COURT:  Let me just ask one more

11   question.  Mr. Schmitz, were there any plea offers that

12   were extended to the defendant in this case?

13             MR. SCHMITZ:  Your Honor --

14             THE COURT:  I know you took over for another

15   counsel.

16             MR. SCHMITZ:  Right.  Perhaps the defense

17   attorney could speak to this.

18             THE COURT:  Did you extend any offers to the

19   defendant?

20             MR. SCHMITZ:  No, Your Honor, and none that

21   I'm aware of, but like I said, I inherited this case

22   about two weeks ago.

23             THE COURT:  Mr. Joffe?

24             MR. JOFFE:  Yes, Your Honor.  Throughout the

25   course of my appointment in this case, I had discussed

1   with my client the amount of heroin that he believed he

2   was responsible for.  Mr. Williams' position is, or

3   it's the position of the defense that we're responsible

4   for half a kilo or less of heroin, no more than half a

5   kilo of cocaine.  I have discussed that with AUSA

6   Robert Barclift.  Mr. Barclift, he was I guess amenable

7   to my position, went to Mr. Casas for permission,

8   Mr. Casas said, no, that if Mr. Williams wanted to

9   plea, he would have to plea to the entire amount and

10  that we could argue the amount at sentencing.

11          I discussed that with Mr. Williams at least

12  twice if not three times, and it was our position that

13  if Mr. Williams pleas to what's in the indictment that

14  he's locked into an amount, and it makes it very

15  difficult for sentencing purposes to argue that it

16  theoretically should be less.

17          I think in the vein of trying to work it out,

18  Mr. Barclift created the jury instructions with an

19  entrapment instruction, as well as with the amounts of

20  heroin that the government may or may not be able to

21  prove, so that's where we are.  I discussed that with

22  Mr. Williams, and Mr. Williams' position was I'm not

23  going to plea to a full kilo of heroin, so that's where

24  we are.  And really the only issue at trial for us,

25  well, one of the issues is the amount.

1          THE COURT:  Understood.  And, Mr. Williams;

2    that's correct?

3          THE DEFENDANT:  Yes.

4          THE COURT:  You've had those discussions with

5    your counsel and you feel comfortable and confident

6    that you wish to go to trial in this case?

7          THE DEFENDANT:  If they would have gave me

8    the plea, I would have pled out.

9          THE COURT:  All right.  But you do have a

10   dispute with the amount, so it's your choice to go to

11   trial and make them prove the amount?

12         THE DEFENDANT:  Yes, they kept pushing more

13   drugs on me.

14         THE COURT:  Okay.  Just wanted to make sure

15   that you were extended whatever offers or no offer at

16   all; just so that you've made an informed decision to

17   go to trial and it appears that you have.  So that's

18   where my question was going.

19         MR. SCHMITZ:  Your Honor, I have a corrected

20   redacted indictment.  May I approach?

21         THE COURT:  Yes, you may.  Thank you.

22         MR. LAZARUS:  Just for the record, I took out

23   the one reference to forfeiture that I had

24   inadvertently left in the caption on the first page.

25   The rest of the redaction is exactly as stated a few

1    minutes ago.

2            MR. JOFFE:  I've received that, Your Honor,

3    and it appears correct.  Thank you.

4            MR. SCHMITZ:  Your Honor, one more just minor

5    housekeeping issue that I want to make the Court aware

6    of.  We have three chemists that are going to testify

7    in this case, they're coming from Miami, they are going

8    to be here at 12:00.  If for some miraculous reason we

9    get to them before 12:00 I want to let the Court know

10   that.  I don't see that happening, but just so the

11   Court is aware, as of 12:00 or 1:00 at the latest we

12   will have all of our witnesses here.

13           THE COURT:  All right.  I would anticipate

14   that voir dire examination will be concluded right

15   around that time, lunchtime, and we'll take our lunch

16   break, and then go from there.  Or if anything we'll

17   get openings before lunch, but that hasn't been my

18   experience so far.

19           MR. SCHMITZ:  Your Honor, a couple questions

20   before the jury comes in.  In terms of strikes, is it

21   ten and six and the Court's, again, the Court's

22   position on back striking?

23           THE COURT:  Yes, it is ten and six, and I

24   allow very limited back striking, so if we get through

25   the first panel and you've kind of selected those

1  jurors, unless they say something during the second

2  round of selection that throws you off in some way,

3  then I would entertain a back strike, but otherwise if

4  you've kind of accepted them during the first round,

5  you've accepted them.

6  MR. SCHMITZ:  Thank you.

7  THE COURT:  Does that make sense?

8  MR. JOFFE:  Your Honor, I see page 3 of 6 of

9  the names of the potential jurors, number 26, Benjamin

10  Eugene Crotteau, so I don't know if they're related to

11  Ronald Francis Crotteau.  It's an unusual name.

12  THE COURT:  I guess we'll see.  He's not in

13  the first round.

14  MR. JOFFE:  Okay.  Very good.

15  THE COURT:  We'll go ahead and bring the

16  jurors in.

17  (Potential jury in at 9:10 a.m.)

18  THE COURT:  Good morning, ladies and

19  gentlemen.  My name is Judge Chappell, and I'm a

20  district court judge here in the Middle District of

21  Florida.  On behalf of the judges here in the middle

22  district, I do want to thank you for being here with us

23  today.  We do appreciate your presence and we're fully

24  aware that many of you would probably much rather be

25  somewhere else than with us here today.  But we do

1    appreciate that you're here.  We understand that jury

2    service is not always convenient, but I hope that

3    you'll realize that the service you perform is

4    extremely important.  One of our most cherished

5    constitutional rights that we have is the right to a

6    trial by a jury, so if you or I or anyone else becomes

7    involved in a criminal case, we have an absolute right

8    to have the charge heard and decided by a jury, a

9    completely impartial group of our fellow citizens.  I

10   hope that when you finish your jury service that you

11   will have had an interesting, a challenging, and an

12   informative experience, as well as the satisfaction

13   that comes with a job well done.

14           I would like to give you a brief overview of

15   the jury selection process that we're going to go

16   through here.  Madam clerk, has the jury been generally

17   qualified?

18           CLERK:  Yes, Your Honor.

19           THE COURT:  All right.  Thank you.  Each of

20   you have been found to have the requisite

21   qualifications to serve as a juror of this court.  No

22   one should avoid fulfilling that obligation, except for

23   the most pressing of circumstances.  The demand upon

24   your time for this jury duty will not be unreasonable

25   or unduly prolonged.  Every effort will be made to see

1    that your time is not wasted.

2          You have been placed in random order, and 24

3    of you have been seated here in the jury box.  You've

4    been placed under oath, and I'll ask those of you in

5    the jury box a series of questions as to your

6    qualifications to serve as a juror in this particular

7    type of case.  Voir dire means to speak the truth, and

8    under your oath as a prospective juror, you agree to

9    truthfully answer questions concerning your

10   qualifications.  Please understand that this

11   questioning is not for the purpose of prying into your

12   personal affairs, but it's only for the purpose of

13   determining if your decision in this case would in any

14   way be influenced by opinions which you now hold or by

15   some personal experience or special knowledge which you

16   may have concerning the subject matter to be tried.

17   The object of the jury selection is to get a jury which

18   will impartially try the issues in this case upon the

19   evidence and the law presented in this courtroom,

20   without being influenced by any other factors.

21          Now, a certain number of jurors will be

22   excused, and if you are excused, please do not be

23   offended or feel that your honesty or your integrity is

24   being questioned in any way.  It's simply part of the

25   jury selection process.  The purpose of the questioning

1   is to make sure that those finally selected to sit on

2   the jury are the most impartial persons available in

3   relation to the issues being tried in this case.  Those

4   of you not seated in the jury box should listen

5   carefully to the questions as well because in my

6   experience many of you will find yourselves up in the

7   jury box being questioned at a later time.  So please

8   listen carefully to the questions as well.

9           When I finish with my voir dire examination,

10  the attorneys will be allowed to ask brief follow-up

11  questions, and then when the questioning is completed,

12  the attorneys will be given a chance to review their

13  notes and will approach sidebar to exercise any

14  challenges they may have as to individual jurors.  The

15  attorneys do have a right to excuse a certain number of

16  jurors for any reason that they think is appropriate,

17  so, again, if you should happen to be excused, please

18  don't take that personally; it's part of the selection

19  process.

20          If you're selected and seated on this jury,

21  you'll normally be expected to be here around 9:00 in

22  the morning, we'll take a morning break, a lunch break,

23  and then one break in the afternoon.  Usually we

24  conclude around 5:00.  The only exception to that is if

25  at some point you're given the case to deliberate, then

1  you may be asked to stay a little bit longer to

2  deliberate on the case.  The attorneys expect the trial

3  in this case to take between two and three days.

4          All right.  At this time we're going to find

5  out a little bit about each and every one of you, so

6  you've been provided with a questionnaire, or if you

7  would like to look at the screen, please stand and tell

8  us a little bit about yourselves.  Mr. Akrami, we're

9  going to start with you, so if you would stand and tell

10  us about yourself, please.

11          POTENTIAL JUROR AKRAMI:  Hello.  Jason

12  Akrami.  I have lived in Naples, Florida, I have lived

13  there for about one year and a half, lived in Florida

14  for about a year and a half.  I'm a physician.  Marital

15  status, single.  No children.  Education is medical

16  school, no military service.  I have been sued in the

17  past, but that was dismissed without prejudice.  And no

18  jury service in the past.

19          THE COURT:  Okay.  What type of medicine do

20  you practice?

21          POTENTIAL JUROR AKRAMI:  Neuroradiology.

22          THE COURT:  Okay.  Thank you very much.

23          Mr. Wynne.

24          POTENTIAL JUROR WYNNE:  My name is Randy

25  Wynne, I'm from Bonita Springs, Florida, been there for

1  five years, been in Florida for 40.  I'm in the office

2  equipment sales business, and divorced.  No children,

3  some college, no military, no court and no jury.

4          THE COURT:  What did your wife do prior to

5  your divorce?

6          POTENTIAL JUROR WYNNE:  Real estate.

7          THE COURT:  Okay.  Thank you very much.

8          Mr. Stevens.

9          POTENTIAL JUROR STEVENS:  Bruce Stevens, I

10 live in Naples, Florida.  I have lived there for three

11 years and I have lived in Florida for three years.  I'm

12 a dentist and a managing partner of multiple Dairy

13 Queens.  I'm married and she's a retired homemaker.  We

14 have three children, a 34-year-old daughter who is a

15 dentist, 30-year-old son who is an engineer, a

16 28-year-old son who is a teacher.  Dental school, DDS,

17 no military service, no court experience, and no jury

18 experience.

19         THE COURT:  Okay.  Am I the only one that may

20 see a conflict of interest between being a dentist and

21 owning some Dairy Queens?

22         POTENTIAL JUROR STEVENS:  You are.

23         THE COURT:  Ms. Squatrito.

24         POTENTIAL JUROR SQUATRITO:  Renee Squatrito,

25 I live in Cape Coral, I've been there for 13 years,

1    I've been in Florida for 43 years.  My husband and I

2    own a martial arts school in Cape Coral.  I am married.

3    His day job he works for the post office.  I have two

4    children, 23-year-old, she's in banking and a

5    20-year-old who is in automotive accessory

6    installation.  High school graduate, never been in the

7    military.  I have been in the court before for a

8    divorce, and never been on a jury before.

9             THE COURT:  All right.  Thank you very much.

10            Ms. Galvan, can you tell us about yourself.

11            PROSPECTIVE JUROR GALVAN:  My name is Noelia

12   Galvan, I live in Naples for four years now and I've

13   been in Florida for 20 years.  I'm a preschool teacher,

14   and I'm married and my husband he works in

15   construction.  I have two children, my daughter is 11

16   and my son is 16, middle school and high school.  First

17   time -- I have no military and I have no court

18   experience, and my first time on jury duty.

19            THE COURT:  Thank you very much.  Welcome.

20            Mr. Clark, tell us about yourself.

21            POTENTIAL JUROR CLARK:  My name is Jeremy

22   Clark, I'm from Arcadia, Florida, I was born and raised

23   there, so I've been there all of my life, which is

24   23 years.  My occupation is an order selector for a

25   warehouse, and I'm also a retail data auditor for chain

1  stores.  I'm single.  I have one daughter, she's five

2  years old.  My highest level of education is high

3  school.  I have no military service, no court

4  experience, and no jury service.

5        THE COURT:  All right.  Thank you, Mr. Clark.

6        We're going to pass the microphone down then

7  to Ms. Kelly.

8        POTENTIAL JUROR KELLY:  My name is Michelle

9  Kelly, I live in Lehigh Acres, Florida, I have lived

10  there for eight and a half years, I have also lived in

11  Florida for eight and a half years.  I am a church

12  administrator, I am married to a minister.  We have two

13  children, 12 and 14.  I have an associate's degree, I

14  haven't served in the military, I have no previous

15  court experience, and I have not had any jury service.

16        THE COURT:  All right.  Thank you, Mr. Kelly.

17        Mr. Everling.

18        POTENTIAL JUROR EVERLING:  My name is Kenneth

19  Everling.  I've been in Cape Coral for 22 years, been

20  in Florida for 25 years.  I'm retired surveyor, I'm

21  married, my wife is in retail management.  We have no

22  children, high school level education, no military

23  service.  I was a defendant in reckless driving charge,

24  and I've been called up to Lee County numerous times

25  but never served on a jury.

1          THE COURT:  The reckless driving charge, did

2   you go to trial on that case?

3          POTENTIAL JUROR EVERLING:  Yes.

4          THE COURT:  Okay.  Thank you, Mr. Everling.

5          Ms. Johnson.

6          POTENTIAL JUROR JOHNSON:  My name is

7   Elizabeth Johnson.  I live in Bonita Springs, Florida,

8   and I have lived there for 15 years, and I have lived

9   in Florida for 15 years.  I'm in sales for a group of

10  hotels.  I'm divorced, and I have two children, a son

11  age 40 who is in property management and a daughter who

12  is 37, and she's a wedding photographer.  I was

13  educated in England to college level.  No military

14  service, no previous court experience, and I did serve

15  on a jury in October 2014 here in Fort Myers.

16         THE COURT:  Was that in state court?

17         POTENTIAL JUROR JOHNSON:  Yes.

18         THE COURT:  Criminal or a civil case?

19         POTENTIAL JUROR JOHNSON:  It was a criminal,

20  and we did return a verdict.

21         THE COURT:  All right.  Were you the

22  foreperson?

23         POTENTIAL JUROR JOHNSON:  No.

24         THE COURT:  All right.  And what did your

25  husband do prior to the divorce?

1          POTENTIAL JUROR JOHNSON:  He was an

2     anesthesiologist technician.

3          THE COURT:  All right.  Thank you.

4          Mr. Schrader.

5          POTENTIAL JUROR SCHRADER:  I'm David

6     Schrader, resident of Estero, Florida.  We've been here

7     now for three years, bought property.  I'm retired.  I

8     was a quality engineer with Ford for 23 years, with

9     Mazda and we went after 147 suppliers to make sure all

10    the data was correct, the product was correct.  Marital

11    status, yes, I'm married.  My wife is a homemaker and

12    retired.  Education level I have an engineering degree

13    from State in Michigan.  I was in the Air Force for

14    four and a half years, honorably discharged, I am a

15    40 percent disabled Vietnam vet.  Previous court

16    experience, I had a divorce and I have never served --

17    yes, in Michigan I was up on a civil case up there and

18    a verdict was not delivered.

19         THE COURT:  All right.  In regard to the

20    civil case, you'll probably hear -- well, I know you'll

21    hear a different standard for this particular case

22    because it is a criminal case.  Will you be able to

23    follow the difference between the case that you had in

24    Michigan and this case?

25         POTENTIAL JUROR SCHRADER:  Oh, yes.

1            THE COURT:  Okay.  Thank you.

2            Ms. Shade.

3            POTENTIAL JUROR SHADE:  Yes, my name is

4    Debbie Shade, I am from Cape Coral, I have lived there

5    for 15 years, 20 in Florida.  I'm an account -- I'm

6    sorry, I'm in the finance department, I'm an accounting

7    clerk.  I'm single, I have two children, 13 and 6, both

8    in school, no jobs.  High school education, I have

9    never been in the military, no previous experience in

10   court, but I was on a civil jury in '99 in Pennsylvania

11   where it settled.

12           THE COURT:  All right.  Thank you very much.

13           Mr. Durfee.

14           POTENTIAL JUROR DURFEE:  My name is Dennis

15   Durfee, I'm in Lehigh Acres, I lived there for

16   12 years, lived in Florida for 12 years, I'm retired

17   operating engineer.  Yes, I'm married.  She was a

18   supervisor in electronics.  I have two children, one is

19   49, he's in automotive and sales, and my daughter is a

20   supervisor for Comcast.  12th grade.  Yes, I have

21   military experience.  I served on a jury and I was the

22   foreman; that's about 30 years ago, 40 years ago.

23           THE COURT:  Was that a civil or a criminal

24   case?

25           POTENTIAL JUROR DURFEE:  Criminal case.

```
1              THE COURT:  Okay.  Thank you, Mr. Durfee.
2              Ms. Shadaram, we'll pass the microphone to
3   you.
4              POTENTIAL JUROR SHADARAM:  My name is Jeannie
5   Shadaram, I live in Lehigh Acres, I've been there six
6   years, moved to Florida six years ago.  I am a 911
7   dispatcher for fire and EMS here in Lee County, I am
8   married, my husband is a semiretired computer
9   programmer, business analyst.  We have a combined
10  family of seven children total.  I have a 30-year-old
11  daughter who is in Ohio and she's a psychiatric
12  resident at Cleveland Clinic, 29-year-old stepdaughter
13  who is a student, 26 and 25-year-old daughters who are
14  both office administrators, 24-year-old son who is a
15  student and we have two children at home that are nine
16  and seven.  I have an associate's degree, no previous
17  military experience.  I did divorce, and I also have a
18  bankruptcy in '92.  And I have never been on a jury
19  before.
20             THE COURT:  Okay.  Thank you, Ms. Shadaram.
21             Mr. Davis, tell us about yourself.
22             POTENTIAL JUROR DAVIS:  Good morning, my name
23  is Christian Davis, I'm from Naples, Florida, lived
24  there for 38 years, lived in Florida for 38 years.  I
25  am currently a construction manager, single.  I have a
```

1   17-year-old daughter who is a high school student,

2   although I wish she would get a job.  I have a college

3   degree, I am a U.S. Navy vet of submarines.  And I was

4   a defendant in a reckless driving case, and no prior

5   jury duty experience.  Oh, and I was a witness in a

6   civil case.

7           THE COURT:  All right.  Did you actually

8   testify in that civil case?

9           POTENTIAL JUROR DAVIS:  No.

10          THE COURT:  Did you take the willful, wanton,

11  and reckless driving charge to court?

12          POTENTIAL JUROR DAVIS:  No.

13          THE COURT:  Okay.  And what is your college

14  degree in?

15          POTENTIAL JUROR DAVIS:  Math.

16          THE COURT:  Okay.  Thank you very much.

17          Ms. Demello.

18          POTENTIAL JUROR DEMELLO:  Hi, my name is

19  Kelly Demello, I live in Cape Coral, Florida.  I have

20  lived there for 15 years.  Lived in Florida 38.  My

21  occupation is deputy clerk with Lee County Clerk of

22  Courts.  I am married.  Married to a deputy sheriff for

23  Lee County.  I have two children, one is 28, one is 30.

24  My 28-year-old is customer service for Comcast, and my

25  31-year-old is a shipping clerk for private.  I do have

```
1    education to 12th grade, no military experience or no

2    service at all.  Court experience, I did sue, oh, gosh,

3    probably 15 years ago, but it didn't go to court.

4    Okay.  I just served in county court as a juror, but I

5    wasn't selected, in January.

6              THE COURT:  Okay.  And what part of the

7    clerk's office do you work in over.

8              POTENTIAL JUROR DEMELLO:  Criminal,

9    misdemeanor, felony, traffic.

10             THE COURT:  Do you go to court actually?

11             POTENTIAL JUROR DEMELLO:  No.

12             THE COURT:  Okay.  So you're down in the

13   clerk's office --

14             POTENTIAL JUROR DEMELLO:  Right.

15             THE COURT:  -- looking through the files and

16   things.

17             POTENTIAL JUROR DEMELLO:  Right.

18             THE COURT:  Okay.  Thank you very much.

19             POTENTIAL JUROR DEMELLO:  You're welcome.

20             THE COURT:  Ms. Mitchell.

21             POTENTIAL JUROR MITCHELL:  My name is Cheryl

22   Mitchell, I live in Estero, Florida, I have lived there

23   for three and a half years, I've been in Florida for

24   14 years.  I'm currently retired, married, my husband

25   is retired.  We have three children, 46, 44, 42.  One
```

1    is a floor installer, one is a child care worker, and

2    the other one is a consultant for the state board of

3    education in Illinois.  I have a master's degree, I

4    have no military experience, I have no court

5    experience.  I previously served on a jury trial in the

6    state of Illinois approximately 35 years ago.

7              THE COURT:  Okay.  Let me ask you this, you

8    said you and your husband are retired.  What did you

9    retire from?

10             POTENTIAL JUROR MITCHELL:  We're in the

11   automotive industry.

12             THE COURT:  Okay.  What did you get your

13   master's in?

14             POTENTIAL JUROR MITCHELL:  Science

15   technology.

16             THE COURT:  And was it a civil or criminal

17   case that you served on the jury?

18             POTENTIAL JUROR MITCHELL:  Civil.

19             THE COURT:  Were you the foreperson of the

20   jury?

21             POTENTIAL JUROR MITCHELL:  I think I was.  I

22   can't remember.

23             THE COURT:  It's been awhile back.

24             POTENTIAL JUROR MITCHELL:  Yes, it has.  A

25   lot of years.

1          THE COURT:  All right.  I'll be instructing

2   you on the burden of proof in this particular case,

3   which is different from that in a civil case.  Will you

4   be able to follow those instructions?

5          POTENTIAL JUROR MITCHELL:  Yes, ma'am.

6          THE COURT:  Okay.  Thank you.

7          Ms. Dickens.

8          POTENTIAL JUROR DICKENS:  My name is Karen

9   Dickens, I'm from North Fort Myers, Florida, but I have

10  lived in Florida for 48 years.  I'm unemployed

11  presently.  I'm a former senior executive assistant, I

12  am married to a building contractor.  I have a

13  33-year-old son who is a professional charter boat

14  captain, and a 30-year-old daughter who is a nursing

15  student.  I have an associate's degree, I have no

16  military service, and I have been a plaintiff or I have

17  sued someone in court, and I have no prior jury

18  service.

19         THE COURT:  All right.  Thank you.

20         POTENTIAL JUROR STIDAM:  My name is Kevin

21  Stidam, I am in Lehigh Acres, been there three years,

22  been in Florida seven and a half years, I'm a retail

23  supervisor, I'm married, my spouse is in retail as

24  well.  No children, high school education, no military.

25  I was a witness in an auto accident case, and no jury.

1          THE COURT:  All right.  Thank you very much,

2  Mr. Stidam.

3          Ms. Beck.

4          POTENTIAL JUROR BECK:  My name is Sandra

5  Beck, I live on Marco Island.

6          THE COURT:  Could you speak up for us,

7  please?

8          POTENTIAL JUROR BECK:  My name is Sandra

9  Beck, I live on Marco Island, lived there for 30 years,

10  been in Florida for 30 years.  I am a waitress.  My

11  marital status, I'm a widow.  I have two children, a

12  48-year-old son and a 40-year-old son -- 44-year-old

13  son, excuse me, 48 and 44.  The 48-year-old is a chef,

14  and the 44-year-old does things with computers.  I'm a

15  high school graduate, no military service, no

16  experience as a witness, plaintiff, or defendant.  A

17  long time ago I was on a jury in Naples, but I really

18  don't remember the particulars about it.

19          THE COURT:  Okay.  What did your husband do,

20  Ms. Beck?

21          POTENTIAL JUROR BECK:  Pardon me?

22          THE COURT:  What did your husband do?

23          POTENTIAL JUROR BECK:  His last occupation

24  was taxi driver.

25          THE COURT:  Okay.  Thank you very much.

1          Mr. Bennett.

2          POTENTIAL JUROR BENNETT:  Hi, my name is Don

3  Bennett.  I'm from Naples, Florida.  I've been there

4  16 years, lived in Florida 16 years.  I'm a

5  homebuilder.  I am married.  My wife is in property

6  management.  I have one child, 24 years old, she's a

7  pharmacy tech at Walgreens.  I graduated high school

8  and a carpenter apprenticeship program.  No military

9  experience, did get divorced, and have not served on a

10  jury.

11          THE COURT:  All right.  Thank you,

12  Mr. Bennett.

13          Ms. Alonzi.

14          POTENTIAL JUROR ALONZI:  I'm Kim Alonzi, I

15  live in Fort Myers, I've lived there for the whole

16  20 years that I've been in Florida.  I'm a pharmacist.

17  I'm married to a teacher, we have no children, I have a

18  bachelor's degree, never served in the military.  I was

19  a plaintiff against a veterinarian, and I have never

20  served on a jury.

21          THE COURT:  All right.  Thank you very much.

22          Mr. Franklin.

23          POTENTIAL JUROR FRANKLIN:  Mark Franklin.  I

24  live in Punta Gorda.  I have lived there 23 months,

25  I've been in Florida 23 months.  Occupation was retired

1  United States Air Force and Red Cross.  Married, my

2  wife is a paralegal.  I have two children, daughter 47,

3  pharmaceutical rep, son, IT, 44.  I have a two-year

4  degree.  Yes, military.  No court, no jury.

5          THE COURT:  Does your wife work in the civil

6  or criminal field as a paralegal?

7          POTENTIAL JUROR FRANKLIN:  It would be

8  personal injury.

9          THE COURT:  Okay.  Civil.  Thank you.

10         Mr. Hunter.

11         POTENTIAL JUROR HUNTER:  Hi, my name is

12 Andrew Hunter, I live in Naples, Florida, been there

13 for five years, lived in Florida for five years.  I'm a

14 restaurant chef.  I am married, my wife is a

15 stay-at-home mother.  We have four children, ten, five,

16 and two four-year-olds, none of them have jobs.  I have

17 an associate's degree.  I have no military service.  I

18 was involved in one lawsuit that did not go to court.

19         THE COURT:  Were you the plaintiff or the

20 defendant?

21         POTENTIAL JUROR HUNTER:  I was the plaintiff.

22         THE COURT:  Okay.

23         POTENTIAL JUROR HUNTER:  And I do not have

24 any jury service.

25         THE COURT:  All right.  Thank you,

1    Mr. Hunter.

2              Mr. Boyd, could you tell us about yourself.

3              POTENTIAL JUROR BOYD:  It's my turn?

4              THE COURT:  Yes, it is your turn.

5              POTENTIAL JUROR BOYD:  My name is Ronald Boyd

6    Senior.  I live in Clewiston, Florida.  I've lived

7    there for 32 years, I've lived in the State of Florida

8    for 52 years.  I am presently employed by the U.S. Army

9    Corps of Engineers as a lock and dam operator leader,

10   and I'm the one that releases the murky water from Lake

11   Okeechobee.  I am married, been married for 42 years to

12   the same woman.  My wife she's retired, she worked for

13   the State of Florida, human resources.  We have four

14   children, the oldest one is a son, he's 40, he's a

15   floorcovering salesperson.  Our 39-year-old, she's a

16   schoolteacher in Orlando.  I have a 37-year-old son

17   he's a FedEx driver.  I have a 32-year old, the baby,

18   she's a part-time salesperson.  I have the equivalent

19   of two years of college.  I served in the U.S. Army, an

20   honorable discharge.  Previous experience in court was

21   a character witness back in 1979.  I served on jury

22   duty in West Palm Beach federal in the early '80s, and

23   I served on jury duty in Hendry County in the mid '90s,

24   and that's it.

25             THE COURT:  All right.  And were those

1    criminal or civil cases?

2          POTENTIAL JUROR HUNTER BOYD:  One was civil

3    and one was criminal.

4          THE COURT:  Okay.  So you'll be able to

5    follow the Court's instructions on the law in regard to

6    this case and the burden of proof and the like?

7          POTENTIAL JUROR BOYD:  Yes, ma'am.

8          THE COURT:  Okay.  Thank you very much,

9    Mr. Boyd.

10          In order for you to know the court personnel

11    with whom you'll be dealing with, the courtroom deputy

12    is Leslie Freedman, and as long as she doesn't give

13    birth she'll be here for the rest of the trial.  She is

14    the Court's administrator in the courtroom.  The court

15    reporter is Lori Bundy, and she transcribes, takes down

16    everything that is said in the courtroom, including the

17    statements I'm making now, those that you've made, any

18    questions, answers that come up during the course of

19    the case.  The court security officer right now is

20    Jake, but you'll be seeing a number of court security

21    officers come in and out.  They enforce the Court's

22    orders, they're in charge of the jury while away from

23    the courtroom.  At any time if there's anything that

24    you need, any questions you need answered, go ahead and

25    ask those questions of the Court security officer.  If

1    there's anything that you need to get information to

2    me, please tell the court security officer, and then he

3    will immediately give me whatever information I need in

4    regard to that.

5            This is a criminal case.  It's the United

6    States of America versus Norris Williams.  It's Case

7    Number 15-cr-149.  At this time I'm going to have the

8    attorneys identify themselves to you.

9            MR. SCHMITZ:  Thank you, Your Honor, my name

10   is Charles Schmitz, I represent the United States.  I'm

11   Assistant United States Attorney in the U.S. Attorney's

12   Office.

13           MR. LAZARUS:  Good morning, Your Honor, good

14   morning, ladies and gentlemen, my name is David

15   Lazarus, I'm also an Assistant United States Attorney

16   in the United States Attorney's Office, and I'm

17   representing the United States.

18           THE COURT:  If you would go ahead and

19   introduce your case agent.

20           MR. SCHMITZ:  Thank you, Your Honor, this is

21   agent Mark Strang for the Drug Enforcement

22   Administration.

23           THE COURT:  All right.  Thank you very much.

24   Mr. Joffe.

25           MR. JOFFE:  Thank you, Your Honor.

1          Ladies and gentlemen, good morning, my name

2    is David Joffe, and I represent Mr. Norris Williams who

3    is seated to my right.  Thank you.

4          THE COURT:  All right.  Thank you.  Are any

5    of you related by blood or marriage to any of the

6    attorneys?

7          ALL JURORS:  No.

8          THE COURT:  Do any of you know the Court?

9    No.  All right.

10         I will now read to you the pertinent portions

11   of the indictment, which sets forth the charges against

12   the defendant.  The indictment is not to be considered

13   as evidence; it's a mere formal accusation against the

14   defendant.  You must not consider it as evidence of the

15   defendant's guilt, and you must not be influenced by

16   the fact that the indictment has been filed against the

17   defendant.  The indictment reads as follows:  The grand

18   jury charges in Count 1 that on or about November 18th

19   of 2014 in Lee County in the Middle District of

20   Florida, the defendant herein, Norris Williams, did

21   knowingly possess with intent to distribute and

22   distribute a quantity of a mixture or substance

23   containing a detectable amount of heroin, a Schedule I

24   controlled substance in violation of Title 21 United

25   States Code sections 841(a)(1) and 841(b)(1)(c).

1          Count 2, on or about December 17th of 2014 in
2    Lee County in the Middle District of Florida, the
3    defendant herein, Norris Williams, did knowingly
4    possess with intent to distribute and distribute a
5    quantity of a mixture or substance containing a
6    detectable amount of heroin, a Schedule I controlled
7    substance, in violation of Title 21 United States Code
8    Section 841(a)(1) and 841(b)(1)(c).
9          Count 3, on or about February 11, 2015, in
10   Lee County, in the Middle District of Florida, the
11   defendant herein, Norris Williams, did knowingly
12   possess with intent to distribute and distribute a
13   quantity of a mixture or substance containing a
14   deductible amount of heroin, a scheduled one controlled
15   substance in violation of Title 21, United States Code,
16   Section 841(a)(1) and 841(b)(1)(c).
17         Count 4, on or about October 20th, 2015, in
18   Lee County, in the Middle District of Florida, the
19   defendant herein, Norris Williams, did knowingly
20   attempt to possess with intent to distribute a kilogram
21   or more of a quantity of a mixture or substance
22   containing a detectable amount of heroin, a Schedule I
23   control substance, in violation of Title 21 United
24   States Code sections 841(a)(1), 841 (b)(1)(a)(1), and
25   846.

1          The defendant denies the allegations and has

2     entered a plea of not guilty to each of the counts

3     contained within the indictment.

4          Do any of you know anything about this case,

5     either through your own personal knowledge or by

6     discussions with anyone else or reading or hearing

7     about this case in the news media?

8          ALL JURORS:  No.

9          THE COURT:  All right.  Thank you.  Is there

10    anything about the nature of this case which would in

11    any way prevent you from acting fairly or impartially?

12    Obviously this is a case involving drugs, specifically

13    heroin.  Is there anything about the nature of the case

14    that would concern you, prevent you from acting fairly

15    or impartially?

16         Mr. Durfee.

17         POTENTIAL JUROR DURFEE:  Yes, ma'am.

18         THE COURT:  Go ahead.  Tell me, if you can --

19         POTENTIAL JUROR DURFEE:  Well, my son has had

20    problems with drugs, so I'd just assume not.

21         THE COURT:  Would the fact that your son has

22    had problems with drugs, you believe that would enter

23    into your ability to be --

24         POTENTIAL JUROR DURFEE:  Yep.

25         THE COURT:  -- fair or impartial in this

1  case?

2          POTENTIAL JUROR DURFEE:  Yes, ma'am.

3          THE COURT:  Would that affect your ability to

4  listen to the evidence as it came forward and follow

5  the Court's instructions on the law?

6          POTENTIAL JUROR DURFEE:  I believe so.

7          THE COURT:  Okay.  Thank you very much,

8  Mr. Durfee.

9          Anyone else?  I will now read to you the

10  names of possible witnesses who may testify in this

11  case.  If you know or think you know any of these

12  individuals in any capacity, if you would just raise

13  your hand after I've read the name.  Samuel Gonzalez

14  from the Lee County Sheriff's Office, Carlos Diaz, who

15  is a senior forensic chemist, Deepa Vanmali, Alexandra

16  Gongora, Victor Chica from the DEA, Mark Strang, Teresa

17  Browning, Steve Duquette, Courtney Allen, Adam

18  Heinlein, and Candice Petaccio, anyone recognize any of

19  the names I just read?

20          Do any of you know any of the other jurors on

21  the panel?

22          Have you or members of your family ever

23  worked for the United States government?  Okay.

24  Mr. Boyd, you do; correct?

25          POTENTIAL JUROR BOYD:  Yes, ma'am.

1          THE COURT:  Would the fact that you work for

2   the government in any way enter into your ability to be

3   fair or impartial in this case?

4          POTENTIAL JUROR BOYD:  No.

5          THE COURT:  Okay.  Mr. Franklin, did you have

6   your hand raised, too?

7          POTENTIAL JUROR FRANKLIN:  United States Air

8   Force.

9          THE COURT:  Okay.  Would that in any way

10  affect your ability to be fair or impartial in this

11  case?

12         POTENTIAL JUROR FRANKLIN:  No.

13         THE COURT:  All right.  Anyone else?  All

14  right.  Mr. Davis.

15         POTENTIAL JUROR DAVIS:  U.S. Navy.

16         THE COURT:  And the same question to you,

17  would that in any way affect your ability to be fair or

18  impartial in this case?

19         POTENTIAL JUROR DAVIS:  Your Honor, it's

20  possible.  We did do counter drug ops when I was in the

21  Navy.

22         THE COURT:  As part of your duties?

23         POTENTIAL JUROR DAVIS:  Yes, ma'am.

24         THE COURT:  Would you be able to listen to

25  the facts and evidence as they came -- as they came

1  forward in this case and just judge this case based

2  upon the evidence that came forward?

3          POTENTIAL JUROR DAVIS:  Probably not.

4          THE COURT:  You think that your experience

5  would enter into your ability to be fair or impartial

6  in this case?

7          POTENTIAL JUROR DAVIS:  When you're staring

8  down the business end of a rifle, I believe so.

9          THE COURT:  All right.  Thank you.

10          Anyone else?  Yes.

11          POTENTIAL JUROR DEMELLO:  I know one of the

12  other jurors.

13          THE COURT:  Okay.  They aren't up here yet --

14          POTENTIAL JUROR DEMELLO:  No.

15          THE COURT:  -- but you recognize someone?

16          POTENTIAL JUROR DEMELLO:  Yes.

17          THE COURT:  Who would that be?

18          POTENTIAL JUROR DEMELLO:  Isabella, she's got

19  her hand raised.  I used to work with her.

20          THE COURT:  All right.  Well, I'm sure if

21  Isabella makes her way up here, then we'll ask that

22  same question a little later.  Thank you.

23          Anyone have any previous litigation with or

24  against the United States government?  Any present

25  litigation pending, anticipated litigation?  All right.

1              Anyone here who has a close friend or family

2    member who works in the U.S. Attorney's Office or the

3    State Attorney's Office?

4              ALL JURORS:  No.

5              THE COURT:  Ms. Demello, I know that you work

6    for the clerk's office, so I'm sure you have some

7    familiarity with some of the prosecutors, as well as

8    defense attorneys in cases; is that right?

9              POTENTIAL JUROR DEMELLO:  Right.

10             THE COURT:  Would that in any way affect your

11   ability to be fair or impartial here?

12             POTENTIAL JUROR DEMELLO:  No.

13             THE COURT:  Anyone have any matters pending

14   before the United States Attorney's Office in this

15   district or anywhere else?  Anyone studied the law?

16             ALL JURORS:  No.

17             THE COURT:  Ms. Demello, I know you indicated

18   that your husband works for the sheriff's department.

19   Do you believe that the fact that your husband works

20   for the sheriff's department, that would enter into

21   your ability to be fair or impartial in this case?

22             POTENTIAL JUROR DEMELLO:  No.

23             THE COURT:  If a law enforcement officer

24   testified in this case, as it's expected that there

25   will be officers testifying, would you be able to judge

1   that officer's credibility like you would any other

2   witness?

3            POTENTIAL JUROR DEMELLO:  Right, I would.

4            THE COURT:  Okay.  You would not give them

5   any special treatment because they were a law

6   enforcement officer.

7            POTENTIAL JUROR DEMELLO:  No.

8            THE COURT:  Okay.  Let me ask the rest of you

9   then, have any family members or close friends that are

10  in law enforcement?  All right.  Ms. Alonzi.

11           POTENTIAL JUROR ALONZI:  My brother is a

12  police officer.

13           THE COURT:  Your brother?  And would that

14  affect your ability to be a fair or impartial juror in

15  this case?

16           POTENTIAL JUROR ALONZI:  No.

17           THE COURT:  Do you believe that you would be

18  able to listen to the testimony of law enforcement

19  officers if they testified and judge their credibility

20  like you would any other witness?

21           POTENTIAL JUROR ALONZI:  Yes, but I also do

22  work with the DEA.

23           THE COURT:  Okay.  That's through your job as

24  a pharmacist?

25           POTENTIAL JUROR ALONZI:  Correct.

1          THE COURT:  Did you recognize any of the

2   agents that were listed?

3          POTENTIAL JUROR ALONZI:  No.

4          THE COURT:  And would the fact that you have

5   worked with the DEA because of being a pharmacist,

6   would that affect your ability to be fair or impartial

7   in this case?

8          POTENTIAL JUROR ALONZI:  It could.

9          THE COURT:  Can you tell me why you think

10  that's the case?  Can you explain that a little bit

11  more?

12          POTENTIAL JUROR ALONZI:  Well, we work with

13  people that are abusing drugs and selling drugs and

14  doctors that are misprescribing and trying to

15  prosecute.

16          THE COURT:  Okay.  All right.  Have you ever

17  had to testify in any of those cases?

18          POTENTIAL JUROR ALONZI:  I have not had to

19  testify in court.

20          THE COURT:  Were you listed as a witness?

21          POTENTIAL JUROR ALONZI:  No, I don't think it

22  went to trial.

23          THE COURT:  Okay.  Thank you very much.

24  Anyone else, close family members -- close friends,

25  family members?

1          POTENTIAL JUROR MITCHELL:  How close of a

2     family members, like a niece?

3          THE COURT:  That's fine.  The whole point is

4     if, in fact, you would be able to listen to the

5     evidence as it came forward here.  If your niece is a

6     law enforcement officer, we can note that.

7          POTENTIAL JUROR MITCHELL:  She's Homeland

8     Security.

9          THE COURT:  Okay.  Would the fact that she

10    works for Homeland Security in any way affect your

11    ability to be fair in this case?

12         POTENTIAL JUROR MITCHELL:  No, ma'am.

13         THE COURT:  Okay.  Thank you.  Anyone have

14    any particularly strong feelings for or against law

15    enforcement officers?  Mr. Davis.

16         POTENTIAL JUROR DAVIS:  I have strong

17    feelings for law enforcement.

18         THE COURT:  All right.  And you've kind of

19    indicated to us your situation with work.  Are you

20    saying that you would not be able to listen to a law

21    enforcement officer's testimony then without giving an

22    officer more credibility than any other witness?  I

23    don't want to put words in your mouth.  What do you

24    mean by that?

25         POTENTIAL JUROR DAVIS:  I mean, it's

1    possible.  I moonlight with a lot of off-duty officers.

2              THE COURT:  Okay.  Thank you very much.

3              Have any of you, family members, or close

4    friends ever been investigated by any federal, state,

5    or local law enforcement agency?

6              ALL JURORS:  No.

7              THE COURT:  Anyone here who's had a family

8    member or a relative, close friend that's been

9    arrested, charged or convicted of a felony?

10   Mr. Durfee, was that with your son?

11             POTENTIAL JUROR DURFEE:  Yes, ma'am.

12             THE COURT:  Okay.  Thank you.  And Mr. Davis.

13             POTENTIAL JUROR DAVIS:  I've had two uncles

14   arrested on drug and alcohol charges, felony charges.

15   I'm not close to them at all, but I did completely

16   forget, my cousin is FDLE.

17             THE COURT:  Okay.  Thank you, Mr. Davis.

18             Anyone here who has not told us but have you

19   ever been a victim of a crime?  Ms. Squatrito, you have

20   been a victim before?

21             POTENTIAL JUROR SQUATRITO:  I have,

22   carjacking, yes.

23             THE COURT:  Would that situation enter into

24   your ability to be fair or impartial in this case?

25             POTENTIAL JUROR SQUATRITO:  I don't believe

1    so.

2          THE COURT:  Okay.  You would be able to put

3    that situation aside, listen to the facts and evidence

4    as they came forward here, and then just judge this

5    case based on the facts and evidence that are presented

6    in court and the law that I instruct you on?

7          POTENTIAL JUROR SQUATRITO:  I believe so,

8    yes.

9          THE COURT:  Okay.  Thank you.  Anyone else in

10   the first row?  Second row, anyone else been a victim

11   of a crime?

12         Ms. Demello, you had something else that you

13   wanted to.

14         POTENTIAL JUROR DEMELLO:  Yeah, I wanted to

15   mention to you, I don't know if it has anything to do

16   with this, but the sheriff's department and everything,

17   I'm right in the middle of an investigation because

18   I -- I don't know if you've read in the paper, the

19   other day --

20         THE COURT:  Is this something you want to

21   approach the bench and tell me about?

22         POTENTIAL JUROR DEMELLO:  Yeah, I better.

23         THE COURT:  Okay.  Counsel, if you would

24   approach.

25         (Bench conference was held within the

1    presence of the jury.)

2            POTENTIAL JUROR DEMELLO:  I'm in the middle

3    of an investigation because the other day I was opening

4    mail at the justice center and I opened it and it

5    contained substance, so they're --

6            THE COURT:  So you're working with the

7    sheriff's department, between that --

8            POTENTIAL JUROR DEMELLO:  I don't know if you

9    need to know that, with the postal service, everything,

10   fire department.

11           THE COURT:  Okay.

12           POTENTIAL JUROR DEMELLO:  Yeah, because I was

13   exposed, but everything was fine.

14           THE COURT:  Okay.

15           POTENTIAL JUROR DEMELLO:  But it's in the

16   middle of a big investigation for that.

17           THE COURT:  Would you be able to put that

18   situation aside and just base your verdict here on the

19   evidence and facts that came forward here?

20           POTENTIAL JUROR DEMELLO:  Oh, yeah.

21           THE COURT:  Okay.  It's just something you

22   wanted to let us know.

23           POTENTIAL JUROR DEMELLO:  I just wanted to

24   let you know about it.

25           THE COURT:  Counsel, do you have any further

1    questions for her?

2           MR. JOFFE:  I don't, Your Honor.  Thank you.

3           THE COURT:  Thank you.

4           (Bench conference concluded and proceedings

5    continued as follows:)

6           THE COURT:  Is there anything -- let me ask,

7    anyone been a witness to a crime who has not told us

8    that before?

9           Does anyone have any personal beliefs,

10   religious beliefs, or other mental reservations such

11   that you could not in good faith and in good conscience

12   sit as a juror in this criminal case and return a

13   verdict of guilty if you believed from all the evidence

14   that the government proved its case beyond a reasonable

15   doubt?  All right.

16          Anyone here who feels that for any moral or

17   religious reasons that they would not be able to sit in

18   judgment of another?

19          This is Tony.  Tony is now our new court

20   security officer.  See, I told you they would switch

21   out.

22          Will all of you follow the Court's

23   instructions when I tell you that in reaching your

24   verdict in this case that you must not be influenced in

25   any way by either sympathy or prejudice for or against

1    the government or the defendant?

2              Is there anyone here who believes that heroin

3    or any other controlled substance like heroin should be

4    legalized in this country under the laws of this

5    country?  Go ahead, Mr. Franklin.

6              POTENTIAL JUROR FRANKLIN:  My sister is an RN

7    in the emergency room.  She advocates heroin for

8    terminally ill patients, and I agree with her strongly.

9              THE COURT:  And given the fact that you may

10   have that belief, would you still be able to listen to

11   the evidence in this case and follow my instructions on

12   the law?

13             POTENTIAL JUROR FRANKLIN:  I believe so.

14             THE COURT:  Okay.  All of the evidence that

15   you may consider in this case will come from this

16   courtroom.  One of the things that means is that during

17   the course of the trial you cannot discuss this case

18   amongst yourselves until the very end, but you also

19   cannot discuss this case outside of court.  So you

20   can't conduct any independent research about the case,

21   the matters in the case, the individuals, the

22   individuals involved.  In other words, you should not

23   consult with dictionaries, reference materials, search

24   the Internet, websites, blogs, or other -- using any

25   other electronic means.

1          Many of you have smartphones that you use on

2    a regular basis or tablets, electronic devices which

3    you use to communicate every day.  You're not going to

4    be allowed to talk to anyone about this case or use

5    these tools to communicate electronically with anyone

6    about the case.  This includes your family and friends.

7    You may not communicate with anyone about the case on

8    your cell phone, through e-mails, texts, text messages,

9    Twitter, blogging, chat rooms.  You can't communicate

10   with anyone through social media networking, websites,

11   including Facebook, Myspace, LinkedIn, or YouTube.  If

12   you do, this case would have to be retried.  So the

13   reason I'm telling you about this is that it is a

14   serious violation to discuss this case with anyone

15   else.

16          Will all of you be able to follow the Court's

17   instructions on the law and that instruction

18   specifically?  All right.  Thank you.

19          Do any of you have any physical impairments,

20   anything that we need to know so that we can

21   accommodate you during the course of this service?

22   Mr. Davis.

23          POTENTIAL JUROR DAVIS:  I'm deaf in my left

24   ear.

25          THE COURT:  Have you been able to hear my

1    questions -- you've answered a lot of questions, so I

2    assume you've been able to hear the Court.

3              POTENTIAL JUROR DAVIS:  Yes, ma'am.

4              THE COURT:  And if everyone uses the

5    microphone, you're able to hear that.

6              POTENTIAL JUROR DAVIS:  Yes, ma'am.

7              THE COURT:  Okay.  Thank you.

8              You as jurors will be required to calmly,

9    fairly, and dispassionately consider all of the

10   evidence of this case and from the evidence and from

11   the law which the Court will give you arrive at your

12   verdict.  You should not be swayed in the performance

13   of your duty by prejudice, sympathy, or any other

14   sentiment.  With that instruction as background, if

15   you're selected as a juror in this case, can and will

16   each of you render a fair or impartial verdict based on

17   the evidence presented in this courtroom?

18             ALL JURORS:  Yes.

19             THE COURT:  Given the anticipated length of

20   trial, which is, as I told you, two to three days, is

21   there any good reason why you could not serve as a

22   juror in this case?  Mr. Bennett.

23             POTENTIAL JUROR BENNETT:  Yes.  I am the care

24   giver for my four-year-old granddaughter.  Her mother

25   is single and they all live with us, and my schedule

1   allows me to actually baby sit her while her mother

2   goes to work and works evenings.  So it would be kind

3   of hard for her to find someone to watch my

4   granddaughter.

5          THE COURT:  All right.  So you do not believe

6   there would be able to be accommodations made for the

7   two to three days?  She stays with you?

8          POTENTIAL JUROR BENNETT:  I mean, maybe if I

9   had time to find somebody for her.

10          THE COURT:  Okay.  But she stays with you

11   during the day?

12          POTENTIAL JUROR BENNETT:  Yes, I work in the

13   office and she works in the office.

14          THE COURT:  Okay.  Thank you very much.

15   Anyone else?  Yes, Mr. Davis.

16          POTENTIAL JUROR DAVIS:  I think I'd hope to

17   get out of this, but I have a root canal in the

18   morning, tomorrow morning.

19          THE COURT:  All right.  Thank you very much.

20          Yes, Mr. Durfee, I'm sorry.

21          POTENTIAL JUROR DURFEE:  I have an eye

22   appointment Friday.

23          THE COURT:  Is that something you would be

24   able to reschedule, if you had to?

25          POTENTIAL JUROR DURFEE:  It's a long waiting

1   period.  It's at the VA.

2           THE COURT:  All right.  Thank you very much.

3   Anyone else?  Will each of you follow the law in

4   accordance with the Court's instructions?  All right.

5   Then at this time I'm going to allow brief follow-up

6   questions.  Mr. Schmitz, are you going to inquire, or

7   Mr. Lazarus?

8           MR. SCHMITZ:  Yes, Your Honor.

9           THE COURT:  You may do so then.  Thank you.

10          MR. SCHMITZ:  Thank you.  May it please the

11  Court.  Thank you, Your Honor.

12          Just briefly, juror number one, Mr. Akrami.

13  I ruined your name.  What's your name?

14          POTENTIAL JUROR AKRAMI:  Akrami.

15          THE COURT:  You can't read your own notes; is

16  that it?

17          MR. SCHMITZ:  That's right.

18          Mr. Akrami, where are you a radiologist?

19          POTENTIAL JUROR AKRAMI:  I work from home,

20  but I work for a large company that covers across the

21  entire country.

22          MR. SCHMITZ:  Okay.  Ms. Squatrito, you

23  mentioned that you were a victim of a carjacking.  Is

24  there anything about that that would cause you to be

25  unfair to the defendant in this case?

1            POTENTIAL JUROR SQUATRITO:  I don't believe

2   so.

3            MR. SCHMITZ:  Is there anything that would

4   cause you to be unfair to the United States in this

5   case?

6            POTENTIAL JUROR SQUATRITO:  No.

7            MR. SCHMITZ:  Okay.  Ms. Kelly, so you

8   mentioned that you're a church administrator.  Is there

9   anything about your beliefs that would prevent you from

10  being a juror in this case?

11           POTENTIAL JUROR KELLY:  No, sir.

12           MR. SCHMITZ:  Ms. Demello, you said you were

13  involved in a lawsuit before.

14           POTENTIAL JUROR DEMELLO:  Right.

15           MR. SCHMITZ:  What type of lawsuit was that?

16           POTENTIAL JUROR DEMELLO:  A slip and fall.

17           MR. SCHMITZ:  And is there anything about

18  that case that would cause you to be unfair to the

19  United States in this case?

20           POTENTIAL JUROR DEMELLO:  No.

21           MR. SCHMITZ:  Anything that would cause you

22  to be unfair to the defendant in this case?

23           POTENTIAL JUROR DEMELLO:  No.

24           MR. SCHMITZ:  Ms. Alonzi, you mentioned that

25  you did some work for the DEA.  Is there anything about

1    that that would cause you to be unfair or impartial in

2    this case to the defendant?

3              POTENTIAL JUROR ALONZI:  I mean, I think it's

4    just the basis of my occupation.

5              MR. SCHMITZ:  Now, if the judge instructs you

6    on the law at the end of the case, would you be able to

7    follow that law as the judge instructed you?

8              POTENTIAL JUROR ALONZI:  Yes.

9              MR. SCHMITZ:  If she told you you had to be

10   fair and impartial to both the United States and the

11   defendant, would you be able to follow that

12   instruction?

13             POTENTIAL JUROR ALONZI:  I hope so.

14             MR. SCHMITZ:  Mr. Boyd.

15             POTENTIAL JUROR BOYD:  Yes, sir.

16             MR. SCHMITZ:  You mentioned that you were a

17   character witness in a case.  Was there anything about

18   that experience that would cause you to be unfair to

19   the United States in this case?

20             POTENTIAL JUROR BOYD:  No, sir.

21             MR. SCHMITZ:  Anything that would cause you

22   to be unfair to the defendant in this case?

23             POTENTIAL JUROR BOYD:  No, sir.

24             MR. SCHMITZ:  Okay.  Would you be able to

25   follow the law as instructed by the judge in this case?

 1               POTENTIAL JUROR BOYD:  Yes, sir.

 2               MR. SCHMITZ:  Okay.  Ms. Mitchell, you said

 3       you served on a jury before.

 4               POTENTIAL JUROR MITCHELL:  Yes, sir.

 5               MR. SCHMITZ:  Did you return a verdict?

 6               POTENTIAL JUROR MITCHELL:  Yes, sir.

 7               MR. SCHMITZ:  Mr. Everling, you said you were

 8       involved in a reckless driving suit before.  Is there

 9       anything about that experience that would cause you to

10       be unfair to the United States?

11               POTENTIAL JUROR EVERLING:  No.

12               MR. SCHMITZ:  Is there anything that would

13       cause you to be unfair to the defendant?

14               POTENTIAL JUROR EVERLING:  No.

15               MR. SCHMITZ:  Okay.  Were you treated fairly

16       during that case?

17               POTENTIAL JUROR EVERLING:  Yes.

18               MR. SCHMITZ:  And I assume this isn't true,

19       but it wasn't our office that was prosecuting that

20       case, the U.S. Attorney's Office, was it?

21               POTENTIAL JUROR EVERLING:  No.

22               MR. SCHMITZ:  Okay.

23                POTENTIAL JUROR EVERLING:  I don't think

24       federal does that kind of stuff.

25               MR. SCHMITZ:  Not typical.

1              Mr. Hunter, you mentioned you were a

2     plaintiff in a case.  Is there anything about that

3     experience that would cause you to be unfair to the

4     United States in that case?

5              POTENTIAL JUROR HUNTER:  No.

6              MR. SCHMITZ:  Anything that would cause you

7     to be unfair to the defendant?

8              POTENTIAL JUROR HUNTER:  No.

9              MR. SCHMITZ:  What type of case was that?

10             POTENTIAL JUROR HUNTER:  It was a rental

11    dispute.

12             MR. SCHMITZ:  Would you be able to -- the

13    standard in a civil case is different than the standard

14    in a criminal case.  The government is held to a higher

15    burden of proof.  Would you be able to follow that in

16    this case?

17             POTENTIAL JUROR HUNTER:  Yes.

18             MR. SCHMITZ:  Okay.  And Mr. Shade, did I get

19    that right, juror number 11.

20             POTENTIAL JUROR SHADE:  It's Debbie.

21             MR. SCHMITZ:  Excuse me.  I didn't write it

22    down fully.  Ms. Shade.  I apologize.  You mentioned

23    that you were involved in a civil case as well?

24             POTENTIAL JUROR SHADE:  Yes.

25             MR. SCHMITZ:  What type of civil case was

1   that?

2           POTENTIAL JUROR SHADE:  Medical.

3           MR. SCHMITZ:  The standard in a civil case is

4   different than a criminal case.  The government has to

5   prove in this case, and you'll hear, we're going to

6   have to prove beyond a reasonable doubt what was

7   charged in the indictment.  Would you be able to follow

8   that instruction?

9           POTENTIAL JUROR SHADE:  Yes.

10          MR. SCHMITZ:  Okay.  Mr. Franklin, you said

11  you were in the U.S. Air Force.  What job did you have

12  in the U.S. Air Force?

13          POTENTIAL JUROR FRANKLIN:  Aircraft

14  maintenance.

15          MR. SCHMITZ:  And, Mr. Boyd, I don't know if

16  you mentioned this, but what job did you have when you

17  were in the U.S. Army.

18          POTENTIAL JUROR BOYD:  Military policeman,

19  supply clerk.

20          MR. SCHMITZ:  Is there anything about that

21  experience that would cause you to be unfair to the

22  defendant in this case?

23          POTENTIAL JUROR BOYD:  No.

24          MR. SCHMITZ:  Anything that would cause you

25  to be unfair to the United States?

1              POTENTIAL JUROR BOYD:  No, sir.

2              MR. SCHMITZ:  Those are all the questions I

3    have, Your Honor.  Thank you.

4              THE COURT:  Mr. Joffe, brief follow-up

5    questions?

6              MR. JOFFE:  Yes, Your Honor.  Thank you.

7              Ladies and gentlemen, good morning.

8              ALL JURORS:  Good morning.

9              MR. JOFFE:  Everyone happy to be here this

10   morning?  How many of you have positive feelings or

11   feelings towards lawyers in general?  Okay.  There we

12   go.  Just so everyone is aware, this is a criminal

13   case, and I represent Mr. Norris Williams, and

14   Mr. Williams is presumed innocent.  And the presumption

15   of innocence, if you're chosen to serve as a juror on

16   this case, goes with Mr. Williams throughout the entire

17   trial.  If you're asked to sit as a juror in this case,

18   you'll be asked not to deliberate until all the

19   evidence has been presented during the course of the

20   trial.

21             Does anyone, as you sit here today, and I'm

22   going to ask you in general some questions, have an

23   issue with the presumption of innocence, being presumed

24   innocent, which is really at the heart of a criminal

25   case in this judicial process.  Does anyone have an

1    issue with that?  Okay.

2           Now, Mr. Williams is charged by what's called

3    an indictment.  The government has gone to a grand

4    jury, they get an indictment.  Okay?  It's a charging

5    document.  The government is saying, Mr. Williams,

6    we're accusing you of doing -- committing a crime.

7    Does anyone, as you sit here today, think or feel that

8    just because Mr. Williams has been charged that he's

9    done something wrong?

10          MR. SCHMITZ:  Your Honor, may we approach?

11          THE COURT:  Not at this time.

12          MR. SCHMITZ:  Okay.

13          THE COURT:  Mr. Joffe, go ahead and ask some

14   brief follow-up questions to the Court's questions.

15          MR. JOFFE:  Certainly.  Let me ask -- well,

16   Mr. Boyd, why don't we hand you the microphone.

17          POTENTIAL JUROR BOYD:  Pardon me?

18          MR. JOFFE:  Why don't we hand you the

19   microphone so we can hear you.  How are you?

20          POTENTIAL JUROR BOYD:  Fine and you?

21          MR. JOFFE:  Good.  You said you're the guy

22   that releases the water; is that correct?

23          POTENTIAL JUROR BOYD:  Yes, sir.

24          MR. JOFFE:  Well, thank you very much.  We

25   appreciate that.  You deal with volumes of water; is

1    that correct?

2            POTENTIAL JUROR BOYD:  True.

3            MR. JOFFE:  Do you have to measure the amount

4    of water that you're releasing at any given time?

5            POTENTIAL JUROR BOYD:  Yes.

6            MR. JOFFE:  And how do you make that

7    measurement?

8            POTENTIAL JUROR BOYD:  Well, we have chart

9    conversions.  You have three factors, you take a head

10   reading, a tail reading, and the opening of a

11   structure, how much it's open and how long it stays

12   open.  And then at the end of the 24 hours it's

13   computerized measurements.

14           MR. JOFFE:  And do you try to be as precise

15   as you possibly can with the amount?

16           POTENTIAL JUROR BOYD:  Definitely.

17           MR. JOFFE:  Why is that.

18           POTENTIAL JUROR BOYD:  It's my job.

19           MR. JOFFE:  Okay.  And do you keep written

20   notes of the amounts?

21           POTENTIAL JUROR BOYD:  We do, yes.

22           MR. JOFFE:  Are there computers that keep

23   notes as well?

24           POTENTIAL JUROR BOYD:  All of it is logged

25   into a system that's called performance monitoring

1  system, and it has a paper trail as well.

2          MR. JOFFE:  So if someone were to go back to

3  you six months ago and say how much water did you

4  release on a certain date six months ago, you would be

5  able to retrieve that information?

6          POTENTIAL JUROR BOYD:  Yes.

7          MR. JOFFE:  Okay.  You said you had prior

8  jury service in Palm Beach and Hendry County; is that

9  correct?

10          POTENTIAL JUROR BOYD:  Yes, sir.

11          MR. JOFFE:  Was any of that jury service

12  criminal, if you remember?

13          POTENTIAL JUROR BOYD:  We might have to break

14  down the terminology.  The case in West Palm Beach was

15  a government case.

16          MR. JOFFE:  Meaning the federal government.

17          POTENTIAL JUROR BOYD:  Federal government.

18          MR. JOFFE:  Were they charging a person or

19  persons?

20          POTENTIAL JUROR BOYD:  They were charging a

21  person.

22          MR. JOFFE:  With committing a federal

23  violation?

24          POTENTIAL JUROR BOYD:  Yes, sir.

25          MR. JOFFE:  Okay.  Was that at the U.S.

1    district court in downtown West Palm Beach?

2            POTENTIAL JUROR BOYD:  Yes.

3            MR. JOFFE:  And the case -- so that was a

4    federal matter.

5            POTENTIAL JUROR BOYD:  Yes, that was federal.

6            MR. JOFFE:  And the case in Hendry County,

7    was that a state case?

8            POTENTIAL JUROR BOYD:  County, state, yes.

9            MR. JOFFE:  Was that civil or criminal?

10           POTENTIAL JUROR BOYD:  I guess you would say

11   criminal.

12           MR. JOFFE:  And do you recall if you were the

13   foreperson on any of those cases?

14           POTENTIAL JUROR BOYD:  On both occasions.

15           MR. JOFFE:  You were the foreperson?

16           POTENTIAL JUROR BOYD:  Yes.

17           MR. JOFFE:  Congratulations.  Thank you, sir,

18   for answering the questions.  I appreciate it.

19           Dr. Stevens, good morning, sir, how are you?

20           POTENTIAL JUROR STEVENS:  Well.  And you?

21           MR. JOFFE:  Good.  Do you still actively

22   practice dentistry?

23           POTENTIAL JUROR STEVENS:  It depends on my

24   daughter's definition.

25           MR. JOFFE:  You practice on the kids and

1    grandkids?

2          POTENTIAL JUROR STEVENS:  No, I see patients

3    a little bit.

4          MR. JOFFE:  Okay.  And during the normal

5    course of your activities as a licensed dentist, do you

6    prescribe medication?

7          POTENTIAL JUROR STEVENS:  Yes.

8          MR. JOFFE:  And when you prescribe that

9    medication, do you prescribe certain amounts?

10         POTENTIAL JUROR STEVENS:  Yes.

11         MR. JOFFE:  And how do you keep track of what

12   you're prescribing?

13         POTENTIAL JUROR STEVENS:  I put it in the

14   chart, written in.

15         MR. JOFFE:  So if there's a question you can

16   go back?

17         POTENTIAL JUROR STEVENS:  Definitely.

18         MR. JOFFE:  Okay.  Do you ever prescribe more

19   than what's required to the patient?

20         POTENTIAL JUROR STEVENS:  No.

21         MR. JOFFE:  Why is that?

22         POTENTIAL JUROR STEVENS:  I don't want

23   anybody to become addicted, and it's not the right

24   thing to do.

25         MR. JOFFE:  Okay.  And this case involves

1  heroin, you'll hear testimony about heroin, you'll hear

2  evidence from a DEA agent.  Do you believe you can be

3  fair or impartial if you're chosen to sit on this case?

4           POTENTIAL JUROR STEVENS:  Definitely.

5           MR. JOFFE:  And the fact that you have these

6  multiple -- you're a franchise owner; correct?

7           POTENTIAL JUROR STEVENS:  Yes.

8           MR. JOFFE:  And do you have the time and the

9  ability to sit for at least three days?

10          POTENTIAL JUROR STEVENS:  Yes.

11          MR. JOFFE:  Very good.  Thank you, sir.  I

12  appreciate it.

13          MR. SCHMITZ:  Your Honor, can we approach?

14          THE COURT:  Yes.

15          (Bench conference was held within the

16  presence of the jury.)

17          MR. SCHMITZ:  Your Honor, I believe this is

18  improper questioning of the jury here.  My

19  understanding was that we are supposed to ask as brief

20  follow-up questions about the information that the

21  Court asked about.  I believe that counsel is trying to

22  get additional voir dire questions that haven't been

23  submitted to us and haven't been submitted to the

24  Court.

25          THE COURT:  I understand your objection.

1  Mr. Joffe.

2         MR. JOFFE:  There's no rule that requires me

3  to submit these questions, these questions go beyond

4  the general questions raised by the Court and in terms

5  of burden of proof, et cetera, I moved on.  I don't

6  think that's been with the jury, I'm asking specific

7  questions of specific jurors whether they can be fair

8  or impartial.

9         THE COURT:  I'm going to allow the questions,

10 but make sure it's follow-up questions.

11        MR. JOFFE:  Certainly.

12        (Bench conference concluded and proceedings

13 continued as follows:)

14        MR. JOFFE:  Dr. Stevens, thank you, sir.

15        Yes, ma'am, you're raising your hand.  Why

16 don't you wait until you get to the microphone.

17        POTENTIAL JUROR ALONZI:  Back to your

18 original question about --

19        MR. JOFFE:  Why don't you state your name for

20 the record.

21        THE WITNESS:  Kim Alonzi.  Back to your

22 original question about innocent until proven, I guess

23 in my previous experience and my faith with the DEA and

24 law enforcement, I kind of feel like if there's enough

25 there to indict someone, I would have to be swayed the

1   other way, that I would probably have prejudice.

2           MR. JOFFE:  And you said you're employed with

3   DEA?

4           POTENTIAL JUROR ALONZI:  Correct, it was

5   probably a couple years ago.

6           MR. JOFFE:  What kind of work did you do for

7   them?

8           POTENTIAL JUROR ALONZI:  As far as

9   investigating a physician for prescribing.

10          MR. JOFFE:  Were you a federal law

11  enforcement agent?

12          POTENTIAL JUROR ALONZI:  No, I'm a

13  pharmacist, and I actually initiated the investigation.

14          MR. JOFFE:  You made the complaint; correct?

15          POTENTIAL JUROR ALONZI:  Correct.

16          MR. JOFFE:  Do you still practice as a

17  pharmacist?

18          POTENTIAL JUROR ALONZI:  Yes, uh-huh.

19          MR. JOFFE:  And how involved were you with

20  DEA in that case?

21          POTENTIAL JUROR ALONZI:  You know, I mean, I

22  pulled all of my records, and I have her business card

23  and we would discuss things.  But once they got the

24  initial information from me, I wasn't really involved.

25  I was on a witness list, but I was never called to

1   trial.

2           MR. JOFFE:  Was that a state or federal case?

3           POTENTIAL JUROR ALONZI:  I believe it was

4   federal.

5           MR. JOFFE:  And was that indicted here in

6   Fort Myers?

7           POTENTIAL JUROR ALONZI:  I'm not sure.  I

8   think -- well, the doctor's license was revoked, so I

9   think that was a state thing.  I don't know.  I don't

10  know where it was done.

11          MR. JOFFE:  But the criminal case was

12  indicted in Fort Myers, do you know?

13          POTENTIAL JUROR ALONZI:  I don't know.

14          MR. JOFFE:  And what year was that?

15          POTENTIAL JUROR ALONZI:  Probably about three

16  years ago.

17          MR. JOFFE:  And you practiced as a

18  pharmacist?

19          POTENTIAL JUROR ALONZI:  Correct, for

20  30 years.

21          MR. JOFFE:  Here in Fort Myers?

22          POTENTIAL JUROR ALONZI:  Right.

23          MR. JOFFE:  And you prescribe -- you fill

24  prescriptions.

25          POTENTIAL JUROR ALONZI:  Correct, and I also

1   have to screen all of the prospective people through E

2   force and through criminal background checks to decide

3   whether we will dispense or not.

4          MR. JOFFE:  Okay.  And there's a DEA agent

5   involved in this case.  Do you recognize him?

6          POTENTIAL JUROR ALONZI:  No, I don't.

7          MR. JOFFE:  Have you ever dealt with him at

8   all?

9          POTENTIAL JUROR ALONZI:  No.

10          MR. JOFFE:  What about the folks from the

11   U.S. Attorney's Office, have you dealt with folks in

12   the U.S. Attorney's Office?

13          POTENTIAL JUROR ALONZI:  No.

14          MR. JOFFE:  Okay.  So I believe what you're

15   saying is that you could not be fair and impartial in

16   this particular case to Mr. Williams, is that fair to

17   say?

18          POTENTIAL JUROR ALONZI:  I'm saying when

19   there's enough evidence for an indictment, I'm probably

20   swayed -- I would have to be swayed the other way, that

21   he's not guilty.

22          MR. JOFFE:  So you would require the

23   defendant to prove something to prove his innocence;

24   correct?

25          POTENTIAL JUROR ALONZI:  Correct.

1          MR. JOFFE:  Okay.  Thank you, ma'am.  I

2   really appreciate your honesty.  Thank you so much.

3          Ms. Squatrito, is that correct?

4          POTENTIAL JUROR SQUATRITO:  Yes.

5          MR. JOFFE:  How are you, ma'am?  We'll hand

6   you the microphone.  Good morning, ma'am, how are you?

7          POTENTIAL JUROR SQUATRITO:  I'm good, thank

8   you.

9          MR. JOFFE:  Good.  You testified about being

10  a victim of a carjacking.

11         POTENTIAL JUROR SQUATRITO:  I was.

12         MR. JOFFE:  Was that investigated by law

13  enforcement?

14         POTENTIAL JUROR SQUATRITO:  Yes, it was.

15         MR. JOFFE:  Do you know if they were state or

16  federal law enforcement officers?

17         POTENTIAL JUROR SQUATRITO:  They were state.

18         MR. JOFFE:  Okay.  Was anyone charged in that

19  case?

20         POTENTIAL JUROR SQUATRITO:  They were

21  ultimately all caught for a subsequent crime.

22         MR. JOFFE:  And did you have to go and

23  identify any pieces of property?

24         POTENTIAL JUROR SQUATRITO:  My ex-husband

25  did, yes.

1          MR. JOFFE:  Okay.  Were you listed as a

2   witness?

3          POTENTIAL JUROR SQUATRITO:  Yes.

4          MR. JOFFE:  Was your deposition taken?

5          POTENTIAL JUROR SQUATRITO:  Yes.

6          MR. JOFFE:  Did you testify in court?

7          POTENTIAL JUROR SQUATRITO:  No, sir.

8          MR. JOFFE:  What year was that, do you

9   remember?

10          POTENTIAL JUROR SQUATRITO:  1989.

11          MR. JOFFE:  Was that here in Fort Myers?

12          POTENTIAL JUROR SQUATRITO:  Yes, it was.

13          MR. JOFFE:  Do you recognize the judge in

14   this case as involved in that case at all?

15          POTENTIAL JUROR SQUATRITO:  No.

16          MR. JOFFE:  Do you recognize anyone working

17   for the government?

18          POTENTIAL JUROR SQUATRITO:  No.

19          MR. JOFFE:  Were you satisfied with the

20   result in that case?

21          POTENTIAL JUROR SQUATRITO:  Yes.

22          MR. JOFFE:  And as you sit here today, do you

23   believe you could be fair and impartial to

24   Mr. Williams?

25          POTENTIAL JUROR SQUATRITO:  I believe so,

1    yes.

2              MR. JOFFE:  Thank you.  Appreciate it.  Thank

3    you so much.

4               Ms. Mitchell, how are you, ma'am?

5              POTENTIAL JUROR MITCHELL:  I'm fine.

6              MR. JOFFE:  You said you had a master's

7    degree in science; is that correct?

8              POTENTIAL JUROR MITCHELL:  Yes, sir.

9              MR. JOFFE:  What type of science?

10             POTENTIAL JUROR MITCHELL:  Technology, sir.

11             MR. JOFFE:  You don't have to call me, sir,

12   but I appreciate it.  Thank you.  You said you were

13   involved in the auto industry; is that correct?

14             POTENTIAL JUROR MITCHELL:  Yes, sir.

15             MR. JOFFE:  What type of involvement did you

16   have in the auto industry?

17             POTENTIAL JUROR MITCHELL:  My husband and I

18   both worked for General Motors.

19             MR. JOFFE:  For how many years?

20             POTENTIAL JUROR MITCHELL:  I was over

21   31 years, and I think he put -- he also worked with the

22   International United Auto Workers, so he was with them

23   for 25 years and he was in the auto industry for 13 to

24   15 years.

25             MR. JOFFE:  Was your husband a rep for UAW?

 1          POTENTIAL JUROR MITCHELL:  Yes, he was.

 2          MR. JOFFE:  And were you a rep as well?

 3          POTENTIAL JUROR MITCHELL:  No, I wasn't.

 4          MR. JOFFE:  And did you or your husband ever

 5  create your own separate business to sell to the auto

 6  companies or --

 7          POTENTIAL JUROR MITCHELL:  No, we didn't.

 8          MR. JOFFE:  -- you just worked for General

 9  Motors.

10          POTENTIAL JUROR MITCHELL:  We're actually

11  employees of General Motors.

12          MR. JOFFE:  Okay.  And you're now retired.

13          POTENTIAL JUROR MITCHELL:  We weren't

14  consultants, we weren't vendors.

15          MR. JOFFE:  What specifically did you do for

16  General Motors?

17          POTENTIAL JUROR MITCHELL:  I was a

18  journeyman.

19          MR. JOFFE:  Which means what?

20          POTENTIAL JUROR MITCHELL:  I repaired the

21  machines.

22          MR. JOFFE:  The machines that manufactured

23  the cars?

24          POTENTIAL JUROR MITCHELL:  The mold machines,

25  yes.

1              MR. JOFFE:  Did you deal with chemicals when

2  you were dealing with those machines?

3              POTENTIAL JUROR MITCHELL:  Yes, I did.

4              MR. JOFFE:  And you did that for how many

5  years?

6              POTENTIAL JUROR MITCHELL:  31.

7              MR. JOFFE:  Thank you, ma'am.  I appreciate

8  it.  Thank you.  Is it Dr. Akrami?

9              POTENTIAL JUROR AKRAMI:  Yes.

10             MR. JOFFE:  Why don't we hand you the

11 microphone.  Good morning.

12             POTENTIAL JUROR AKRAMI:  Good morning.

13             MR. JOFFE:  In your current job as a neuro --

14 is it radiologist?

15             POTENTIAL JUROR AKRAMI:  Yes.

16             MR. JOFFE:  So what is it that you actually

17 do?

18             POTENTIAL JUROR AKRAMI:  I do -- basically

19 send -- have exams sent to me around the country and

20 interpret them and just give a reported, a dictated

21 report.

22             MR. JOFFE:  Okay.  So they send you MRIs, CAT

23 scans, x-rays.

24             POTENTIAL JUROR AKRAMI:  Yes.

25             MR. JOFFE:  Did you ever prescribe

1  medication?

2          POTENTIAL JUROR AKRAMI:  Not anymore.

3          MR. JOFFE:  Did you do that for a period of

4  time?

5          POTENTIAL JUROR AKRAMI:  Yes, very early as a

6  resident.

7          MR. JOFFE:  Okay.  I'm sorry.  Go ahead.

8          POTENTIAL JUROR AKRAMI:  Pretty much as a

9  resident.  I don't even know as an attending if I ever

10  did.

11         MR. JOFFE:  Did you ever practice medicine in

12  a hospital?

13         POTENTIAL JUROR AKRAMI:  Yes.

14         MR. JOFFE:  For how many years?

15         POTENTIAL JUROR AKRAMI:  About six years.

16         MR. JOFFE:  As a resident.

17         POTENTIAL JUROR AKRAMI:  As an attending.

18         MR. JOFFE:  Okay.  And where was that?

19         POTENTIAL JUROR AKRAMI:  This was in the

20  Chicago area.

21         MR. JOFFE:  And you prescribed medication?

22         POTENTIAL JUROR AKRAMI:  As an attending,

23  very rarely.

24         MR. JOFFE:  Okay.  And after being an

25  attending physician, did you practice medicine?

1           POTENTIAL JUROR AKRAMI:  Yes.

2           MR. JOFFE:  Where?

3           POTENTIAL JUROR AKRAMI:  Most of that time

4    was in Illinois and then the past year and a half in

5    Florida.

6           MR. JOFFE:  Okay.  Do you still practice

7    medicine?

8           POTENTIAL JUROR AKRAMI:  Yes.

9           MR. JOFFE:  In Illinois.

10           POTENTIAL JUROR AKRAMI:  In Florida.

11           MR. JOFFE:  Just in Florida.

12           POTENTIAL JUROR AKRAMI:  Yes.

13           MR. JOFFE:  And in your current status, you

14    don't prescribe any medication?

15           POTENTIAL JUROR AKRAMI:  No.

16           MR. JOFFE:  Your Honor, I have no further

17    questions.  I appreciate it.

18           THE COURT:  All right.  Ladies and gentlemen,

19    I'm going to have the attorneys look at their notes.

20    I'm going to go ahead and give you a break, so those of

21    you who are in this bar area, you can use the

22    facilities in the jury room, those of you who are

23    outside the bar area, you'll be able to use the

24    facilities down the hall.  So stand, stretch, walk

25    around.  If the attorneys would go through their notes

1    and then we'll approach sidebar after you're done.

2              (Jury out at 10:21 a.m.)

3              MR. JOFFE:  Your Honor, can my client exit

4    the courtroom?

5              THE COURT:  Yes, ladies and gentlemen, I'll

6    have you exit the courtroom just so you can stand and

7    stretch.

8              (A break was taken.)

9              MR. SCHMITZ:  Your Honor, does the defendant

10   want to be up here for this?

11             THE COURT:  I indicated earlier he could if

12   he wanted to.

13             MR. JOFFE:  Mr. Williams, do you want to come

14   up while we do this?

15             THE COURT:  I'm going to tender the entire

16   panel to the government for any challenges for cause.

17             MR. SCHMITZ:  All right.  Going in order,

18   Your Honor, the United States challenges Mr. Durfee,

19   number 12 for cause.

20             THE COURT:  Mr. Durfee, do you have any

21   objection?

22             MR. JOFFE:  I would agree, Your Honor.

23             THE COURT:  All right.  The Court agrees with

24   the challenge for cause on Mr. Durfee, he indicated he

25   had a son who had been involved in felony drug arrest

1    and that he could not be fair based upon the facts of

2    this case.  Go ahead.

3              MR. SCHMITZ:  Your Honor, the government

4    challenges juror number 14, Christian Davis for cause.

5              MR. JOFFE:  The defense would agree.

6              THE COURT:  Based upon a number of things

7    Mr. Davis said that are clear on the record.

8              MR. JOFFE:  Correct.

9              THE COURT:  He would be a valid challenge for

10   cause.  The Court will exercise that.

11             MR. SCHMITZ:  Your Honor, the government

12   would challenge juror number 20, Donald Bennett for

13   cause.  He mentions he has child care issues.

14             MR. JOFFE:  No objection.

15             THE COURT:  All right.  It is a valid

16   challenge for cause, if he has a child the age that he

17   does, as far as he's a grandfather, takes care of his

18   four-year-old grandson, does not have any

19   accommodations, juror number 20 will be a challenge for

20   cause.

21             MR. SCHMITZ:  And the government would

22   challenge juror number 21, Kimberly Alonzi for cause.

23             MR. JOFFE:  The defense would agree, Your

24   Honor.

25             THE COURT:  Ms. Alonzi indicated that based

1  upon the defendant being indicted she would be

2  prejudiced in that regard.  The challenge for cause is

3  valid on juror number 21, Ms. Alonzi.  Any other

4  challenges for cause from the government?

5         MR. SCHMITZ:  No, Your Honor.

6         THE COURT:  I would tender the panel to the

7  defense for any challenges for cause.

8         MR. JOFFE:  Your Honor, the defense has no

9  challenges for cause for the panel.

10         THE COURT:  All right.  Then I would tender

11  the panel through juror number 13, Ms. Shadaram, to the

12  government for any peremptory challenge.

13         MR. SCHMITZ:  Your Honor, the government is

14  going to use its first peremptory challenge on juror

15  number seven, Ms. Kelly.

16         THE COURT:  The government has used its first

17  strike on juror number seven, Ms. Kelly.  I would

18  tenner the panel to the defense through juror number

19  15, Ms. Demello.

20         MR. JOFFE:  Your Honor, the defense would

21  exercise a peremptory challenge to juror number five,

22  Noelia Galvan.

23         THE COURT:  The defense is using its first

24  challenge on juror number five, Ms. Galvan.  Tender the

25  panel to the defense through juror number 16,

1    Ms. Mitchell.

2              MR. JOFFE:  To the defense, Your Honor?

3              THE COURT:  Yes.

4              MR. JOFFE:  Is it my challenge next?

5              THE COURT:  Yes, it is.

6              MR. JOFFE:  The defense would exercise a

7    peremptory as to juror number nine, Elizabeth Jeanne

8    Johnson.

9              THE COURT:  The defense has exercised its

10   second challenge on number juror nine.  I tender the

11   panel to the government through number 17, Ms. Dickens.

12             MR. SCHMITZ:  Your Honor, the government is

13   going to challenge for its second peremptory, juror

14   Mr. David Schrader, juror number ten.

15             THE COURT:  The government is exercising its

16   second challenge on juror number ten, Mr. Schrader.

17   Tender the panel to the defense through juror number

18   18, Mr. Stidom.

19             MR. JOFFE:  Your Honor, the defense would

20   challenge -- exercise peremptory challenge to number

21   13, Jeanne B. Shadaram.

22             THE COURT:  The defense is using its third

23   strike to juror number 13 Jeanne Shadaram.  I tender to

24   the defense through juror number 19, Ms. Beck.

25             MR. JOFFE:  Your Honor, the defense would

1    exercise a peremptory challenge to juror number 15,

2    Kelly Suzanne Demello.

3              THE COURT:  The defense has exercised its

4    fourth challenge on Ms. Demello, juror number 15.  I

5    would tender the panel to the government through juror

6    number 22, Mr. Franklin.

7              MR. JOFFE:  Your Honor, the government

8    exercises its third peremptory on juror number 16,

9    Cheryl Mitchell.

10             THE COURT:  The government has exercised its

11   third challenge on juror number 16, Cheryl Mitchell.  I

12   would tender the panel to the defense through juror

13   number 23, Mr. Hunter.

14             MR. JOFFE:  Your Honor, the defense would

15   exercise its peremptory challenge to juror number 22,

16   Mark Thomas Franklin.

17             THE COURT:  The defense has exercised its

18   fifth challenge on juror number 22, Mr. Franklin.  I

19   would tender the panel to the defense through Mr. Boyd,

20   juror number 24.

21             MR. JOFFE:  Is that 12 jurors, Your Honor?

22             THE COURT:  Yes, it is.

23             MR. JOFFE:  The defense would accept the

24   panel as it is currently set up.

25             THE COURT:  I would tender the panel then to

1   the government to juror number 24, Mr. Boyd.

2          MR. SCHMITZ:  Your Honor, the government is

3   going to strike with its peremptory challenge juror

4   number 19, Sandra Beck.

5          THE COURT:  The government is using its

6   fourth challenge on juror number 19, Ms. Beck.  I would

7   tender the panel then to the defense.

8          MR. JOFFE:  We accept the panel, Your Honor.

9          THE COURT:  Does the government wish to make

10  any other challenges?

11         MR. SCHMITZ:  The government accepts the

12  panel, Your Honor.

13         THE COURT:  All right.  So what we're going

14  to do is move everyone around and down and then we'll

15  seat.  What are your thoughts?

16         MR. JOFFE:  We have 11 or ten?

17         THE COURT:  11.  And I intend to take two

18  alternates, unless you think otherwise.

19         MR. JOFFE:  Okay.  So should we pick the next

20  12 or is that too many?

21         MR. SCHMITZ:  We wouldn't have any objection

22  to 12.  We have two strikes left.  I'm not sure, I

23  haven't counted the defendant's strikes.

24         THE COURT:  We might as well just fill the

25  rest of the box then and question them.

1          MR. JOFFE:  That's fine.

2          THE COURT:  Thank you.

3          (Bench conference concluded and proceedings

4    continued as follows:)

5          (A break was taken.)

6          THE COURT:  Let the record reflect the

7    defendant is present in court with counsel.  You can

8    bring them in.  And has been present during the entire

9    proceedings.

10          (Potential jury in at 10:43 a.m.)

11          THE COURT:  Ladies and gentlemen, we have

12   selected some of you who will need to remain with us at

13   this time.  If I call your name, you will need to stay

14   here in the courtroom.  Dr. Akrami, Mr. Wynne,

15   Dr. Stevens, Ms. Squatrito, Mr. Clark, Mr. Everling,

16   Ms. Shade, Ms. Dickens, Mr. Stidam, Mr. Hunter, and

17   Mr. Boyd.  You will need to remain with us.  If I did

18   not call your name, then you are excused with our

19   thanks.  You will need to go back downstairs and check

20   in with the jury clerk; just so she can give you future

21   instructions.

22          Then I'm going to have -- Mr. Clark, I'm

23   going to have you move over one chair.  Mr. Everling,

24   if you would move down into the final chair in the

25   first row, please.  Ms. Shade, all the way over to the

1  end chair, Ms. Dickens, next to her, Mr. Stidam, next

2  to Ms. Dickens, and then Mr. Hunter and Mr. Boyd I'm

3  going to have you move down and into the second row as

4  well.  Madam clerk, if you would call the additional

5  jurors.

6          COURTROOM DEPUTY:  Debra Everett, Benjamin

7  Crotteau, Ronald Bowman, Kitty Gio, Leonard Joyce,

8  Shawn Tooker, Joseph Archambault, Cynthia

9  Graor-Casperson, Ajay Pandey, Michael Piccirilli,

10  Virginia Sauvageau, Bernd Oetting, and Carolyn Leib.

11          THE COURT:  Ms. Everett, we're going to start

12  with you, and we're going to have you tell us a little

13  bit about yourself.  Tell us a little bit about

14  yourself, Ms. Everett.

15          POTENTIAL JUROR EVERETT:  My name is Debra

16  Everett, I live in Naples, I've lived there about

17  32 years and that's how long I've lived in Florida.

18  I'm an office administrator for a school district.  I'm

19  married, my husband is retired.  I have one son who is

20  35 and he's a pool technician.  I have some college, no

21  military service, no court, and no prior jury.

22          THE COURT:  All right.  Thank you.

23  Mr. Crotteau, tell us about yourself.

24          POTENTIAL JUROR Crotteau:  My name is Ben

25  Crotteau, I live in Fort Myers for about two years, I

1  have lived in Florida for about 14.  I'm self-employed

2  for a window treatment company.  I'm married, my wife

3  is in advertising.  I have two kids, four and six, both

4  unemployed at the moment.  I've been high school

5  educated, no military.  My experience in court I have

6  been a defendant in minor drug case and reckless

7  driving DUI, and I have no experience on the jury.

8          THE COURT:  All right.  Thank you very much.

9  Mr. Bowman.

10         POTENTIAL JUROR BOWMAN:  Yes, my name is Ron

11 Bowman, I live in Fort Myers, I have lived there for

12 ten years.  I've been in Florida for ten years.  I'm

13 currently self-employed, I'm a building contractor.  I

14 own REB Construction.  My marital status is I'm

15 married.  My wife is retired.  I have two children, a

16 daughter 39 who is a dental hygienist, a son who is 37

17 that's a Home Depot store manager.  Level of education,

18 I have a master's degree in business management, no

19 jury service, I was in the Navy and in the Army.  I was

20 honorably discharged.  I have no previous court

21 experience.  This last December I was called up for

22 district jury duty but was not picked.

23         THE COURT:  All right.  Thank you,

24 Mr. Bowman.  Ms. Gio.

25         POTENTIAL JUROR GIO:  Hi, my name is Kitty

1    Gio, I have lived in Cape Coral for four years now,

2    Florida four years.  My current occupation is account

3    manager for a software company, and prior to that I was

4    in marketing.  I am married.  My spouse is retired, and

5    previously he worked for GMC.  I have two children, one

6    39 and one 34.  My 39-year-old is currently looking for

7    work and living back at home and my son, 34, is a

8    stay-at-home dad.  Level of education, I have a BA in

9    administration.  I have never served military, I have

10   no court experience, and no jury.

11            THE COURT:  All right.  Thank you very much.

12   Mr. Joyce.

13            POTENTIAL JUROR JOYCE:  Hi, my name is

14   Leonard Joyce.  I reside in Naples, Florida.  I have

15   lived there for five years, I have also lived in

16   Florida for five years.  I'm retired.  I was an

17   executive.  I am divorced.  I have one son, 27 years

18   old, he's in hotel and restaurant management.  I have a

19   bachelor's degree.  I was not in the military.  I do

20   have some court experience.  I was a witness on a civil

21   trial with regards to patent and prior art.  I also

22   have had previous jury service in New York City.  It

23   was a criminal case, assault.

24            THE COURT:  Were you able to reach a verdict

25   in that case?

1          POTENTIAL JUROR JOYCE:  Yes, we did.

2          THE COURT:  And were you the foreperson of

3    the jury?

4          POTENTIAL JUROR JOYCE:  No, I was not.

5          THE COURT:  Mr. Tooker.

6          POTENTIAL JUROR TOOKER:  I'm Shawn Tooker, I

7    live in Englewood, Florida, I've lived here all my

8    life, I was born in Englewood, 39 years.  I'm doing

9    landscaping, mowing yards and stuff, been married

10   13 years.  She's a waitress.  I have three children,

11   12, 10, and 8, never served in the military and I've

12   been a defendant a couple few times, and --

13         THE COURT:  What types of cases, Mr. Tooker?

14         POTENTIAL JUROR TOOKER:  Driving with

15   suspended license, misdemeanor pot, felony trespassing

16   on a construction site.

17         THE COURT:  Okay.  Thank you.

18         POTENTIAL JUROR ARCHAMBAULT:  My name is Joe

19   Archambault, I've lived in Fort Myers for 20 years, in

20   Florida for 30.  I have a restaurant on Sanibel.

21   Currently married.  I have two children, 15 and 17.

22   Two years of college, no military experience.  I have a

23   reckless driving and no jury service.

24         THE COURT:  Okay.  Thank you.  Ms.

25   Graor-Casperson, can you tell us about yourself?

1          POTENTIAL JUROR GRAOR-CASPERSON:  Hi, my name

2    is Cynthia Graor-Casperson.  I have lived in Fort Myers

3    for ten years now and moved to Florida ten years ago.

4    I'm an interior designer, somewhat on the retired side

5    now, as my husband is retired.  He worked for

6    Hewlett-Packard for years in sales.  I have two

7    daughters, one daughter that's 36 and she's in the

8    health care industry, and my 32-year-old daughter works

9    in manufacturing.  I have a fine arts degree and no

10   military service, no court experience, and the only

11   jury service that I've had, and I believe it was

12   federal, was in Cleveland, Ohio.

13          THE COURT:  Do you remember if it was a

14   criminal or a civil case?

15          POTENTIAL JUROR GRAOR-CASPERSON:  It was

16   criminal.

17          THE COURT:  Okay.  Thank you very much.

18          POTENTIAL JUROR PICCIRILLI:  My name is Mike

19   Piccirilli, city of residence, Marco Island.  36 years

20   Marco Island, 36 years in Florida.  Previous -- current

21   occupation, hair stylist, marital status, divorced.

22   Two children, 34-year-old son, in Orlando, personal

23   trainer, 24-year-old daughter works in a manufacturing

24   plant in North Carolina.  Level of education, high

25   school plus some cosmetology school after high school,

1   no military service, no court experience, no jury

2   experience.

3          THE COURT:  Mr. Piccirilli, I'm going to ask

4   you to switch chairs with Mr. Pandey because he's the

5   next and I'll have him tell us about himself.  Thank

6   you.  Mr. Pandey, tell us about yourself.

7          POTENTIAL JUROR PANDEY:  Good morning, my

8   name is Ajay Pandey, I live in Naples, Florida almost

9   eight years, I lived in Florida for eight years.  I'm a

10  software quality assurance analyst.  I'm married, my

11  spouse is a mental health clinician, we have two kids,

12  16 and 14, students.  I have a graduate degree.  No

13  military service, no experience in court, and no prior

14  jury experience.

15         THE COURT:  What is your graduate degree in?

16         POTENTIAL JUROR PANDEY:  Information systems.

17         THE COURT:  All right.  Thank you.

18         POTENTIAL JUROR SAUVAGEAU:  Hi, I'm Virginia

19  Sauvageau, I live in Fort Myers.  I have been here for

20  nine years, Florida nine years.  I guess you could say

21  I'm retired from the workforce, but I'm still a

22  homemaker and I don't think you ever get to retire.

23         THE COURT:  I don't think you do.

24         POTENTIAL JUROR SAUVAGEAU:  I was a business

25  contingency planner at a financial services company in

1  Boston.  I'm married.  My husband is a retired chief

2  technology officer for a mutual fund company.  I have

3  two beautiful stepdaughters, one is 33, she's an ER

4  nurse in New Hampshire, one is 31 and she's a graphic

5  designer outside of DC.  Four years of college, no

6  military service, divorced once upon a time and no

7  court or jury.

8           THE COURT:  All right.  Thank you.

9  Mr. Oetting.

10          POTENTIAL JUROR OETTING:  My name is Bernd

11  Oetting, I live in Naples, Florida, I lived there since

12  1985, that's about 31 years.  Same for Florida, I never

13  lived anywhere else.  My occupation is I provide

14  Naples' best restaurants with the finest wines, very

15  important.  My previous occupation is I own four French

16  restaurants, three in Germany, and the first one

17  Naples, Florida.  I am married.  The occupation of my

18  wife is property management.  I have a son age 34, he's

19  a doctor of jurisprudence of the interior ministry of

20  the state of Bavaria in Germany.  I myself went to four

21  years law school in Munich but decided to form the

22  restaurant business later on.  Military service, I did

23  my German military service with the German border

24  police for 18 months.  I have no previous court

25  experience, I have never been sued or have never sued

1    anybody, and question number 12 doesn't apply.

2              THE COURT:  All right.  Thank you very much.

3    Ms. Leib, could you tell us about yourself?

4              POTENTIAL JUROR LEIB:  My name is Caroline

5    Leib, and I live in Lehigh Acres.  I've been there

6    15 years, I've been in the state of Florida 18 years.

7    I'm currently working as a state employee of Florida

8    and I work at the Hendry County Health Department in

9    LaBelle and I'm an administrative assistant for a

10   program called Healthy Families.  I am a widow.  I have

11   four children.  My oldest is 48 years old, daughter,

12   who lives with me, she's disabled, and then I have twin

13   daughters that are 45 and they're out in Kansas City

14   and they're both in sales.  And then I have a son who

15   lives in New Jersey and he's a construction worker.  My

16   level of education is high school, I've never been in

17   the military, and I've never had any court experience

18   or never had any jury experience.

19             THE COURT:  All right.  Thank you very much,

20   Ms. Leib.

21             I previously introduced to you the court

22   personnel, and this is, as you heard me tell the other

23   ladies and gentlemen earlier that this is a criminal

24   case, the United States of America versus Norris

25   Williams, and there is an indictment in this case.  The

1    indictment is not evidence, as it is a mere formal

2    accusation against the defendant, and you must not

3    consider the indictment to be evidence of the

4    defendant's guilt, and you must not be influenced by

5    the fact that an indictment has been filed against the

6    defendant.

7            The indictment includes four charges.  Did

8    all of you hear the Court read the indictment and also

9    read along on the screen?

10           ALL JURORS:  Yes.

11           THE COURT:  All right.  The defendant denies

12   the allegations in the four-count indictment, and has

13   entered a plea of not guilty to each and every count

14   contained within the indictment.

15           Do any of you know anything about this case,

16   either through your own personal knowledge or by

17   discussions with anyone else or by reading or hearing

18   about it in the news media?

19           ALL JURORS:  No.

20           THE COURT:  I indicated to the other ladies

21   and gentlemen that this trial would be about two to

22   three days, so today through Friday.  Is there anything

23   about the case being two to three days that it should

24   be of concern to us?  Will all of you be able to serve

25   for that period of time?

1        ALL JURORS:  Yes.

2        THE COURT:  All right.  Is there anything

3   about the nature of this case which would in any way

4   prevent you from acting fairly or impartially?

5        The case involves, as you've saw from the

6   indictment, heroin.  Is there anyone who believes that

7   heroin should be legalized?  All right.  I'm going to,

8   again, show you the slide, including all of the names

9   of the potential witnesses in this case.  If you think

10  you know any of them, please raise your hands.  Samuel

11  Gonzalez, Carlos Diaz, Deepa Vanmali, Alexandra

12  Gongora, Victor Chica, Mark Strang, Teresa Browning,

13  Steve Duquette, Courtney Allen, Adam Heinlein, and

14  Candice Petaccio.  Do any of you know any of those

15  witnesses?

16       Does anyone know any of the attorneys or the

17  Court?  Do any of you know any of the other jurors on

18  the panel?  Have any of you or your family members ever

19  worked for the United States government?  Okay.

20  Mr. Piccirilli.

21       POTENTIAL JUROR PICCIRILLI:  I know a juror

22  that was sitting here earlier.

23       THE COURT:  Oh, okay.

24       POTENTIAL JUROR PICCIRILLI:  From Marco

25  Island.

1        THE COURT:  They've left?

2        POTENTIAL JUROR PICCIRILLI:  Yes.

3        THE COURT:  Okay.  Thank you.  Anyone have

4   any friends or family members or yourself who have

5   worked for the United States government?  Okay.  Ms.

6   Everett.

7        POTENTIAL JUROR EVERETT:  My parents both

8   work for the federal government, and I worked for the

9   federal government for eight years.

10       THE COURT:  What capacity did you work for

11  the federal government?

12       POTENTIAL JUROR EVERETT:  Civilian.

13       THE COURT:  And how about them?

14       POTENTIAL JUROR EVERETT:  Civilian also.

15       THE COURT:  Okay.  Anything about the fact

16  that they worked for the government or that you did

17  that would cause you to believe that you could not be

18  fair or impartial in this case?

19       POTENTIAL JUROR EVERETT:  No.

20       THE COURT:  Ms. Leib, did you have your hand

21  raised as well?  Obviously you work for the state at

22  this time.

23       POTENTIAL JUROR LEIB:  I work for the state,

24  but at age 50 I retired from the federal government.

25       THE COURT:  What was your position with the

1   federal government?

2          POTENTIAL JUROR LEIB:  I worked for the VA

3   hospital.  I was a secretary.

4          THE COURT:  Okay.  Anything about the

5   position with the VA hospital that would lead you to

6   believe that you would not be able to be fair or

7   impartial in this case?

8          POTENTIAL JUROR LEIB:  No, I would be fair

9   and impartial.

10          THE COURT:  Thank you.  Anyone have any

11   litigation currently pending with the United States

12   government?  Any anticipated litigation?  Anyone

13   have -- I believe, Mr. Oetting, you said you studied

14   law, went to law school.  Anyone else study the law?

15   Anyone have any friends or family members in law

16   enforcement?  Ms. Everett?

17          POTENTIAL JUROR EVERETT:  I have several

18   friends that are with the Collier County Sheriff's

19   Department as youth relations deputies.

20          THE COURT:  As youth?

21          POTENTIAL JUROR EVERETT:  Youth relations

22   deputies with schools.

23          THE COURT:  Would that affect your ability in

24   this case, knowing them, to be fair or impartial?

25          POTENTIAL JUROR EVERETT:  No.

1          THE COURT:  Would you be able to listen to a

2     law enforcement officer's testimony and judge that

3     officer like you would any other witness?

4          POTENTIAL JUROR EVERETT:  Yes.

5          THE COURT:  Anyone else?  All right.

6     Mr. Bowman?

7          POTENTIAL JUROR BOWMAN:  I have a

8     brother-in-law that's a deputy sheriff, but it's in

9     Culver County, Minnesota.

10          THE COURT:  And would that fact in any way

11     affect your ability to be fair or impartial here today?

12          POTENTIAL JUROR BOWMAN:  I don't believe so.

13          THE COURT:  Would you listen to the testimony

14     of the law enforcement officers who testified in this

15     case and judge their credibility like you would any

16     other witness?

17          POTENTIAL JUROR BOWMAN:  I think so.

18          THE COURT:  Okay.  Thank you, Mr. Bowman.

19          Mr. Piccirilli?

20          POTENTIAL JUROR PICCIRILLI:  Yeah, I just

21     want to say I've had two out of my last three

22     girlfriends be opiate addicts, so I don't know how that

23     will figure into my -- I've got views about that kind

24     of stuff, to be totally honest about it, strong views

25     about it, seeing it firsthand.

1          THE COURT:  All right.  Would those views

2    cause you to --

3          POTENTIAL JUROR PICCIRILLI:  Yeah, they

4    would.

5          THE COURT:  Not be fair or impartial in this

6    case --

7          POTENTIAL JUROR PICCIRILLI:  I think so,

8    maybe, I think so.

9          THE COURT:  All right.  Anyone else?  Anyone

10   have any particularly strong feelings for or against

11   law enforcement?  Would all of you be able to judge the

12   credibility of a law enforcement officer the same you

13   would any other witness?  Any of you had any family

14   members, you yourself ever been investigated by a

15   federal, state, or local law enforcement agency?  Have

16   any of you ever been arrested, charged or convicted of

17   a felony?

18          Mr. Tooker, you said --

19          POTENTIAL JUROR TOOKER:  Felony trespassing

20   where I was fishing at was a construction site.

21          THE COURT:  Okay.  Were your rights restored?

22          POTENTIAL JUROR TOOKER:  Yes.

23          THE COURT:  Okay.  Would the fact that you

24   have had an issue with law enforcement or that you had

25   this particular conviction, would that affect your

1    ability in this case to be fair or impartial?

2         POTENTIAL JUROR TOOKER:  No.

3         THE COURT:  Okay.  You also, I think, said

4    that you had a misdemeanor marijuana charge, a driving

5    while license suspended.  Does that in any way affect

6    your ability to be fair or impartial here?

7         POTENTIAL JUROR TOOKER:  No, ma'am.

8         THE COURT:  Okay.  Mr. Crotteau, I would ask

9    you the same question, you had indicated you had a

10   reckless driving, DUI, and I think you also said a

11   minor drug offense.  Would that in any way affect your

12   ability to be fair or impartial here today?

13        POTENTIAL JUROR CROTTEAU:  Unfortunately, I

14   think it would.  The circumstances surrounding my

15   misdemeanor drug charge --

16        THE COURT:  Why don't you -- if you would,

17   why don't you come up to sidebar and we'll address the

18   issue at sidebar.  Thank you.

19        (Bench conference was held within the

20   presence of the jury.)

21        POTENTIAL JUROR CROTTEAU:  The circumstances

22   surrounding my drug charge was I was at a rave party, I

23   was handed ecstasy by somebody who turned out to be a

24   law enforcement officer.  As soon as they were in my

25   hand, I was swarmed in by other law enforcement

1   officers and my conviction was not -- it was like I was

2   put on probation, but I was very suspect about the

3   circumstances surrounding that.  So I would be probably

4   relatively partial against the law enforcement agencies

5   involved in this situation.

6           THE COURT:  Okay.  So you believe based upon

7   the facts and circumstances of your particular

8   situation that this would not be the type of case that

9   you would be best suited for.

10          POTENTIAL JUROR CROTTEAU:  Absolutely

11  correct, yes.

12          THE COURT:  Okay.

13          POTENTIAL JUROR CROTTEAU:  Unfortunately.

14          THE COURT:  So if you heard the testimony of

15  the law enforcement officers in this case, I think what

16  you're saying is you would be suspect of what they had

17  to say?

18          POTENTIAL JUROR CROTTEAU:  They would have to

19  prove well beyond a shadow of a doubt.  They're going

20  to have a high hill to climb with me.

21          THE COURT:  Okay.  Questions from the

22  government?

23          MR. SCHMITZ:  No.

24          THE COURT:  Mr. Joffe?

25          MR. JOFFE:  Yes.  If you were to be told by

1  the court that the burden of proof is beyond a

2  reasonable doubt and the Court would tell you that that

3  was the standard that you must follow, if you were

4  chosen as a juror in this case, could you follow that

5  standard?

6  POTENTIAL JUROR CROTTEAU:  I believe I'm

7  mentally capable of following a standard, but I think

8  I'm put in a box where I'm not the best person to ask

9  those questions.

10  MR. JOFFE:  So you can follow that

11  instruction.

12  POTENTIAL JUROR CROTTEAU:  I can follow the

13  instructions, but I'm going to be extremely suspect

14  about evidence presented and how it was collected

15  during the trial; just due to the nature of the case.

16  MR. JOFFE:  And if you were also told that

17  the burden of proof is on the government, solely on the

18  government, could you accept that standard of proof?

19  POTENTIAL JUROR CROTTEAU:  I can accept that

20  standard of proof, yes.

21  MR. JOFFE:  And do you believe you could be

22  fair or impartial to the defendant in this case?

23  POTENTIAL JUROR CROTTEAU:  I would like to

24  think so, yes.

25  MR. JOFFE:  Okay.  So is that a yes?

1          POTENTIAL JUROR CROTTEAU:  Yes.

2          MR. JOFFE:  Do you believe you could be fair

3    or impartial to the government in this case?

4          POTENTIAL JUROR CROTTEAU:  Most likely not.

5          MR. JOFFE:  Thank you.

6          THE COURT:  Anything else?

7          MR. SCHMITZ:  No, Your Honor.

8          THE COURT:  All right.  Thank you very much.

9    I appreciate it.

10         (Bench conference concluded and proceedings

11   continued as follows:)

12         THE COURT:  Have any of you, your close

13   family members or friends ever been a victim of a crime

14   that anyone hasn't told us about?

15         POTENTIAL JUROR OETTING:  I had a restaurant

16   partner who stole like 250,000 Deutsche marks, I put

17   him three years and eight months into jail.

18         THE COURT:  Okay.  So you had -- there was a

19   criminal case as a result of that?

20         POTENTIAL JUROR OETTING:  Yes, yes.

21         THE COURT:  And did you have to testify in

22   that case?

23         POTENTIAL JUROR OETTING:  But of course.

24         THE COURT:  Would that experience in any way

25   affect your ability to be fair or impartial in this

1  case?

2          POTENTIAL JUROR OETTING:  No, it would not.

3          THE COURT:  All right.  And I think a couple

4  of you had said you had been a witness in a case.

5  Anyone else been a witness to a crime or had to testify

6  in court about a case?  All right.  Anyone have any

7  feelings that for any moral or religious reasons you

8  would not be able to sit in judgment of the defendant

9  in this case based upon the evidence that was

10  presented?  All right.

11          Will all of you follow the Court's

12  instructions when I tell you that in reaching your

13  verdict in this case you cannot let prejudice, bias, or

14  sympathy enter into your verdict either for or against

15  the government or for or against the defendant?  Will

16  all of you follow that instruction?

17          I indicated there were a number of social

18  media sites that many of us may go on to with the use

19  of phones, smartphones, tablets.  Will all of you

20  follow the instruction and not discuss this case

21  amongst yourselves or with anyone else until the Court

22  indicates that you can do so?  Will all of you follow

23  the Court's instruction on that?

24          Anyone feel that they would not be able to

25  not post something on their Facebook account?  You're

1    all going to follow my instruction.  Good.  And

2    honestly and we do kid about this, but it is a very

3    serious violation if you do so, so I want to make sure

4    that you can all follow the Court's instruction.

5              Anyone have any physical impairments,

6    anything we need to know or accommodate?  Hearing,

7    sight difficulties, any medical conditions, anything we

8    can assist you in that we need to know about?  All

9    right.  Mr. Bowman.

10             POTENTIAL JUROR BOWMAN:  I am hearing

11   impaired.  I can only hear below 1800 cycles.

12             THE COURT:  Okay.  Am I talking above or

13   below 1800 cycles?

14             POTENTIAL JUROR BOWMAN:  You're below.

15             THE COURT:  So you're having a difficult time

16   hearing me?

17             POTENTIAL JUROR BOWMAN:  Not at that level,

18   but I have when you were talking normally.

19             THE COURT:  Okay.

20             POTENTIAL JUROR BOWMAN:  And any background

21   noise at all and I can barely hear at all.

22             THE COURT:  Is there anything we can do to

23   accommodate you that would help, if you were given

24   earphones or something like that, would that help you?

25             POTENTIAL JUROR BOWMAN:  Earphones would

1    work.  I do have hearing aids, but they don't work in

2    background, where there's background noise or poor

3    acoustics.

4            THE COURT:  All right.  Thank you.

5            POTENTIAL JUROR OETTING:  I'm wearing hearing

6    aids; just so you know.  I have a 20 percent loss, but

7    I hear you just fine.

8            THE COURT:  All right.  Thank you.

9            Is there any good reason why you believe that

10   you cannot serve on this jury?  All right.  Then I

11   would allow brief follow-up questions, Mr. Schmitz.

12           MR. SCHMITZ:  Thank you, Your Honor.  Good

13   morning, ladies and gentlemen.  Mr. Bowman, can you

14   hear me?

15           POTENTIAL JUROR BOWMAN:  Yes, I can with the

16   mic.

17           MR. SCHMITZ:  What job did you have in the

18   Navy?  In the Navy, what job did you have?

19           POTENTIAL JUROR BOWMAN:  I was a helicopter

20   mechanic and crewman.

21           MR. SCHMITZ:  And can you pass the mic to

22   Mr. Tooker?  Mr. Tooker, you mentioned that you were a

23   defendant in a case before.  Was that experience --

24   were you treated fairly?

25           POTENTIAL JUROR TOOKER:  Yes.

1          MR. SCHMITZ:  Do you have any feelings about

2    the government based upon that case?

3          POTENTIAL JUROR TOOKER:  No.

4          MR. SCHMITZ:  Could you be fair and impartial

5    to the United States in this matter?

6          POTENTIAL JUROR TOOKER:  Yes.

7          MR. SCHMITZ:  Could you be fair and impartial

8    to the defendant?

9          POTENTIAL JUROR TOOKER:  Yes.

10          MR. SCHMITZ:  Can you pass the mic to

11    Mr. Archambault?  So the same question, you were

12    involved in a reckless driving case.  Were you treated

13    fairly?

14          POTENTIAL JUROR ARCHAMBAULT:  Yes.

15          MR. SCHMITZ:  Is there anything about that,

16    do you harbor any hard feelings towards the government?

17          POTENTIAL JUROR ARCHAMBAULT:  No.

18          MR. SCHMITZ:  Would you be able to be fair to

19    the government in this case?

20          POTENTIAL JUROR ARCHAMBAULT:  Sure.

21          MR. SCHMITZ:  Would you be able to be fair to

22    the defendant?

23          POTENTIAL JUROR ARCHAMBAULT:  Sure.

24          MR. SCHMITZ:  Okay.  And juror number, I

25    think it's, my handwriting is not the best.  Mrs.

1   Graor-Casperson.

2           POTENTIAL JUROR GRAOR-CASPERSON:  Yes.

3           MR. SCHMITZ:  You mentioned that you had

4   previously sat on a jury.  Did that jury reach a

5   verdict?

6           POTENTIAL JUROR GRAOR-CASPERSON:  Yes, they

7   did.

8           MR. SCHMITZ:  Thank you.  No more questions,

9   Your Honor.

10          THE COURT:  Mr. Joffe, brief follow-up

11  questions?

12          MR. JOFFE:  Yes, Your Honor.  Thank you.

13  Mr. Archambault, did I say it correct?

14          POTENTIAL JUROR ARCHAMBAULT:  Joe.

15          MR. JOFFE:  Sorry.

16          POTENTIAL JUROR ARCHAMBAULT:  My name is Joe.

17  That's probably easier.

18          MR. JOFFE:  What's the name of the restaurant

19  you own in Sanibel?

20          POTENTIAL JUROR ARCHAMBAULT:  Traders.

21          MR. JOFFE:  How long have you owned that

22  restaurant?

23          POTENTIAL JUROR ARCHAMBAULT:  13 years.

24          MR. JOFFE:  And if you were asked to serve on

25  this jury, say, for three days, maybe four days, would

1    that affect your ability to run the restaurant?

2              POTENTIAL JUROR ARCHAMBAULT:  No problem.

3              MR. JOFFE:  You have folks that work for you?

4              POTENTIAL JUROR ARCHAMBAULT:  A lot of them.

5              THE COURT:  Two to three days.

6              MR. JOFFE:  And the reckless driving, did you

7    go to trial in that case?

8              POTENTIAL JUROR ARCHAMBAULT:  No.

9              MR. JOFFE:  You entered a plea.

10             POTENTIAL JUROR ARCHAMBAULT:  Yes.

11             MR. JOFFE:  And why did you enter a plea in

12   that case?

13             POTENTIAL JUROR ARCHAMBAULT:  On the advice

14   of my attorney.

15             MR. JOFFE:  Did you feel you were guilty?

16             POTENTIAL JUROR ARCHAMBAULT:  Yeah, I guess I

17   was; yeah.

18             MR. JOFFE:  What year was that?

19             POTENTIAL JUROR ARCHAMBAULT:  '09, I believe,

20   '08, '09.

21             MR. JOFFE:  '09.

22             POTENTIAL JUROR ARCHAMBAULT:  It could have

23   been, I think it was about '09.

24             MR. JOFFE:  So about seven years ago?

25             POTENTIAL JUROR ARCHAMBAULT:  Yes.

1              MR. JOFFE:  Was that here in Fort Myers?

2              POTENTIAL JUROR ARCHAMBAULT:  It was.

3              MR. JOFFE:  And how long did your case take

4    before you ended it that way?

5              POTENTIAL JUROR ARCHAMBAULT:  Well, it was

6    about 20 minutes.

7              MR. JOFFE:  Do you believe you could be fair

8    and impartial to both the government and the defense in

9    this case?

10             POTENTIAL JUROR ARCHAMBAULT:  Sure.

11             MR. JOFFE:  Okay.  Thank you, sir, I

12   appreciate that.  Is it Carolyn Leib, did I say it

13   correctly, how are you, ma'am?

14             POTENTIAL JUROR LEIB:  I'm fine.

15             MR. JOFFE:  You worked for the VA hospital

16   for how long?

17             POTENTIAL JUROR LEIB:  I worked almost

18   24 years.

19             MR. JOFFE:  In what city?

20             POTENTIAL JUROR LEIB:  I worked in New Jersey

21   at -- I'm trying to think of the name of it, I've been

22   so long ago because I retired at the age 50, and I'm

23   now 67.

24             MR. JOFFE:  You're still a young spring

25   chicken.

1           POTENTIAL JUROR LEIB:  Oh, yeah.

2           MR. JOFFE:  And in your work as a secretary,

3    were you employed with doctors and nurses?

4           POTENTIAL JUROR LEIB:  Yes, I was a Ward

5    secretary, yeah, that was in Lyons, New Jersey.

6           MR. JOFFE:  A ward secretary?

7           POTENTIAL JUROR LEIB:  Ward secretary.

8           MR. JOFFE:  What were your job duties?

9           POTENTIAL JUROR LEIB:  To, well, just

10   whatever the doctor wrote on the chart, you know, make

11   appointments, you know, fix the paperwork to enroll

12   somebody or discharge them.

13          MR. JOFFE:  Did you deal with prescriptions

14   at all.

15          POTENTIAL JUROR LEIB:  Just the doctors would

16   make them out and I would -- if they were released I

17   would give them a prescription.

18          MR. JOFFE:  You would hand those to the

19   patients?

20          POTENTIAL JUROR LEIB:  Yes.

21          MR. JOFFE:  Other than handing the

22   prescriptions to the patients, the physical

23   prescriptions to the patients, did you have anything

24   else to do with the dissemination of that medication?

25          POTENTIAL JUROR LEIB:  No, nothing to do with

1    medication.

2         MR. JOFFE:  And the fact you were employed by

3    the federal government for a significant part of your

4    life, and paid by the federal government, do you feel

5    that you could be fair or impartial to a defendant

6    who's being charged criminal by the federal government?

7         POTENTIAL JUROR LEIB:  Yes, I do.  I would

8    want to hear all the evidence and I would be impartial.

9         MR. JOFFE:  Very good.  Thank you, ma'am.  I

10   appreciate it.

11        Thank you, Your Honor, I have no further

12   questions.

13        THE COURT:  All right.  Thank you.

14        Ladies and gentlemen, you can stand and

15   stretch.  The attorneys are going to go through their

16   notes, and then we will come sidebar.  So please, if

17   you feel the need to stand and stretch, if you would

18   like to use the restroom facilities, you are again able

19   to do that.

20        Counsel, whenever you have finished going

21   through your notes, you can approach.

22        (Bench conference was held within the

23   presence of the jury.)

24        THE COURT:  I'm going to tender the entire

25   panel to the government for any challenges for cause.

1              MR. SCHMITZ:  Your Honor, the government

2    would challenge Ben Crotteau, I think he's juror number

3    26.

4              MR. JOFFE:  No objection.

5              THE COURT:  Based on his statements on the

6    record, Mr. Crotteau would be challenged for cause,

7    juror number 26.  Any other challenges?

8              MR. SCHMITZ:  Your Honor, the government

9    would challenge, I believe it's Michael Piccirilli for

10   cause.

11             THE COURT:  Juror number 34.

12             MR. SCHMITZ:  Based on his statements

13   about --

14             MR. JOFFE:  No objection.

15             THE COURT:  Based upon his statements about

16   drugs and drug addicts, juror number 34 will be

17   stricken at this time for cause.  Anyone else?

18             MR. SCHMITZ:  Your Honor, no other strikes

19   for cause.

20             THE COURT:  Any challenges for cause,

21   Mr. Joffe?

22             MR. JOFFE:  No, Your Honor.

23             THE COURT:  All right.  Then I would tender

24   the panel through Ms. Everett to the defense.

25   Mr. Joffe, you would be exercising your sixth

1    peremptory if you chose to do so.

2          MR. JOFFE:  Your Honor, the defense would

3    exercise a peremptory against juror number 25, Debra

4    Jeanne Everett.

5          THE COURT:  The defense has exercised a

6    challenge their sixth peremptory challenge on Ms.

7    Everett, juror number 25.  I tender the panel to the

8    government through Mr. Bowman, juror number 27.

9          MR. SCHMITZ:  Judge, I just want to confirm,

10   and I'm not moving for cause, but can we -- can the

11   court accommodate Mr. Bowman's hearing issues?

12         THE COURT:  We can, we're looking for -- they

13   said we all have headphones.  I think it's the

14   headphones that our interpreter uses maybe on another

15   channel, but we should be able to accommodate him with

16   headphones.

17         MR. SCHMITZ:  We do have video and we do

18   calls that are sort of audio sensitive, so I want to

19   raise that.

20         THE COURT:  Right.

21         We can accommodate him, so it would not be a

22   challenge for cause.  However, if you have a peremptory

23   challenge you may use for whatever reason, that's

24   certainly up to you.

25         MR. SCHMITZ:  And the panel is tendered

1    through which juror again?

2              THE COURT:  Mr. Bowman, juror number 27.

3              MR. SCHMITZ:  The government accepts the

4    panel.

5              THE COURT:  I would tender the panel through

6    Mr. Bowman to the defense.

7              MR. JOFFE:  And that gives us how many jurors

8    now?

9              THE COURT:  12.

10             MR. JOFFE:  Okay.  So we need two alternates;

11   correct?

12             THE COURT:  If you're accepting Mr. Bowman.

13             MR. JOFFE:  We'll accept Mr. Bowman, Your

14   Honor.

15             THE COURT:  All right.  Then that would be

16   the panel, just so we have it, it would be Dr. Akrami,

17   Mr. Wynne, Dr. Stevens, Ms. Squatrito, Mr. Clark,

18   Mr. Everling, Ms. Shade, Ms. Dickens, Mr. Stidam,

19   Mr. Hunter, Mr. Boyd, and Mr. Bowman.  That would be

20   your panel.

21             MR. JOFFE:  That's correct.

22             THE COURT:  The first two alternates then are

23   Ms. Gio and Mr. Joyce, you each have one peremptory

24   challenge to use.  I tender the panel to you.

25             MR. SCHMITZ:  The government accepts the

```
 1   panel.
 2              THE COURT:  Mr. Joffe, Ms. Gio, Mr. Joyce?
 3              MR. JOFFE:  Your Honor, I would move to
 4   strike juror number 28, Ms. Gio.
 5              THE COURT:  All right.  So you have used your
 6   strike, your alternate strike on Ms. Gio.  I'll tender
 7   Mr. Joyce and Mr. Tooker to the government.
 8              MR. SCHMITZ:  Your Honor, the government is
 9   going to use a peremptory strike on Mr. Tooker.
10              THE COURT:  The government has used its
11   strike on juror number 30, Mr. Tooker.  That would mean
12   juror number 29, Mr. Joyce, and juror number 31,
13   Mr. Archambault, would be your two alternates.
14              MR. JOFFE:  Very good.
15              MR. SCHMITZ:  Okay.
16              THE COURT:  Do you want to do your openings
17   before?  I have to instruct them and do openings.
18              MR. LAZARUS:  If it's an option -- Your
19   Honor, I'm going to open for the government, if it's an
20   option, I prefer after lunch, but I'm prepared to
21   proceed, if that's what you would like.
22              THE COURT:  Why don't we give them until
23   quarter to 1:00, I'll swear them after lunch then,
24   instruct them and we'll do your openings and we'll
25   proceed.
```

1          MR. JOFFE:  So we'll do openings after lunch?

2          THE COURT:  Yes.

3          MR. JOFFE:  That's fine.

4          THE COURT:  Because otherwise I'll have to

5   instruct them -- well, we can swear them, instruct

6   them, and do openings after lunch, that would get that

7   portion of things out of the way.

8          MR. LAZARUS:  That's fine with me.

9          THE COURT:  Let's go ahead and do that.

10          (Bench conference concluded and proceedings

11   continued as follows:)

12          THE COURT:  Ladies and gentlemen, we have

13   been able to select a jury.  At this point I will read

14   the names of the individuals who will need to remain

15   with us and will be sitting on the jury to try this

16   case.  They are Dr. Akrami, Mr. Wynne, Dr. Stevens, Ms.

17   Squatrito, Mr. Clark, Mr. Everling, Ms. Shade, Ms.

18   Dickens, Mr. Stidam, Mr. Hunter, Mr. Boyd, Mr. Bowman,

19   Mr. Joyce, and Mr. Joe Archambault.  The others of you

20   are excused with our thanks.  You will need to call

21   back in this evening to the jury clerk.  And, ladies

22   and gentlemen, we did not get to you, you were close,

23   but at this time I'm also going to release you with the

24   Court's thanks.  Please do call in this evening at

25   6:00.  Thank you.  And you are excused at this time as

1   well.

2           (Prospective jurors exited the courtroom.)

3           THE COURT:  Is this the jury that the

4   government has selected?

5           MR. SCHMITZ:  Yes, Your Honor, it is.

6           THE COURT:  Is this the jury the defense has

7   selected?

8           MR. JOFFE:  Yes, Your Honor.

9           THE COURT:  All right.  Then, ladies and

10  gentlemen, I'm going -- do you need to stand and

11  stretch?  If you need to walk or stretch, do whatever

12  you need to do.

13          Ladies and gentlemen, if you would please

14  stand and raise your right hands, I'm going to have the

15  clerk swear you in.

16          (Jury was sworn.)

17          THE COURT:  You may be seated.  Just so you

18  know, ladies and gentlemen, what I'm going to do is I'm

19  going to instruct you, give you the preliminary

20  instructions.  Once we come back, we'll remove the

21  chairs in the front row and you'll be able to sit back

22  in the jury box.  If you're comfortable for a few more

23  minutes, let me just go ahead and read the preliminary

24  instructions, if that's okay with you from where you

25  are.

1       Ladies and gentlemen, now that you have been
2   sworn, I need to explain some basic principles about a
3   criminal trial and your duty as jurors.  These are
4   preliminary instructions.  At the end of the trial, I
5   will give you more instructions, more detailed
6   instructions.
7       It will be your duty to decide what happens
8   so you can determine whether the defendant is guilty or
9   not guilty of the crimes charged in the indictment.  At
10  the end of the trial, I will explain the law that you
11  must follow to reach your verdict.  You must follow the
12  law as I explain it to you, even if you do not agree
13  with the law.  You must decide the case solely on the
14  evidence that's presented here in the courtroom.
15  Evidence can come in many forms.  The evidence
16  presented to you during the trial will primarily
17  consist of the testimony of the witnesses and tangible
18  items, including papers or documents called exhibits.
19      Some evidence proves a fact indirectly.
20  Indirect evidence, sometimes called circumstantial
21  evidence, is simply a chain of circumstances that
22  proves a fact.  As far as the law is concerned, it
23  makes no difference whether evidence is direct or
24  indirect.  You must choose to believe or disbelieve
25  either kind and should give every piece of evidence

1    whatever weight that you think it deserves.

2           Statements and arguments of the lawyers is

3    not evidence.  In their opening statements and closing

4    arguments, the lawyers will discuss the case, but their

5    remarks are not evidence.  Questions and objections of

6    the lawyers are not evidence; only the witness's

7    answers are evidence.  You should not think that

8    something is true just because a lawyer's question

9    suggests that it is.

10          There are rules of evidence that control what

11   can be received into evidence.  From time to time

12   during the trial I may be called upon to make rulings

13   of law on objections or motions made by the lawyers.

14   You should not infer or conclude anything from any

15   ruling or other comment that I may make that I have any

16   opinions on the merits of the case favoring one side or

17   the other.  If I overrule the objection, then the

18   question may be answered or the exhibit received.  If I

19   sustain the objection, then the question cannot be

20   answered and the exhibit cannot be received.  And if I

21   should sustain an objection to a question that goes

22   unanswered by a witness, you should not guess or

23   speculate what the answer might have been nor should

24   you draw any inferences or conclusions from the

25   question itself.  That means that when you are deciding

1    the case, you must not consider that evidence.

2           Some evidence is admitted only for a limited

3    purpose.  When I instruct you that an item of evidence

4    has been admitted for a limited purpose, you must

5    consider it only for that limited purpose and no other.

6           During the trial it may be necessary for me

7    to confer with the lawyers from time to time out of

8    your hearing with regard to questions of law or

9    procedure that require additional consideration.  On

10   some occasions you may be excused from the courtroom

11   for that same reason.  I'll try to limit these

12   interruptions as much as possible, but you should

13   understand and remember the importance of the matter

14   that you are here to determine and should be patient,

15   even though the case may seem to go slowly at times.

16          As I mentioned earlier, the court reporter

17   transcribes and takes down everything that is said in

18   the courtroom, including the testimony of the

19   witnesses.  She does so in case it should become

20   necessary at a future date to prepare printed

21   transcripts of any portion of the trial proceedings.

22   However, these transcripts will not be prepared in

23   sufficient time or appropriate form for your use during

24   your deliberations, and you should not expect to

25   receive them.  Therefore, you should pay close

1  attention to the testimony because it will be necessary

2  for you to rely upon your memories concerning what the

3  testimony was.

4          On the other hand, any exhibits admitted into

5  evidence during the trial will be available to you for

6  detailed study, if you wish, during your deliberations.

7  So if an exhibit is received into evidence but is not

8  fully read to you or shown to you at the time, don't be

9  concerned because you will get to see and study it

10 later during your deliberations.

11         You will during the course of the trial be

12 permitted to take notes.  On the other hand, if you

13 don't want to take notes, of course, you're not

14 required to take notes.  That will be left up to you

15 individually.  If you decide to take notes, do not try

16 to write everything down because you will get so

17 involved in note taking that you might become

18 distracted from the ongoing proceedings.  Just make

19 notes of names or dates and places; things that might

20 be difficult to remember.  Also your notes should be

21 used only as aids to your memory, and if your memory

22 should later differ from your notes, you should rely

23 upon your memory and not your notes.  If you do not

24 take notes, you should rely upon your own independent

25 recollection or memory of what the testimony was, and

1    you should not be unduly influenced by the notes of

2    other jurors.  Notes are not entitled to any greater

3    weight than the recollection or impression of each

4    juror concerning what the testimony was.

5              You'll be provided with a notebook for taking

6    notes, and you'll leave that notebook in the jury room

7    every evening before you leave.  So write your name on

8    your notebook so it can be returned to you each

9    morning.  After the trial is completed, your notes will

10   be destroyed.

11             In reaching your verdict, you may have to

12   decide what testimony to believe and what testimony not

13   to believe.  You may believe everything a witness says

14   or part of it or none of it.  In considering the

15   testimony of any witness, you may take into account the

16   opportunity and ability of the witness to see or hear

17   or know the things testified to, the witness's memory,

18   the witness's manner while testifying, the witness's

19   interest in the outcome of the case and any bias or

20   prejudice, whether other evidence contradicted the

21   witness's testimony, the reasonableness of the

22   witness's testimony in light of all of the evidence and

23   any other factors that bear on believability.  I will

24   give you additional guidelines for determining

25   credibility of witnesses at the end of the case.

1          As you know, this is a criminal case.  There

2    are three basic rules about a criminal case that you

3    must first keep in mind.  The defendant is presumed

4    innocent until proven guilty.  The indictment against

5    the defendant brought by the government is only an

6    accusation; nothing more.  It is not proof of guilt.

7    Second, the burden of proof is on the government until

8    the very end of the case.  The defendant has no burden

9    to prove his innocence or to present any evidence or to

10   testify.

11         Since the defendant has the right to remain

12   silent and may choose whether to testify, you cannot

13   legally put any weight on a defendant's choice not to

14   testify.  Third, the government must prove the

15   defendant's guilt beyond a reasonable doubt.  I will

16   give you further instructions on this point later.

17         During the trial, you should keep an open

18   mind and should avoid reaching any hasty impressions or

19   conclusions.  Reserve your judgment until you have

20   heard all of the testimony in evidence, the closing

21   arguments or summations of the lawyers, and my

22   instructions or explanations to you concerning the

23   applicable law.

24         Because of your obligation to keep an open

25   mind during trial coupled with your obligation to then

1  decide the case only on the basis of the testimony and

2  evidence presented, do not talk either among yourselves

3  or with anyone else about anything related to the case.

4  You may tell the people with whom you live and your

5  employer that you are a juror and give them information

6  about when you will be required to be in court, but you

7  may not discuss with them or anyone else anything

8  related to the case.

9           Our law does not permit jurors to talk with

10  anyone else about the case or to permit anyone to talk

11  to them about the case because only jurors are

12  authorized to render a verdict.  Only you have been

13  found to be fair and only you have promised to be fair,

14  no one else is so qualified.

15           To avoid the risk of contact with the

16  parties, lawyers, and witnesses, please don't wander

17  the halls or use the public restrooms in the building.

18  When you report for duty each morning, then please go

19  straight to the jury deliberation room, same thing when

20  you come back from lunch, go immediately to the jury

21  deliberation room.

22           Do not visit or view the premises or place

23  where the charged crime was allegedly committed or any

24  other premises or place involved in the case.  Our law

25  does not permit you to visit a place discussed in the

1  testimony.  First you cannot be sure that the place is

2  in the same condition as it was on the day in question;

3  second, even if it were in the same condition, once you

4  go to a place discussed in the testimony to evaluate

5  the evidence in light of what you see, you become a

6  witness not a juror.

7          Do not read, watch, or listen to any counts

8  or discussions related to the case which may be

9  reported by newspapers, television, radio, the

10 Internet, or any other news media.  Do not attempt to

11 research any fact, issue, or law related to this case,

12 when by discussions with others, by library or Internet

13 research or by any other means or source.  Your

14 decision must be based solely on the testimony and

15 other evidence presented in this courtroom.  Also the

16 law often uses words and phrases in special ways, so it

17 is important that any definitions you hear come from

18 me, not from any other source.

19          In this age of instant electronic

20 communication and research, I again want to emphasize

21 that in addition to not taking -- talking face-to-face

22 with anyone about the case, you must not communicate

23 with anyone about the case by any other means,

24 including telephone, text messages, e-mail, Internet

25 chat, chat room, blogs, or social networking website,

1    such as Facebook, My Space, or Twitter.  You must not

2    provide any information about the case to anyone by any

3    means whatsoever, and that includes posting information

4    about the case or what you're doing in the case on any

5    device or Internet site, including blogs, chat rooms,

6    social websites, or any other means.

7              You also must not use Google or otherwise

8    search for any information about the case or the law

9    that applies to the case or the people involved in the

10   case, including the defendant, the witnesses, the

11   lawyers, or the Court.  It is important that you

12   understand why these rules exist and why they're so

13   important.  These rules are designed to help guarantee

14   a fair trial, and our law accordingly sets forth

15   serious consequences if the rules are not followed.  I

16   trust that you understand and appreciate the importance

17   of following these rules.  In accord with your oath and

18   promise I know that you'll do so.

19             The trial is going to begin after lunch.  The

20   attorneys will be giving you their opening statements,

21   which will outline the case.  And then the government

22   will go forward with the calling of witnesses and

23   presentation of evidence, what we call the government's

24   case in chief.  When the government finishes by

25   announcing that they rest, then the defendants may

1 proceed with witnesses and evidence if they wish.

2 After which with certain limitations the government may

3 be permitted to again call witnesses or present

4 evidence during what we call the rebuttal phase of the

5 trial.  The government proceeds first and may rebut at

6 the end because the law places the burden of proof on

7 the government, as I will explain to you as part of

8 many I final instructions.

9        When the evidence portion of the trial is

10 completed, the lawyers will then be given another

11 opportunity to address you and make their summations or

12 final arguments in the case, after which I will

13 instruct you on the applicable law and you will then

14 retire to deliberate upon your verdict.

15        All right.  Then we're about to take our

16 first recess, so I remind you of the instructions.

17 During this recess or any other, you must not discuss

18 the case with anyone else, including your fellow

19 jurors, members of your family, people involved in the

20 trial or anyone else.  If anyone tries to talk to you

21 about the case, please let me know about it

22 immediately.  Do not read, watch, or listen to any news

23 reports on the trial.  Finally keep an open mind until

24 all of the evidence has been received and you have

25 heard the views of your fellow jurors.

1          Although I may not repeat this instruction

2    every time that we take a recess, I will certainly be

3    asking you if you have followed the Court's

4    instructions on the law and have not discussed this

5    case amongst yourselves or with anyone else.

6          All right.  Then we're going to go ahead and

7    take our luncheon recess at this time.  We'll be back

8    at 1:00, and at that time then counsel will start with

9    their opening statements.  Anything else at this time?

10          MR. SCHMITZ:  Nothing from the government,

11    Your Honor.

12          MR. JOFFE:  Nothing from the defense, Your

13    Honor.

14          THE COURT:  All right.  Then, ladies and

15    gentlemen, you are excused at this time to go to lunch,

16    and we will see you back here in this courtroom at

17    1:00.  We're in courtroom 5 D on the fifth floor.

18          (Jury out at 11:42 a.m.)

19          THE COURT:  Counsel, you are excused.  We'll

20    be back at 1:00 for opening statements.

21          (A break was taken.)

22          THE COURT:  Let the record reflect counsel is

23    present in court with the defendant.  Anything we need

24    to discuss before the jury comes out?

25          MR. SCHMITZ:  Nothing from the government,

1  Your Honor.

2          MR. JOFFE:  No, Your Honor.

3          THE COURT:  Then if you would bring them out,

4  please.

5              (Jury in at 1:03 p.m.)

6          THE COURT:  Ladies and gentlemen, when you

7  come in, if you sit down, that's great, because if you

8  don't sit down, we won't sit down, and it becomes a

9  standoff and it's just not good.  So when you come on

10  in, we're standing in deference to you as our jury, so

11  please sit down as soon as you get into the courtroom.

12  All right.  I believe the parties are ready, if they

13  would like to give an opening statement.  I did

14  indicate to you earlier that the opening statement is

15  not evidence, but it's meant to guide you for the trial

16  to come.  So please listen carefully to the attorneys,

17  if they wish to give an opening statement.

18  Mr. Lazarus, you are proceeding?

19          MR. LAZARUS:  Yes, Your Honor.

20          THE COURT:  All right.

21          MR. LAZARUS:  Thank you, Your Honor.  May it

22  please the Court.

23          THE COURT:  You may proceed.

24          MR. LAZARUS:  Good afternoon, ladies and

25  gentlemen.  My name is David Lazarus, as you heard I'm

1   an assistant United States attorney, and I'm one of the

2   attorneys who are representing the government in this

3   case.   This is a case about this defendant, Norris

4   Williams, selling drugs and agreeing and trying to buy

5   a large quantity of drugs here in Fort Myers in the

6   Middle District of Florida.

7        The evidence will show that on three

8   occasions between 2014 and into 2015 this defendant met

9   with the DEA undercover officer who I'll call either an

10  officer on an undercover periodically, or by name

11  throughout my opening statement today.   On those dates

12  this defendant sold that undercover officer heroin.

13       The evidence will also show that after those

14  three deals took place, at a later time the defendant

15  met another person who he believed was a big time drug

16  connection, a big time drug importer, and that the

17  defendant agreed and attempted to buy a kilogram of

18  heroin from that person in exchange for a down payment

19  of $50,000.   What you will learn is that that so-called

20  importer or that connection was also an undercover

21  agent working with the DEA and was, in fact, a second

22  undercover operative.

23       The defendant is accused in a four-count

24  indictment, which the Court reviewed with you earlier

25  today.   Counts 1 through three allege that the

1  defendant possessed with the intent to distribute and

2  distributed a mixture or a substance containing a

3  detectable amount of heroin.  In other words, in those

4  counts the defendant is accused of possessing and

5  selling heroin.  The fourth count alleges that the

6  defendant attempted to possess with intent to

7  distribute a kilogram or more of a mixture or substance

8  containing a detectable amount of heroin.  It's another

9  mouthful.  In other words, what that one says is that

10  the defendant tried to possess a kilogram or more of

11  heroin that he intended to sell.

12          During the course of this trial you're going

13  to hear from the two undercover operatives who were

14  working with the DEA, you'll hear from a DEA special

15  agent, and from forensic scientists, from chemists who

16  work for the DEA in a lab.  They tested the drugs that

17  the defendant sold to the government on those three

18  occasions, and they'll tell you what their findings

19  were.

20          As you sit and listen to the testimony and

21  you see the exhibits and you see and hear some of the

22  video and audio evidence, it may be helpful for you to

23  have some context, and so I would like to tell you a

24  little bit about what the evidence will show during

25  this trial.  In Count 1 on or about November 18th,

1  2014, a DEA undercover by the name of detective Samuel

2  Gonzalez arranged to meet with the defendant here in

3  Fort Myers to complete a drug deal.  You're going to

4  see how fast drug deals can happen.  The defendant

5  arrived and he got into an undercover police vehicle

6  and he sold Detective Gonzalez heroin.  During the

7  course of that transaction, the defendant told the

8  undercover, if you make money, I make money.

9          Ladies and gentlemen, the transaction was

10 recorded, and you're going to see the video, you'll

11 hear the conversation, and you'll also hear the

12 testimony of the undercover.  You will also learn

13 during the transaction and during other transactions

14 you're going to get a little bit of an education about

15 drug terminology, you're going to hear words some of

16 which may be familiar to you, and some you may not be

17 as familiar with, you're going to hear terms like

18 whole, half, key, brick, kilo, terms that you may not

19 be used to using on a regular basis.  If you pay

20 attention, as I know you will, you listen to the

21 witnesses, they're going to explain what some of those

22 terms mean, and the evidence will also provide you with

23 context as you hear those terms, you'll understand what

24 they mean in this particular case when they're used by

25 the witnesses, by the defendant, by others.  And,

1   again, you'll hear and see video, you'll hear audio,

2   you'll have an opportunity to determine what those

3   terms are for yourself.

4          You will learn that after the defendant gave

5   the undercover heroin on November 18th, 2014, the

6   undercover gave that heroin to one of the case agents,

7   special agent Mark Strang, who secured those drugs and

8   he had them transferred, ultimately they were

9   transferred to a DEA chemical lab where they were

10  tested and you'll hear, as I said from the chemist who

11  tested it and confirmed that it is a mixture or

12  substance containing a detectable amount of heroin.

13         About a month later on December 17th, 2014,

14  there was another transaction.  This time the

15  undercover, Detective Gonzalez again, arranged to meet

16  with the defendant here in Fort Myers in the Middle

17  District of Florida.  This was another fast

18  transaction.  The defendant approached and he stood by

19  the undercover driver -- the undercover officer's

20  driver side window and he sold heroin, a mixture or

21  substance containing heroin, to the undercover again on

22  that occasion.  You're going to see the video of that

23  transaction, you'll also hear testimony from the

24  undercover about what occurred.  You will learn that as

25  with the first transaction, after this transaction the

1  defendant provided the undercover with the heroin, the

2  undercover provided it to special agent Mark Strang, it

3  was ultimately secured, transferred to the chem lab and

4  was thereafter tested by a chemist who confirmed that

5  the substance that the United States purchased from the

6  defendant was, in fact, a mixture or substance

7  containing a detectable amount of heroin.

8              On February 11th, 2015, the undercover

9  detective Gonzalez again met with the defendant in Fort

10 Myers.  This time there was also a second undercover

11 present, this was a female undercover operative who was

12 present for that transaction.  As with before the

13 defendant arrived, met with the undercovers, provided

14 them with a mixture or substance containing heroin in

15 exchange for money.  The defendant also provided the

16 undercover more heroin -- pardon me, ladies and

17 gentlemen, I apologize.  The defendant also provided

18 the undercover with more heroin than the undercover had

19 paid for with the understanding that it would be on

20 credit and that the undercover would repay the

21 defendant during a future transaction.  And, again, as

22 with the first two transactions, you're going to see

23 the video, you'll hear the audio and you're going to

24 hear testimony from Detective Gonzalez, the undercover,

25 about what happened.

1        As before, the drugs that were purchased from

2  the defendant, were safeguarded, secured, transferred

3  to the lab, a chemist reviewed the items that were

4  purchased from the defendant, that he sold to the

5  government, and the chemist determined that they were a

6  mixture or substance containing heroin, and you're

7  going to hear again from the chemist with respect to

8  the testing that was done there.

9        The investigation did not end after the

10  defendant sold the DEA heroin on three occasions.  The

11  evidence is going to show that the investigation, in

12  fact, continued and that instead on July 2nd, 2015, yet

13  another DEA undercover by the name of Victor Chica met

14  with the defendant, they met at a restaurant here in

15  Fort Myers at Ker's Wing House.  As you will learn in

16  this meeting, the roles were reversed and so rather

17  than the defendant selling heroin to the government, at

18  this point the defendant was interested in purchasing a

19  large amount of heroin and the new undercover, Victor

20  Chica, was acting as a salesperson.

21        Victor Chica who you're going to hear from,

22  met with the defendant and discussed selling a large

23  quantity of heroin to the defendant.  The meeting was

24  recorded but you'll learn that the recording was too

25  poor quality, so you're going to hear the recording of

1  this meeting at the Wing House.  You will hear

2  testimony from the undercover, Victor Chica, who is

3  going to tell you that at that meeting they

4  discussed -- the defendant said he was looking for --

5  the undercover told the defendant he was looking for a

6  business associate or a connection here in southwest

7  Florida.

8          The defendant told the undercover, and I'm

9  summarizing, you'll hear the testimony, but that the

10  defendant said he could be that connection here in

11  southwest Florida.  The undercover told the defendant

12  that his heroin that the undercover could provide was

13  shipped directly from heroin (sic), and it was very

14  pure and could be further diluted so it could be sold

15  in bigger quanties, it could be cut.  And you'll learn

16  about that from the undercover what that means, and it

17  could be diluted and sold further to other people and a

18  larger quantity than what's actually purchased from the

19  undercover.  The defendant and the undercover discussed

20  prices, and they agreed to set up a deal in the future.

21          Another term you'll learn about is flash or

22  reverse flash.  That's what happened on July 22nd,

23  2015.  A flash is a meeting between the DEA and the

24  defendant where the DEA displayed for the defendant

25  heroin, the merchandise, to demonstrate they're bona

1   fide, to show that they are who they say they are and

2   they can provide what they say they're going to

3   provide.  The undercover, Victor Chica, and another

4   undercover met with the defendant at the TGI Fridays

5   parking lot in the Belltower Mall here in Fort Myers

6   not far from the courthouse.  This meeting was recorded

7   and you're going to see the video, you're going to

8   listen to the meeting, and you're going to hear from

9   Victor Chica who is going to tell you about what

10  happened.  As I said, the purpose of the meeting was to

11  show the defendant one kilogram of heroin to

12  demonstrate the quality of the heroin that the

13  defendant could buy from this undercover and to ensure

14  that the defendant knew that he was dealing with

15  legitimate drug dealers and not with thieves or with

16  people who were looking to scam him.

17           You're going to hear from DEA special agent

18  Mark Strang, one of the case agents who is here at

19  counsel table, that he assisted the DEA in this

20  investigation and that prior to the flash meeting he

21  requisitioned, he requested a kilogram, a brick of

22  heroin from the DEA for them to use at this undercover

23  meeting with the defendant, this reverse flash meeting.

24  At the flash you will see on the video the defendant

25  arrived and he sat in the undercover vehicle which was

1  equipped with a camera and was recording.  The

2  defendant was handed a brick, which is a packaged

3  portion of drugs that was represented to be a whole

4  key, which is a whole kilogram of heroin.

5          If you listen closely, you will hear the

6  defendant say, among other things, he will say whole

7  key, referring to kilogram, and you will hear reference

8  to a whole, referring, again, to a whole kilogram of

9  heroin.  Pay close attention, as I know you will, to

10  the video and the transcript.  When we play a video for

11  you and I'll get into a moment some phone calls, you're

12  going to hear a number of phone calls, there will be

13  transcripts that are going to display for you on the

14  screen as the audio is going, so you'll be able to

15  follow along closely with the transcripts, as well as

16  listening to the exhibits as they're being displayed

17  for you.

18          At the meeting the evidence will show that

19  the defendant demonstrated his belief that he was

20  looking at a whole kilogram of heroin, and you will

21  hear him say things such as, why did you bring the

22  whole thing to this meeting and you will hear the

23  defendant say, I don't want to cut into a whole key, as

24  the defendant is attempting to cut into the brick that

25  the undercover brought to the meeting so that the

1 defendant could take a sample out of that so that the

2 defendant could be satisfied with the quality of the

3 heroin that was being offered for sale.  You'll see

4 that, you'll hear that, and you'll hear testimony about

5 that.

6         The evidence will show that the defendant

7 believed at that meeting that he was looking at a whole

8 key, a whole kilogram.  You're going to learn that the

9 meeting was a theatrical show, that it was just

10 designed to display to the defendant the alleged

11 kilogram of drugs to see if he, the defendant, wanted

12 to have further dealings and to make a deal to buy a

13 kilogram just like that one.  The defendant at that

14 meeting, at the reverse flash, asked how much a whole

15 cost, and he was told by the undercover, 75 thousand

16 dollars.  And numbers become important as the evidence

17 continues, and so if you listen whenever numbers are

18 discussed, you'll be able to follow as the evidence

19 comes in.  So 75 thousand dollars was the quoted price

20 for a whole kilogram of heroin during that flash

21 meeting.

22         You'll see, as I said, the defendant used a

23 knife to cut into the material to inspect the heroin

24 for quality, and you will hear the defendant discuss

25 his plans to distribute the heroin that he might buy in

1    the future to others.  The defendant told the

2    undercover that if the heroin was good quality, and,

3    again, I'm summarizing, you're going to see the meeting

4    and you'll hear the testimony, but it is anticipated to

5    say that the defendant told the undercover if the

6    heroin is of good quality it would sell really fast in

7    the streets and that he the defendant was going to

8    contact somebody who would invest the money to buy pure

9    heroin and that the defendant would let the undercover

10   know when he was ready to proceed with the deal.

11           Over the course of about September 16th

12   through October 15th, the undercover, Mr. Chica,

13   Detective Chica, and the defendant engaged in multiple

14   phone calls about purchasing heroin, and you're going

15   to hear a number of those calls.  For example, on

16   September 16th, 2015, Detective Chica called the

17   defendant.  During the conversation the defendant said,

18   and again, I'm summarizing, you're going to hear the

19   call, that he did not have enough money to purchase a

20   whole but he told the undercover he could purchase a

21   half instead.  And you'll hear the audio and you'll see

22   the transcript.  Pay attention to this call as with the

23   others to the numbers that are being discussed.  You'll

24   hear the defendant first offer 37 thousand dollars for

25   a half of a kilo, and then you'll hear the defendant

1  correct himself and suggest $37,500, which as you'll

2  note, is half of 75 thousand, the price that's quoted

3  to the defendant during the reverse flash meeting.

4        On that same day during another phone call

5  the defendant asked Detective Chica, he called him back

6  and he confirmed that he wanted a half.  Agent Chica

7  told the defendant that he now had spoken to his boss

8  and he was only authorized to sell the defendant a half

9  a kilo for 40 thousand dollars, so the price during

10 this call is established for a half a kilo of 40

11 thousand dollars, and you'll hear that and you'll see

12 the transcript.  As you're going to see and hear, they

13 agree to do a deal on that call, they ultimately did do

14 a deal, but it ended up being for a whole at 50

15 thousand dollars with the remainder on credit, 50

16 thousand dollars down payment.

17        On October 2nd, 2015, Detective Chica

18 returned a call from the defendant and told him that

19 the heroin would be arriving within about a week.  The

20 defendant told the undercover that he was going to try

21 to come up with even more money to be ready, and when

22 you listen to the call, you're going to hear the

23 defendant convincing and trying to tell the undercover

24 that he is the right man for the job, he just needs the

25 right product from the undercover in order to prove

1    that he's worthy of being part of the undercover's

2    operation.

3          If you listen closely to the calls you're

4    going to hear how the defendant describes himself, how

5    he describes his intent, what he plans to do with the

6    heroin that he purchases, and you'll hear that in the

7    defendant's own words through these calls.  The

8    defendant told the undercover that he had 40 thousand

9    dollars available.  You're going to hear that the

10   undercover offered to the defendant that if the

11   defendant could come up with 50 thousand dollars as the

12   down payment, the undercover would provide the rest to

13   the defendant, a whole, and the defendant could pay him

14   back after he sold the heroin that he obtained and

15   possessed from the undercover.  When you listen to the

16   call, keep in mind the discussion about a whole key

17   during the flash meeting and listen as the undercover

18   offers the defendant the same thing the undercover

19   showed him at the flash meeting, that brick, that

20   kilogram of heroin that the defendant cut into at that

21   flash meeting.

22         During another call on October 5th, 2015,

23   there was another phone call and the defendant advised

24   that he had almost all of the money together.  On

25   October 13th, 2015, you will hear a telephone call

1    where the defendant again told the undercover that he,

2    the defendant, was looking for an opportunity to show

3    what he's capable of doing and during which the

4    defendant asked for a delivery date for the heroin

5    because he had money ready.

6          On October 15th, 2015, the defendant told the

7    undercover he would be ready in a matter of days on

8    that coming Sunday, and the undercover told him that he

9    wouldn't be ready that day, he would be ready on a day

10   shortly thereafter.  During the conversation, the

11   undercover provided the defendant with some of the

12   details of how the transaction would happen, they had a

13   discussion about that, and the defendant told the

14   undercover that he, the defendant, had approximately 45

15   thousand to 46 thousand dollars ready to go to purchase

16   heroin.

17         On October 20th, 2015, the defendant was

18   arrested by the DEA.  He was arrested during the course

19   of attempting to purchase one whole kilogram of heroin

20   from what he believed was his connection to Columbia.

21   You're going to see the video and you're going to hear

22   testimony from the undercover, Detective Chica.  Prior

23   to the defendant's arrest on that day, they had a phone

24   call to meet at a shopping center here in Lee County.

25   The undercover told the defendant, and you'll hear this

1    as well, it's exactly the same thing you saw last time,

2    he's bringing, referring to the whole kilogram that was

3    shown during the reverse flash meeting.

4         You will see and hear that the defendant had

5    an opportunity to end his dealings and walk away from

6    the deal, and instead you will see that the defendant

7    went to the prearranged location, he arrived, he got

8    out of his car, he came into the front passenger seat

9    of an undercover vehicle that was being driven by the

10   undercover Detective Chica.  Inside the vehicle the

11   defendant told Detective Chica he was ready to go, he

12   had 50 thousand dollars with him, it was in his car a

13   short distance away.  And, again, keep in mind the

14   numbers as you listen and you watch the video.  The

15   defendant arrives with 50 thousand dollars, 75 thousand

16   had been the original quoted price you will hear, you

17   will hear there's a 50 thousand dollars with the

18   remainder on credit and the half of the kilogram was 40

19   thousand dollars.

20        So keep in mind the numbers, and you will see

21   the defendant arrive, meet with the undercover, go to

22   his vehicle, come back with a shoe box that he says

23   contains 50 thousand dollars.  Detective Chica told the

24   defendant once the money arrived he would look at it

25   and then the heroin would be brought to the vehicle.

1   The defendant told the undercover that he expected to

2   have the rest of the money after he sold some heroin.

3   Agents thereafter moved in and they arrested the

4   defendant.  You're going to get a crash course in drug

5   dealing 101, you're going to see it on both sides here

6   as the defendant participated, selling and attempting

7   to obtain and possess a large quantity, a kilogram of

8   heroin with the intent to further distribute that.

9           You will see the videos, you will hear audio,

10  you'll read the transcripts, you will see the drugs,

11  you will hear from lab analysts, you will hear terms

12  like whole, half, key, brick, reverse.  You will see

13  and hear the context those terms are used and the

14  witnesses will testify about what happened and about

15  the content.

16          At the end of the case after you've heard all

17  of the evidence and you've had a chance to examine it

18  yourselves, we'll come back, we'll ask you to find the

19  only verdict consistent with all the evidence, we'll

20  ask you to find the defendant Norris Williams, guilty

21  as charged of each count in the indictment.  Thank you

22  for your attention, ladies and gentlemen.

23          THE COURT:  Mr. Joffe.

24          MR. JOFFE:  Thank you, may it please the

25  Court, counsel for the government, ladies and

1   gentlemen, good afternoon.  This is a bit of a unique

2   case because during the course of this trial what we

3   the defense are essentially going to ask you to do is

4   make a determination as to the amount of heroin that

5   was dealt in this particular case.  It's the position

6   of the defense during the trial of this case that the

7   evidence that you'll hear during the course of this

8   case shows that the government or the case agents in

9   this particular case chose to essentially lead

10  Mr. Norris Williams down a golden path.  The evidence

11  presented -- that will be presented during the course

12  of this trial will show you beyond a reasonable doubt

13  that Mr. Williams was a low level buyer and seller of

14  narcotics, as good or bad as that may be.

15          And the government in this particular case

16  wanted to essentially up the ante and they're the ones

17  that produced a kilo of heroin, they actually allowed

18  Mr. Williams to take a sample, which you'll hear during

19  the course of the trial is unusual and unheard of, and

20  then even though Mr. Williams said, I can only afford

21  half a kilogram of heroin, the government's case agent

22  continued to push a whole kilogram of heroin.  And

23  during the course of this trial you may ask yourselves

24  why and you may hear some answers during

25  cross-examination of the case agent.  It's our position

1    that the reason the government agents are doing that is

2    because they want to get Mr. Williams to a higher level

3    of narcotics because what drives sentencing in the

4    federal court system --

5              MR. LAZARUS:  Objection, Your Honor.

6    Improper argument.

7              THE COURT:  Sustained.

8              MR. JOFFE:  So you'll hear during the course

9    of this trial that it's the government that's

10   suggesting the larger amounts of narcotics in this

11   particular case, not Mr. Norris Williams.  And

12   Mr. Williams does not come into this case with clean

13   hands and we're not claiming that he has clean hands.

14   All Mr. Williams is asking for is fairness because

15   eventually when we get to the end of this case and you

16   have what's called a verdict form, it will ask you to

17   put down or check off certain amounts of heroin that

18   you think that Mr. Norris Williams is responsible for

19   because always in a criminal case there's something

20   called mens rea or intent.

21             What's the state of mind of a defendant

22   that's going to trial in a particular case, and that's

23   why your function during this trial is so important

24   because all of you will get an opportunity to listen to

25   all of the facts in evidence that's presented during

1  the course of this trial, you'll be able to go back and

2  deliberate amongst yourselves and make a decision

3  that's fair and appropriate for Mr. Williams.

4            Now, this case takes place over a ten-month

5  period; it's not a short period of time.  On

6  December 17th, 2014, there's a transaction for

7  10.8 grams of heroin, an amount that will fit

8  essentially in your hand.  Okay?  On February 11th,

9  2015, there's another transaction for 27.8 grams of

10 heroin, an amount that would basically fit in your

11 hand.  Okay?  And then there's a meeting that occurs on

12 July 2nd, 2015, five months later, where the agents

13 suggest to Mr. Williams to purchase a kilogram of

14 cocaine.  And what they're doing is they're essentially

15 inserting this larger quantity because they want to get

16 Mr. Williams hooked on a larger amount and get him

17 involved in that to drive this large amount or larger

18 amount of cocaine because up until that point the

19 amounts are very small.

20           And I would suggest during the course of this

21 trial that you'll hear testimony that because the

22 amounts are so small that the U.S. Attorney's Office

23 may not even be interested in the case at that point.

24 And you'll hear testimony as to how the agents build

25 these cases.

1            Now, on July 22nd the case agent delivers a

2    kilogram of cocaine and asks Mr. Williams to

3    essentially sample it.  And what's unheard of is

4    Mr. Williams is allowed to take a portion of that

5    kilogram of heroin.  Now, on September 16th, 2015, two

6    months later, the DEA special agent again meets with

7    Norris Williams, and it's taking time because

8    Mr. Williams is not a large dealer.  He's a street

9    level narcotics guy, and a kilogram of heroin is a

10   large amount of heroin.  He's not the guy that deals in

11   those amounts.  The case agents want him to be that guy

12   because it drives the penalty.

13           MR. LAZARUS:  Your Honor, again, improper

14   argument.  I ask the Court to instruct the jury

15   regarding --

16           THE COURT:  Ladies and gentlemen, you'll hear

17   instructions from the Court that it is up to the Court

18   as to the sentencing, if the defendant should be found

19   guilty of this offense, it is up to the Court to

20   sentence the defendant.  That is not your concern.

21   Your concern is whether or not the facts in this case

22   prove beyond and to the exclusion of every reasonable

23   doubt that the defendant is guilty of the charges that

24   are alleged or you obviously can find him not guilty of

25   those charges.

1          Mr. Joffe, the sentencing is for the Court

2     and you are to move on in your argument.

3          MR. JOFFE:  Yes, Your Honor.

4          On September 16th, 2015, DEA special agent

5     Victor Chica met with Norris Williams.  Mr. Williams

6     advised Agent Chica he was not interested, Mr. Williams

7     was not interested in a large quantity purchase of

8     heroin.  Mr. Williams advised the case agent that he

9     had approximately $37,000, enough to purchase half a

10    kilogram of heroin, and that's it.  It was the agent

11    that suggested to Mr. Williams that he come up with

12    even more money.  And it wasn't until October 2nd,

13    almost a month later, that Agent Chica is again pushing

14    the purchase of a kilogram of heroin.  On October 20th,

15    2015, Mr. Williams is arrested with $50,000 cash in a

16    shoe box, that's it.

17         And in this particular case, ladies and

18    gentlemen, all I'm asking you to do is be fair, listen

19    to the evidence in this case, take notes, and come up

20    with the amount of narcotics that you think with a

21    reasoned judgment that Mr. Williams should be held

22    accountable for.  Thank you.  Thank you, Your Honor.

23         THE COURT:  All right.  The government may

24    call its first witness.

25         MR. SCHMITZ:  Thank you, Your Honor, the

1   United States calls Sergeant Samuel Gonzalez.

2   THEREUPON,

3                    SAMUEL GONZALEZ,

4   a witness, having been first duly sworn, upon his oath,

5   testified as follows:

6            THE WITNESS:  Yes.

7            COURTROOM DEPUTY:  Please state and spell

8   your name for the record.

9            THE WITNESS:  Samuel Gonzalez,

10  G-O-N-Z-A-L-E-Z.

11           MR. SCHMITZ:  Your Honor, may we approach

12  just briefly?

13           THE COURT:  Yes.

14           (Bench conference was held within the

15  presence of the jury.)

16           MR. SCHMITZ:  Would it be okay if you could

17  check and see if the juror can hear okay?

18           THE COURT:  I can ask.

19           MR. SCHMITZ:  I just want to make sure the

20  juror is okay.

21           (Bench conference concluded and proceedings

22  continued as follows:)

23           THE COURT:  Ladies and gentlemen, I want to

24  make sure everyone can hear.  Mr. Bowman, does that

25  help you?  If you run out of batteries, let me know, we

1  have a lineup of others.  Okay.  You may inquire.

2        MR. SCHMITZ:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4  BY MR. SCHMITZ:

5  Q.   Sergeant Gonzalez, how are you employed?

6  A.   I work for the Lee County Sheriff's Office.

7  Q.   How long have you worked for Lee County?

8  A.   Nine years.

9  Q.   How long have you worked in narcotics

10 investigations?

11 A.   I've been with the narcotics unit for seven years.

12 Q.   What are your duties with the narcotics section?

13 A.   Currently I'm in charge, I'm supervising a group

14 of detectives, but at the time of this investigation I

15 was assigned to work as an undercover agent and also

16 handle my own cases.

17 Q.   What are your general duties with the

18 undercover -- as an undercover?

19 A.   As an undercover you conduct undercover purchases,

20 set up operations with different individuals to obtain

21 narcotics.

22 Q.   Do you purchase and sell narcotics as an

23 undercover?

24 A.   Yes.

25 Q.   Do you negotiate prices as an undercover agent?

```
 1    A.    Yes.
 2    Q.    What training have you had in your time in
 3  narcotics?
 4    A.    I've had on the job training for several weeks
 5  when I became a narcotics agent.  Since then I've gone
 6  through hundreds of hours of actual extensive training,
 7  I've been to DEA basic, I've been to DEA advanced, I've
 8  gone to clandestine lab investigations and courses of
 9  that nature.
10    Q.    About how many narcotics investigations have you
11  taken part in in your time at Lee County?
12    A.    Easily in the hundreds.
13    Q.    About how many of those involved heroin?
14    A.    It's hard to explain, but a good portion.  I can't
15  give an exact number.
16    Q.    Have you had training in the recognition of
17  controlled substances, including heroin?
18    A.    Yes, I have.
19    Q.    Do you know what heroin looks like?
20    A.    Yes, I do.
21    Q.    Do you know what it smells like?
22    A.    I do.
23    Q.    Does heroin have a distinctive smell?
24    A.    It does.
25    Q.    And in your training and experience in law
```

1  enforcement, do drug dealers usually use formal English

2  when they're setting up drug deals?

3  A.    Not necessarily, no.

4  Q.    Do they sometimes use slang?

5  A.    Slang, codes; things of that nature.

6  Q.    Do they use jargon?

7  A.    Yes.

8  Q.    Are you familiar in your training and experience

9  in law enforcement with the slang and jargon that drug

10 dealers use during drug deals?

11 A.    Yes, I am.

12 Q.    Are you familiar with the practices and procedures

13 sometimes that drug dealers you?

14 A.    Yes.

15 Q.    What is your typical role in an undercover

16 transaction?  Can you take the jury through generally

17 speaking what happens in an undercover buy?

18 A.    In an undercover, you're briefed prior to the

19 actual transaction taking place.

20        MR. JOFFE:  I'm going to object, Your Honor,

21 as to what typically happens.  It's not relevant.

22        THE COURT:  Overruled.

23 BY MR. SCHMITZ:

24 Q.    You may answer, Detective Gonzalez?

25 A.    You get briefed on the person you're going to be

1  purchasing narcotics from.  You're instructed basically

2  what you're going to do by the case agent, you're

3  provided with prerecorded funds basically audio

4  devices; things of that nature before you go to this

5  deal.  You're pretty much coached through the whole

6  process as to what your job is going to be.

7  Q.   And what generally happens at the deal, in general

8  terms?

9  A.   Just basic transaction.  You provide cash for

10 drugs.

11 Q.   Now, did there come a time when you participated

12 into the investigation whether Norris Williams sold

13 heroin?

14 A.   Yes.

15 Q.   Do you know what Norris Williams looks like?

16 A.   Yes, I do.

17 Q.   Do you see him here in the courtroom today?

18 A.   Yes, I do.

19 Q.   Can you point to Mr. Williams and identify an

20 article of clothing?

21 A.   Dark blue suit.

22         MR. SCHMITZ:  Let the record -- Your Honor,

23 we would request that the record reflect that Sergeant

24 Gonzalez has identified the defendant.

25         THE COURT:  The record will so reflect.

BY MR. SCHMITZ:

Q.   If I refer to the defendant from here on out as --
so if I refer to the defendant here on out, will you
know that I'm talk about Norris Williams?

A.   Yes.

Q.   Now, the first transaction I'm going to ask you
about occurred on November 18th, 2014, without going
into any details, had you met the defendant before that
date?

A.   Yes.

Q.   How many times?

A.   Just one time.

Q.   Without going into any details, did a confidential
informant introduce the defendant to you as someone who
would be able to sell you heroin?

A.   Yes.

Q.   And did you obtain the defendant's cell phone
number at some point during that initial meeting?

A.   Yes, I did.

Q.   All right.  Now, after that initial meeting was
the confidential informant ever involved in any of the
three transactions that we've discussed?

A.   No.

Q.   On November 18th, did you purchase what you
suspected as heroin from the defendant?

1    A.    Yes, I did.

2    Q.    How did you communicate with the defendant to set

3    up that deal?

4    A.    Through his phone number.

5    Q.    Did other officers conduct surveillance of the

6    deal?

7    A.    Yes, they did.

8    Q.    Was there video and audio recording of the deal?

9    A.    Yes.

10   Q.    Where was the deal supposed to occur?

11   A.    Home Depot parking lot in Fort Myers.

12   Q.    Is that in the Middle District of Florida?

13   A.    Yes, it is.

14   Q.    Who picked that location?

15   A.    Mr. Williams.

16   Q.    How much was -- how much heroin was originally

17   arranged to be transacted during that deal?

18   A.    A quarter ounce or seven grams.

19   Q.    What was the price per gram of heroin, or what was

20   the price of it?

21   A.    The negotiated price was $700.

22   Q.    So was that $100 per gram?

23   A.    Yes.

24   Q.    $700 for seven grams?

25   A.    Correct.

1  Q.   How much heroin did the defendant ultimately give
2  you during that deal?
3  A.   14 grams or half an ounce.
4  Q.   Now, did you pay for all 14 grams of heroin that
5  he gave you during that first deal?
6  A.   No, I did not.
7  Q.   How much grams did you pay for?
8  A.   For the seven.
9  Q.   And what about the other seven?
10 A.   It was just given to me on credit.
11 Q.   How was the heroin packaged when you received it?
12 A.   It was all in one baggy.
13 Q.   What did it look like?
14 A.   It was light brown in color.
15 Q.   Can you explain for the jury generally what
16 happened during the deal?
17 A.   I arrived at the location we had agreed upon, and
18 Mr. Norris Williams arrived shortly thereafter, got
19 inside my undercover vehicle in the passenger's side,
20 quick exchange, he handed me 14, I explained to him --
21 14 grams, I'm sorry, he explained that it was 14, I
22 told him I only had 700.  And he basically explained to
23 me that's how he did business, I was now in debt to him
24 for $700.
25 Q.   Did he hand you heroin during that deal?

1    A.    Yes.

2    Q.    Did you smell heroin during that deal?  Did you

3    smell it?

4    A.    You can smell it in the vehicle.

5    Q.    The funds you handed him, were those prerecorded?

6    A.    Yes.

7    Q.    Now, in your training and experience, did you

8    recognize that substance as heroin?

9    A.    I did.

10           MR. SCHMITZ:  Your Honor, may I approach the

11   witness freely?

12           THE COURT:  Yes, you may.  And if you would

13   show defense counsel before you show the witness that

14   would be helpful as well, or at least identify the

15   exhibits you're referring to.  Thank you.

16           MR. SCHMITZ:  Thank you, Your Honor.

17   BY MR. SCHMITZ:

18   Q.    So I have shown you what's been marked for

19   identification now as Government's Exhibits 1, 1A, and

20   1E.  Do you recognize those?

21   A.    Yes.

22   Q.    What are those?

23   A.    It's video and a transcript of the deal that took

24   place.

25   Q.    And for the record which exhibit is the video?

1    A.    Exhibit 1.

2    Q.    Is that also 1E on that disk?

3    A.    It just says one.  I don't see 1E.

4          MR. SCHMITZ:  May I approach, Your Honor?

5          THE COURT:  Yes, you may.

6          THE WITNESS:  Okay.  1 and 1E.  Thank you.

7    BY MR. SCHMITZ:

8    Q.    All right.  Have you viewed what's on the contents

9    of that disk, 1 and 1E?

10   A.    Yes, I have.

11   Q.    Are those your initials on the disk?

12   A.    Yes, it is.

13   Q.    Is that a true and accurate recording of the

14   heroin transaction that occurred between you and the

15   defendant on November 18th, 2014?

16   A.    Yes.

17         MR. SCHMITZ:  Your Honor, the government

18   moves admission for Exhibits 1 and 1E.

19         THE COURT:  Any objection?

20         MR. JOFFE:  No, Your Honor.

21         THE COURT:  Government's Exhibits 1 and 1E

22   will be introduced at this time.

23         (Government's Exhibit Number 1 and 1E were

24      admitted into evidence.)

25   BY MR. SCHMITZ:

1    Q.   And have you -- do you recognize Exhibit 1A?

2    A.   Yes.

3    Q.   What is that?

4    A.   Transcript of the deal.

5    Q.   Have you previously reviewed that transcript?

6    A.   Yes, I have.

7    Q.   Is that a true and accurate transcription of that

8    video?

9    A.   Yes.

10        MR. SCHMITZ:   Your Honor, we move for the

11   admission of Government's Exhibit 1A.

12        MR. JOFFE:   No objection, Your Honor.

13        THE COURT:   Government's Exhibit 1A will be

14   introduced at this time.

15        (Government's Exhibit Number 1A was admitted

16     into evidence.)

17        MR. SCHMITZ:   Your Honor, may we publish

18   Exhibits 1, 1A, and 1   E.

19        THE COURT:   Yes.   Members of the jury, as you

20   have heard, Government's Exhibit 1A has been identified

21   as a typewritten transcript of the oral conversation

22   that can be heard on the tape recording received in

23   evidence as Government's Exhibit 1 and 1E.   The

24   transcript also purports to identify the speakers

25   engaged in the conversation.   I have admitted the

1  transcript for the limited and secondary purpose of

2  helping you follow the content of the conversation as

3  you listen to the tape recording and also to help you

4  identify the speakers.  However, you are specifically

5  instructed that whether the transcript correctly

6  reflects the content of the conversation or the

7  identity of the speakers is entirely for you to decide

8  based on your own evaluation of the testimony you have

9  heard about the preparation of the transcript and from

10  your own examination of the transcript in relation to

11  hearing the recording itself as the primary evidence of

12  its own contents.  If you determine that the transcript

13  is in any respect incorrect or unreliable, you should

14  disregard it to that extent.  All right.  You may

15  publish at this time.

16  BY MR. SCHMITZ:

17   Q.   Thank you, Your Honor.  Before I play this video,

18  have you viewed, Detective Gonzalez, or I should say

19  Sergeant Gonzalez, have you reviewed the entire

20  Exhibit 1?

21   A.   Yes, I have.

22   Q.   And about how long is that recording?

23   A.   The recording is about 30 minutes long.

24   Q.   And how long during that video is the actual

25  transaction that occurred?

1   A.   About two minutes.

2   Q.   So the clip I'm going to play you, 1E, about how

3   long is that, the clip of this video?

4   A.   The clip is about a minute, minute and a half, two

5   minutes.

6   Q.   But the rest, for the jury, the rest of that

7   video, that 30 minutes, is that on that disk?

8   A.   Yes, it is.

9   Q.   Can you describe generally for the jury what was

10  going on during that 30 minutes?

11  A.   During that 30 minutes you'll see myself setting

12  up the video inside the vehicle, speaking with several

13  of the agents prior to the deal, and then actually

14  traveling to the location.  So there's a lot of just

15  driving to the Home Depot.

16  Q.   Okay.  Thank you.

17            (At this time, a video was played in open

18       court and taken down to the best of the court

19       reporter's ability.)

20            SPEAKER:  On point.  What's up, my man?

21            SPEAKER:  What's happening?

22            SPEAKER:  I got kids down here, that's why I

23  be coming down.

24            SPEAKER:  So that's 14.  Seven for the

25  previous.

1          SPEAKER:  I brought you another 14.

2          SPEAKER:  I'm still going to have to owe you

3    though; right?

4          SPEAKER:  Yeah, (inaudible) if you make

5    money, I make money.

6          SPEAKER:  I hear you, I hear you.

7          SPEAKER:  It's going to take me a little bit

8    to get it to you.

9          SPEAKER:  I ain't calling you.  You make

10   money, I make money.  If you make money, I make money.

11   That's what I tell Berto.  I see you in a couple weeks.

12         SPEAKER:  All right, bro.  Next time bring

13   more clientele.

14         SPEAKER:  All right.

15          (End of video.)

16   BY MR. SCHMITZ:

17    Q.   Sergeant Gonzalez, I hope you're a very fast

18   reader.  I know that was difficult to read here, so I'm

19   going to show you, Detective Gonzalez, what's been

20   admitted as Government's Exhibit 1A.  Is this the

21   conversation that you had with the defendant that day

22   on November 18th?

23    A.   Yes, it is.

24    Q.   All right.  He says -- okay.  You get there and he

25   says, this is 14; right?  What is 14?

1   A.    14 grams.

2   Q.    Was the deal supposed to be for seven or 14?

3   A.    It was supposed to be for seven.

4   Q.    Did you know before the deal that you're going to

5   get fronted seven grams?

6   A.    I did not.

7   Q.    All right.  When you say I'm still going to have

8   to owe you; right, what do you mean by that?

9   A.    I was going to have to owe him for the extra seven

10  grams that he had just provided me with.

11  Q.    All right.  Now, in your training and experience

12  in law enforcement -- well, let me move on.

13          The defendant then says, that's part of it.

14  If you make money, I make money.  What does that mean?

15          MR. JOFFE:  I'm going to object, Your Honor.

16  It calls for speculation.

17          THE COURT:  Go ahead.

18          MR. SCHMITZ:  Your Honor, can I lay the

19  foundation for that, please?

20          THE COURT:  Yes, you may.

21  BY MR. SCHMITZ:

22  Q.    In your training and experience in law

23  enforcement, are you familiar with slang that drug

24  dealers use during drug deals?

25  A.    I am.

1  Q.   And in your course of dealing with this defendant

2  in this case, did you come to an understanding what

3  certain of the terms he used to describe certain things

4  to you?

5  A.   I did.

6  Q.   All right.  Based upon your training and

7  experience in law enforcement and based upon your

8  communications with the defendant in this case, what

9  does that mean?

10           MR. JOFFE:  I'm going to object, Your Honor,

11  calls for a conclusion, calls for speculation, it's

12  also hearsay.

13           THE COURT:  Overruled.

14           THE WITNESS:  He's basically letting me know

15  that that's how we were going to make money together

16  and continue our business relationship.

17  BY MR. SCHMITZ:

18  Q.   Did you make it clear that you yourself had

19  customers?

20  A.   I did.

21  Q.   Now, towards the end here he says, start bringing

22  more clientele.  All right?  What does that mean?

23  A.   He wanted me to bring more customers to him.

24           MR. SCHMITZ:  Your Honor, may I have a

25  moment?

```
 1            THE COURT:  Yes, you may.
 2    BY MR. SCHMITZ:
 3     Q.   I'm going to publish Exhibits 1E and 1A again,
 4    Your Honor.
 5            (At this time, a video was played in open
 6        court and taken down to the best of the court
 7        reporter's ability.)
 8            SPEAKER:  On point.  What's up, my man?
 9            SPEAKER:  What's up bro, what's happening?
10            SPEAKER:  Chill?
11            SPEAKER:  Got baby seat in here.
12            SPEAKER:  Yeah, I got kids down here that's
13    why I be coming down.  This is 14.
14            SPEAKER:  14?
15            SPEAKER:  And I brought you another 14.
16            SPEAKER:  I'm still going to have to owe you
17    though; right?
18            SPEAKER:  Yeah, that's -- if you make money,
19    I'm going to make money.
20            SPEAKER:  I hear you.  It's going to take me
21    a little bit to get it to you, though.
22            SPEAKER:  I ain't calling you, if you make
23    money, I make money.  If your clientele get better.
24    That's what I tell Berto.  That's what's up.
25            All right.  I see you in a couple weeks, man.
```

1    SPEAKER:  All right.  Next time bring more

2  clientele.

3    SPEAKER:  All right.

4    (End of video.)

5  BY MR. SCHMITZ:

6  Q.   All right.  Sergeant Gonzalez, what did you do

7  after that transaction?

8  A.   I returned to a prearranged meet location where I

9  provided Agent Strang with the purchased heroin.

10  Q.   Did you provide the heroin to anybody else before

11  you provided it to Agent Strang?

12  A.   No, I did not.

13  Q.   Was it in your possession the entire time?

14  A.   Yes, it was.

15  Q.   All right.  I'm going to direct your attention to

16  the transaction that occurred on December 17th, 2014.

17  That day did you purchase what you believed to be

18  heroin from the defendant?

19  A.   Yes, I did.

20  Q.   How did you communicate with the defendant to set

21  up that deal?

22  A.   Via cell phone.

23  Q.   And did other officers conduct surveillance of the

24  deal?

25  A.   Yes.

1    Q.   Was there video and audio recordings of that deal?

2    A.   Yes, there was.

3    Q.   Where was the transaction supposed to occur?

4    A.   The Home Depot parking lot.

5    Q.   Is that here in the Middle District of Florida?

6    A.   Yes, it is.

7    Q.   Who picked that location?

8    A.   Mr. Williams.

9    Q.   How much heroin was originally arranged to be sold

10   during that deal?

11   A.   A quarter, quarter ounce of heroin.

12   Q.   And how much is a quarter ounce of heroin?

13   A.   $700 or seven grams.

14   Q.   How much heroin did the defendant -- excuse me,

15   did the defendant ultimately provide you during that

16   deal?

17   A.   Ten and a half grams.

18   Q.   Did you know he was going to show up with the

19   extra three and a half grams?

20   A.   No, I did not.

21   Q.   Can you explain generally what happened during

22   that deal?

23   A.   He arrived to the Home Depot parking lot like the

24   first time and he came to my driver's side window.  He

25   showed up in a different vehicle.  It had a large flat

1    screen TV box in the back, and I joked around with him,

2    I asked him if he was giving away televisions.  He

3    actually removed the heroin from inside the television

4    box and came to my window, my driver's side window, and

5    that's where we conducted the transaction.

6    Q.   Did he provide you heroin during that transaction?

7    A.   Yes, he did.

8    Q.   Could you smell it?

9    A.   Yes.

10   Q.   Did he provide -- did you provide him money?

11   A.   Yes, I did.

12   Q.   Was that money prerecorded?

13   A.   Yes, it was.

14   Q.   I'm showing you what's been marked for

15   identification as Government's Exhibit 3 and 3A.  Could

16   you please review those, Sergeant Gonzalez?

17   A.   Okay.

18   Q.   Do you recognize Government's Exhibit 3?

19   A.   Yes, I do.

20   Q.   What is Government's Exhibit 3?

21   A.   It's a disk containing the video of the

22   transaction.

23   Q.   The transaction on what date?

24   A.   December 17th, I believe; yes.

25   Q.   Is that a true and accurate -- excuse me, is that

1    a true and accurate recording of the transaction that

2    occurred on December 17th, 2014?

3     A.   Yes, it is.

4     Q.   Your Honor, the government moves for the admission

5    of Government's Exhibit 3?

6              THE COURT:  Any objection?

7              MR. JOFFE:  No objection, Your Honor.

8              THE COURT:  Government's Exhibit 3 will be

9    introduced at this time.

10             (Government's Exhibit Number 3 was admitted

11        into evidence.)

12   BY MR. SCHMITZ:

13    Q.   Sergeant Gonzalez, do you recognize Government's

14   Exhibit 3A?

15    A.   Yes, I do.

16    Q.   What is that?

17    A.   It's the transcript of the actual deal.

18    Q.   Is that a true and accurate transcription of the

19   video, Government's Exhibit 3?

20    A.   Yes, it is.

21             MR. SCHMITZ:  Your Honor, we move for the

22   admission of Government's Exhibit 3A.

23             MR. JOFFE:  No objection, Your Honor.

24             THE COURT:  Government's Exhibit 3A will be

25   introduced.

1          (Government's Exhibit Number 3A was admitted

2       into evidence.)

3          THE COURT:  And as you heard, ladies and

4    gentlemen, Government's Exhibit 3A has been identified

5    as the typewritten transcript of the oral conversation

6    that had been heard on the tape recording received into

7    evidence as Government's Exhibit Number 3.  The

8    transcript also purports to identify the speakers

9    engaged in the conversation.  My admonition to you

10   would be the same as for the introduction of the last

11   exhibit.  You may publish.

12          MR. SCHMITZ:  Thank you, Your Honor.

13   BY MR. SCHMITZ:

14    Q.   And, Sergeant Gonzalez, we previously viewed

15   Government's Exhibit 1 and there was a date stamp on

16   that video.  Was that necessarily an accurate date

17   stamp?

18    A.   No, it was not.

19    Q.   What date did the first transaction Government's

20   Exhibit 1 occur?

21    A.   I believe December 11th.

22    Q.   The first transaction --

23    A.   I'm sorry, November 18th, 2014.

24    Q.   Okay.  And have you viewed that Government's

25   Exhibit 3?

1    A.    Yes, I have.

2    Q.    What date did that occur?

3    A.    That occurred December 18th, 2014.

4    Q.    All right.

5    A.    I'm sorry, 17th.

6    Q.    Okay.

7          MR. SCHMITZ:  May we publish?

8          THE COURT:  Yes.

9          (At this time, a video was played in open

10    court and taken down to the best of the court

11    reporter's ability.)

12         SPEAKER:  You giving away TVs, man?

13         SPEAKER:  Naw, I just bought those cause hey

14    (inaudible) that's all I got left.

15         SPEAKER:  How much is here?

16         SPEAKER:  There's ten and a half.

17         SPEAKER:  Okay.  Listen, I got seven, I got

18    the 14 from the last time?

19         SPEAKER:  Yeah.

20         SPEAKER:  And then I got another seven?

21         SPEAKER:  Uh-huh.

22         SPEAKER:  So that makes us even; right?

23         SPEAKER:  Yeah, so it's just three and a half

24    on that one.

25         SPEAKER:  Hey, you got any more work for next

1  week?

2          SPEAKER:  I got ya, bro.  I'm going to

3  Bogota, Columbia, so when I go to Bogota, we can come

4  down the next time, I'll give you a duffel bag.

5  (Inaudible) I'm leaving on the 18th of January.

6          SPEAKER:  Okay.

7          SPEAKER:  So by the time you come back it

8  will be like in that first week after the holiday.

9          SPEAKER:  All right.  Pulling out.

10          (End of video.)

11  BY MR. SCHMITZ:

12  Q.   Again, is the date stamp on that video accurate?

13  A.   No.

14  Q.   What date did that occur?

15  A.   December 17th, 2014.

16  Q.   The first thing you say here is, you giving away

17  TVs, man.  Why did you say that?

18  A.   He arrived with a large screen TV in the back of

19  his vehicle.  It was just conversation.

20  Q.   Okay.  He says, I fronted you three and three

21  and -- excuse me, three, three and a half.  What did he

22  mean?

23  A.   He was giving me extra, three, three and a half

24  grams of heroin extra.

25  Q.   Okay.

1              And you also say earlier, you say, listen, I

2        got seven, I got 14 from the last time.  What were

3        you referring to?

4    A.   I was paying him for the prior debt from the last

5    deal.

6    Q.   What does seven mean?

7    A.   Seven referring to -- another seven, when I'm

8    saying another seven, I'm talking about money.

9    Q.   Okay.  And you say, I got 14 from the last time.

10   What were you talking about 14?

11   A.   $1,400.

12   Q.   And, again, three and a half, what does that mean?

13   A.   Three and a half grams of heroin.

14   Q.   So did he front you heroin during this deal?

15   A.   Three and a half grams.

16   Q.   All right.  You say, hey, you get me -- excuse me.

17   Hey, you get me more work for next time, though.  What

18   does that mean?

19   A.   I was asking --

20   Q.   What does work mean?

21   A.   More work, more narcotics for me to sell.

22   Q.   All right.  The defendant then says, when I go to

23   Bogota, I'll be gone for two weeks, so when you come

24   down the next time I'll give you enough for like the

25   two weeks I'm gone.  What does that mean?

1    A.    He was explaining to me that he'll give me enough

2    heroin to keep going while he's gone.

3    Q.    During this transaction did the defendant hand

4    heroin to you?

5    A.    Yes.

6    Q.    When did he hand -- when during that transaction

7    did he hand it to you?

8    A.    When he's explaining to me about the extra three,

9    three and a half.

10   Q.    Where were you positioned when he handed the

11   heroin to you?

12   A.    I was sitting in my vehicle on the driver's side.

13   He came to my window.

14   Q.    Did you see where he got the heroin from?

15   A.    The TV box, he removed it from the television box.

16   Q.    Could you smell it?

17   A.    Once I had possession of it, yes.

18   Q.    Based on your training and experience in law

19   enforcement, did it appear to be heroin?

20   A.    Yes.

21   Q.    What did you do after this deal?

22   A.    I returned to a prearranged location and provided

23   Agent Strang with the purchased heroin.

24   Q.    Did you have the heroin in your possession the

25   entire time before you gave it to Agent Strang?

1    A.    Yes, I did.

2    Q.    I'm going to direct your attention now to

3    February 11th, 2015.  Did you buy what you suspected to

4    be heroin from the defendant on that date?

5    A.    Yes, I did.

6    Q.    How did you communicate with the defendant to set

7    up that deal?

8    A.    Via cell phone.

9    Q.    Did other officers conduct surveillance of the

10   deal?

11   A.    Yes, they did.

12   Q.    Was there video and audio recording of the deal?

13   A.    There was.

14   Q.    Where was the transaction supposed to occur?

15   A.    Home Depot parking lot.

16   Q.    Who picked that location?

17   A.    Mr. Williams.

18   Q.    How much heroin was originally arranged for this

19   deal?

20   A.    14 grams or half an ounce.

21   Q.    How much did he actually show -- how much did the

22   defendant actually show up to the deal with?

23   A.    An ounce.

24   Q.    A full ounce?

25   A.    Yes.

1   Q.   How much were you going to originally pay for the

2   half ounce?

3   A.   $1,400.

4   Q.   Again, before you went to this deal, did you know

5   he was going to front you the additional half ounce?

6   A.   No, I did not.

7   Q.   All right.  Can you explain for the jury generally

8   speaking what happened during this deal?

9   A.   I arrived at the parking lot like normal, and he

10  arrived shortly after and he parked very close to my

11  vehicle on the driver's side.  I get out of the vehicle

12  and I approach his passenger's side window, and that's

13  where we conducted the transaction.

14  Q.   I'm showing you what's been marked for

15  identification as Government's Exhibit 5, 5A, and 5E.

16  Take a look at Government's Exhibit 5 and 5E.  Do you

17  recognize that?

18  A.   Yes, I do.

19  Q.   What is that?

20  A.   It's video of the buy, which took place on

21  February 11th.

22  Q.   All right.  Is that a true and accurate recording

23  of that buy that occurred that day?

24  A.   Yes, it is.

25              MR. SCHMITZ:  Your Honor, I move for the

1    admission of Government's five and 5E.

2              MR. JOFFE:  No objection, Your Honor.

3              THE COURT:  Government's Exhibit 5 and

4    Exhibit 5 E will be introduced at this time.

5              (Government's Exhibit Number 5 and 5E were

6         admitted into evidence.)

7    BY MR. SCHMITZ:

8    Q.   Can you take a look at Government's Exhibit 5A,

9    please?  Do you recognize that?

10   A.   Yes, I do.

11   Q.   What is that?

12   A.   It's the transcript of the actual deal.

13   Q.   And is that a true and accurate transcription of

14   Government's Exhibit 5E?

15   A.   Yes, it is.

16   Q.   Did you review that transcript?

17   A.   Yes, I have.

18             MR. SCHMITZ:  Your Honor, the government

19   moves for the admission of Government's Exhibit 5A.

20             MR. JOFFE:  No objection, Your Honor.

21             THE COURT:  Government's Exhibit 5A will be

22   introduced at this time.

23             (Government's Exhibit Number 5A was admitted

24        into evidence.)

25             MR. SCHMITZ:  Your Honor, may we publish

1      Government's Exhibits 5E and 5A?

2              THE COURT:  You may.

3              (At this time, a video was played in open

4         court and taken down to the best of the court

5         reporter's ability.)

6              SPEAKER:  What's up, man?

7              SPEAKER:  (Inaudible).

8              SPEAKER:  I've been up north.

9              SPEAKER:  Yeah.

10             SPEAKER:  Yeah, hey, this is my cousin, my

11    cousin Lori.

12             WOMAN:  Hey, what's up.

13             SPEAKER:  Hey, she's from Miami.  I might

14    start sending her up this way because it's easier for

15    her.

16             SPEAKER:  Okay.

17             SPEAKER:  Is that straight?

18             SPEAKER:  Yeah.  Straight enough.

19             SPEAKER:  I knew you would like that shit.

20             SPEAKER: (Inaudible).

21             SPEAKER:  Let me get out real quick.  Parked

22    all jacked up, man.

23             SPEAKER:  (Inaudible).

24             SPEAKER:  From the last time.  Okay.  All

25    right.  Man, (inaudible).  I'm gonna straighten old boy

1    out, too, because that shit ain't right.

2              SPEAKER: (Inaudible).

3              SPEAKER:  I am, man.

4              SPEAKER: (Inaudible).

5              SPEAKER:  I hear that.  All right, man.  I'm

6    going to send her next time, though.

7              SPEAKER:  All right.

8              WOMAN:  Nice to meet you.

9              SPEAKER:  What's your name?

10             WOMAN:  Lori.

11             SPEAKER:  (Inaudible).

12             SPEAKER:  I got a twin brother.

13             WOMAN:  Oh, really.  That's awesome.  All

14   right.  I'll see ya.

15             SPEAKER:  Damn.  You good?  You good?

16             SPEAKER:  Pull out first, bro.

17             SPEAKER:  All right.

18             SPEAKER: (Inaudible) fucked up.

19             SPEAKER:  Let me go out first.

20             SPEAKER:  Yeah.

21             (End of video.)

22   BY MR. SCHMITZ:

23    Q.   Okay.  When did the defendant hand you the heroin

24   in this transaction?

25    A.   When I went to his car window.

1   Q.   And when did you hand him the money?

2   A.   After he provided me with the heroin.

3   Q.   Were those funds prerecorded?

4   A.   Yes, they were.

5   Q.   All right.  You say down here, parked all jacked

6   up.  What did you mean by that?

7   A.   His vehicle was extremely close to my undercover

8   vehicle in the parking lot.

9   Q.   All right.  You say, damn, you good, you good.

10  And then the defendant says, yeah, pull out first, bro.

11  What happened there?

12  A.   He backed into my vehicle once he was leaving the

13  parking lot.

14  Q.   Was there any damage to the vehicle?

15  A.   No, there was not.

16  Q.   Again, was the date stamp on this video

17  necessarily accurate?

18  A.   No, it wasn't.

19  Q.   And this third transaction, when did this -- what

20  date did this third transaction occur?

21  A.   February 11th, 2015.

22  Q.   What did you do with the heroin -- what did you do

23  after the transaction?

24  A.   Traveled back to a prearranged location and

25  provided Agent Strang with the heroin I purchased.

1    Q.   Did you maintain possession of that heroin the

2    entire time from the time you received it from the

3    defendant to the time you gave it to Sergeant Strang?

4    A.   Yes, I did.

5    Q.   Now, in your transactions with the defendant,

6    those three transactions, let me ask you this,

7    Government's Exhibits 1, 3, and 5, was that you on

8    those videos?

9    A.   Yes, it was.

10   Q.   Was that the defendant on those videos?

11   A.   Yes, it was.

12   Q.   Was that your voice on the videos?

13   A.   Yes.

14   Q.   Was that the defendant's voice?

15   A.   Yes.

16   Q.   In your transactions with the defendant, were you

17   able to determine whether he was comfortable in dealing

18   with credit?

19   A.   Yes.

20   Q.   Was he?

21   A.   He was.

22   Q.   Were you able to determine whether he was

23   comfortable fronting you drugs on the promise you would

24   pay him back?

25   A.   He was.

1    Q.    Was he?

2    A.    Yes.

3    Q.    Did he front you or did he at least attempt to

4    front you extra heroin on all three of those deals?

5              MR. JOFFE:   Objection.   Compound question.

6              THE COURT:   Go ahead and reword your

7    question.

8    BY MR. SCHMITZ:

9    Q.    Did he front you heroin in all three of those

10   deals?

11   A.    Yes, he did.

12   Q.    In your training and experience in law

13   enforcement, have you heard the term brick before?

14   A.    Yes, I have.

15   Q.    What quantity of drugs does the term brick refer

16   to?

17   A.    Refers to a kilo or kilogram of narcotics.

18   Q.    And what type of narcotics would that refer to a

19   kilo of?

20   A.    Cocaine and heroin.

21   Q.    All right.   In your training and experience in law

22   enforcement, have you heard the term key?

23   A.    Yes, I have.

24   Q.    To what quantity of drugs does the term key refer?

25   A.    Kilo or kilogram.

1          MR. SCHMITZ:  Your Honor, may I have a

2    moment?

3          THE COURT:  Yes.

4    BY MR. SCHMITZ:

5     Q.   All right.  Sergeant Gonzalez, I showed you

6    Government's Exhibit 5, that last deal.  There was

7    another woman involved in that deal.  Who was that

8    woman?

9     A.   She was a police officer for Fort Myers Police

10   Department.

11    Q.   All right.  And in deal number -- the second deal,

12   Exhibit Number 3, there was a loud sound on the video

13   and it sounded like it cut off.  What happened there?

14    A.   There was some type of glitch at the end of the

15   video.

16    Q.   Was the rest of that recording completely

17   accurate?

18    A.   Yes.

19    Q.   Thanks.

20          MR. SCHMITZ:  No further questions, Your

21   Honor.

22          THE COURT:  Mr. Joffe, cross-examination?

23          MR. JOFFE:  Yes, Your Honor.

24                  CROSS-EXAMINATION

25   BY MR. JOFFE:

1   Q.   Sergeant Gonzalez, good afternoon, sir.

2   A.   Good afternoon.

3   Q.   Your investigation began as a state investigation;

4   is that correct?

5   A.   No.

6   Q.   Okay.  At the time that you began the

7   investigation, this was a joint task force

8   investigation; correct?

9           MR. SCHMITZ:  Your Honor, objection.

10  Relevance.

11          THE COURT:  Overruled.

12          THE WITNESS:  No, it was not.

13  BY MR. JOFFE:

14  Q.   Okay.  And when you were introduced to

15  Mr. Williams, Mr. Williams was introduced to you as

16  someone who could sell heroin; is that correct?

17  A.   Yes.

18  Q.   And the amounts of heroin that you were told that

19  Mr. Norris Williams could provide to you were small

20  quanties of heroin; correct?

21  A.   No.

22  Q.   But the amounts of heroin that Mr. Williams was

23  selling were small quanties; correct?

24  A.   Still trafficking amounts in the state level.

25  Q.   But my question to you is that the physical

1    amounts of heroin that Mr. Williams was selling to you

2    were small amounts; correct?

3    A.    I would still say no.

4    Q.    Okay.  Fair.  But the amount of heroin that

5    Mr. Williams sold to you each time could fit in the

6    palm of your hand; correct?

7    A.    Yes.

8    Q.    Okay.  It's a small quantity when it's sitting in

9    your hand; correct?

10   A.    Yes.

11   Q.    Okay.  I understand what you're saying, you're

12   saying that the state statutes classify that as

13   trafficking; correct?

14            MR. SCHMITZ:  Objection.  Calls for a legal

15   conclusion.

16            MR. JOFFE:  He's already testified about it,

17   Your Honor.

18            THE COURT:  It's overruled.  Go ahead.

19            THE WITNESS:  That is correct.

20   BY MR. JOFFE:

21   Q.    Okay.  But the amount goes in your hand,

22   basically; correct?

23   A.    Yes.

24   Q.    Okay.  And at no time did Mr. Williams sell you a

25   kilogram of cocaine; correct?

1   A.   That is correct.

2   Q.   Okay.   At no time did you ask Mr. Williams to sell

3   you a kilogram of cocaine; is that correct?

4   A.   That is correct.

5   Q.   And when you met with Mr. Williams on one of the

6   transactions we don't see him; is that correct?   That's

7   the time when you state that Mr. Williams bumped into

8   your car; correct?

9   A.   That is the third time.

10  Q.   The third time; that's correct.   We don't see

11  Mr. Williams; correct?

12  A.   Correct.

13  Q.   Okay.   We hear a woman's voice; correct?

14  A.   Yes.

15  Q.   And you have identified her as a local law

16  enforcement officer; correct?

17  A.   Yes.

18  Q.   Now, is there a reason why we see -- purportedly

19  see Mr. Williams on two transactions but not the third?

20  A.   Just the positioning of the camera device.

21  Q.   Is there a reason why on the third transaction you

22  don't have Mr. Williams get into your vehicle?

23  A.   There was somebody else in my vehicle at the time.

24  Q.   Okay.   Was that preplanned?

25  A.   Yes.

1  Q.   Okay.  And when you met with Mr. Williams the
2  first time, he sold you, what, seven grams?
3  A.   Yes.
4  Q.   Okay.  And that's $700 worth; is that correct?
5  A.   Well, the deal was for 700, he actually brought
6  14.
7  Q.   Okay.  But you paid Mr. Williams $700; correct?
8  A.   That is correct.
9  Q.   And Mr. Williams fronted you an additional seven
10 grams; correct?
11 A.   Yes.
12 Q.   And, again, seven grams would fit in the palm of
13 your hand; correct?
14 A.   Yes.
15 Q.   And it would fit easily; correct?
16 A.   Yes, it would.
17 Q.   Okay.  It's not as if Mr. Williams is giving you a
18 kilogram of cocaine which you've testified is a brick;
19 correct?
20 A.   Yes, I have.
21 Q.   And how many grams in a kilogram -- I keep saying
22 cocaine, heroin.  How many grams in a kilogram of
23 heroin?
24 A.   Thousands.
25 Q.   Thousands?

1   A.   Yes.

2   Q.   Okay.   And how many ounces in a kilogram of

3   heroin?

4   A.   36.

5   Q.   So the amounts, if we look at it in that context,

6   the amounts of heroin that Mr. Williams is selling you

7   are relatively small amounts; correct?

8   A.   Compared to a kilo, yes.

9   Q.   And the reason that you -- let me ask you this,

10  what's your reasoning or your rationale for continuing

11  to have Mr. Williams sell you heroin?

12  A.   I was just following the instructions of the case

13  agent.

14  Q.   Okay.   And did the case agent -- was the case

15  agent the one that made the decision as to the quantity

16  of heroin that you were to purchase on each

17  transaction?

18          MR. SCHMITZ:   Objection, Your Honor,

19  relevance.

20          THE COURT:   Overruled.   If he can answer the

21  question.

22          THE WITNESS:   It was the case agent's

23  decision.

24  BY MR. JOFFE:

25  Q.   Okay.   And when we see these transactions occur on

1  the video, you testified that there had been prior

2  discussions with Mr. Williams; is that correct?

3  A.   Yes.

4  Q.   Okay.  Discussions about amounts; correct?

5  A.   Yes.

6  Q.   And would it be fair to say that you as the buyer

7  of the heroin were telling Mr. Williams how much you

8  wanted?

9  A.   Yes.

10  Q.   Okay.  And when we see these three transactions

11  that you're initially -- that you've testified about,

12  how many days does it typically take Mr. Williams to

13  obtain the heroin that he's selling to you on the

14  video?

15  A.   That I can't answer.  I don't know how long it

16  takes him.  Every time I called he was ready to go that

17  day.

18  Q.   Okay.  And when the heroin was handed to you, did

19  you ever do what's called a presumptive test of the

20  heroin?

21  A.   I did not.

22  Q.   Okay.  Do you know if any other law enforcement

23  officers did that once you handed it to them?

24  A.   I do not.

25  Q.   Okay.  And as you sit here today, do you know what

1  the quality of that heroin was?

2  A.   No, I do not.

3  Q.   And when I say quality, do you know what that

4  means?

5  A.   Yes, I do.

6  Q.   Could you explain to the members of the jury what

7  that is?

8  A.   Basically the purity of the heroin, its potency.

9  Q.   Because heroin can be cut; is that correct?

10  A.   Yes, it can.

11  Q.   Okay.  And what are the agents that are

12  typically -- when I say agents, chemical agents that

13  are typically used to cut heroin?

14  A.   There's several, they use laxatives, they've

15  used -- I mean, I've seen a lot in my experience, a lot

16  of different chemicals that could be added.

17  Q.   Okay.  And when you purchase this heroin, would it

18  be fair to say that each time it was a different color,

19  if you recall?

20  A.   I don't recall.

21  Q.   Okay.  And typically what color is heroin?

22  A.   It's usually brown, light brown.  It varies.  If

23  you get into black tar heroin it's completely black, so

24  there's different variations, but typically you're

25  getting a light brown powder.

1    Q.    Okay.   And does the cutting agent affect the color

2    of the heroin?

3    A.    It can.

4    Q.    Okay.   Does it make it lighter or darker, if you

5    know?

6    A.    Depending on what it's cut with.   It would vary.

7    Q.    Okay.   And in this particular case, the three

8    transactions that you did in this case with

9    Mr. Williams, what was the quality of that heroin, if

10   you know?

11   A.    I do not know the quality.

12   Q.    As to the weight of each transaction that

13   occurred, were you responsible for weighing the heroin

14   when you purchased it from Mr. Williams?

15   A.    No, I was not.

16   Q.    Whose job was that?

17   A.    It was the case agent.

18   Q.    Okay.   And the case agent's job is to then turn it

19   over to where, to an evidence locker?

20        MR. SCHMITZ:   Objection, Your Honor, hearsay,

21   lack of foundation.

22        THE COURT:   Sustained.

23   BY MR. JOFFE:

24   Q.    What's the standard protocol once you receive

25   narcotics in a transaction in this case?   Who do you

1  give it to?

2   A.   I provided the purchased narcotics to the case

3  agent.

4   Q.   And the case agent was whom?

5   A.   Agent Strang.

6   Q.   And what's the normal course of business for law

7  enforcement at that point?  What does Agent Strang do

8  with the narcotics?

9        MR. SCHMITZ:  Objection.  Calls for

10  speculation lack of foundation.

11  BY MR. JOFFE:

12   Q.  If you know?

13        THE COURT:  Overruled.  You can answer the

14  question, if you can.

15        THE WITNESS:  I provided to Agent Strang via

16  chain of custody.  I don't know what the DEA protocol

17  is from that point on.

18  BY MR. JOFFE:

19   Q.   Okay.  Have you had an opportunity to review the

20  DEA laboratory reports before testifying here today?

21   A.   No, I have not.

22   Q.   Okay.  We hear on one of the transactions

23  Mr. Williams saying, that's what I tell Berto.  Do you

24  remember that?

25   A.   Yes, I do.

1   Q.   Was Berto also an undercover agent?

2   A.   No.

3   Q.   Okay.  Now, in the three transactions involved in

4   this case involving Mr. Williams, does Mr. Williams

5   ever attempt to front you a kilogram of heroin?

6   A.   No.

7   Q.   Does Mr. Williams ever attempt to front you a half

8   kilogram of heroin?

9   A.   No.

10  Q.   And the amounts of money that you're dealing with

11  with Mr. Williams consist of what, $700, $1,400; is

12  that correct?

13  A.   Yes.

14  Q.   Okay.  What's the total amount of money for these

15  three transactions that you provided to Mr. Williams,

16  if you recall?

17  A.   Probably close to 5,000.

18  Q.   $5,000?

19  A.   Close to that range total.

20  Q.   That's significantly less than $70,000; is that

21  correct?

22  A.   That is.

23  Q.   Okay.  And as you sit here today, do you know what

24  the street value of a kilogram of heroin is at this

25  time?

1    A.    75,000.

2    Q.    Okay.  And does that price vary?

3    A.    It does.

4    Q.    What causes the price to vary?

5    A.    Location, different parts of the United States, it

6    varies.

7    Q.    Demand?

8    A.    Demand.

9    Q.    Transportation costs?

10   A.    Sure.

11   Q.    Quality?

12   A.    Sure.

13   Q.    Okay.  And were you involved in any way with the

14   provision of the kilogram of heroin to Mr. Williams in

15   this case?

16   A.    No, I was not.

17   Q.    After that third transaction with Mr. Williams,

18   your function ceases in this case; correct?

19   A.    Yes.

20   Q.    Okay.  And that's because you're dealing with

21   relatively small quanties of heroin; correct?

22   A.    No, not necessarily, no.

23   Q.    Well, you're relating it back to state court, but

24   the individual that deals with the kilogram amount is

25   not you; correct?

1    A.    That is correct.

2    Q.    Okay.  That gets transferred to a federal law

3    enforcement officer; correct?

4    A.    The reason I basically bowed out of the case was I

5    was promoted, and just stopped doing undercover work.

6    That's the reason I didn't continue in the case.

7    Q.    Okay.  And when were you promoted during the

8    course of this case?

9    A.    I was promoted in February.

10   Q.    After this third transaction?

11   A.    Just prior.  I did this February 11th transaction

12   and then I was done.

13   Q.    So you had nothing to do with the provision of the

14   kilogram of heroin; correct?

15   A.    Correct.

16   Q.    Okay.  But had you had any discussions with

17   Mr. Williams regarding him purchasing a kilogram of

18   heroin?

19   A.    No, not at that point.

20   Q.    And during these three transactions, it's always

21   Mr. Williams providing the heroin; correct?

22   A.    Yes.

23   Q.    And Mr. Williams is providing these ounce amounts

24   and these gram amounts; correct?

25   A.    That is correct.

1           MR. JOFFE:  Thank you, sir.  I have no

2  further questions of this witness, Your Honor.

3           THE COURT:  Thank you.  Any redirect?

4           MR. SCHMITZ:  Your Honor, just give me a

5  moment, please.

6           THE COURT:  Yes.

7                   REDIRECT EXAMINATION

8  BY MR. SCHMITZ:

9  Q.  All right.  Sergeant Gonzalez, why was Lori

10 inserted into the case in the last buy?

11 A.  The agent decided because I was promoted he wanted

12 to have me introduce her as the potential buyer for the

13 ongoing investigation.

14          MR. SCHMITZ:  No more questions, Your Honor.

15          THE COURT:  Anything, Mr. Joffe?

16          MR. JOFFE:  No, Your Honor.  Nothing further.

17          THE COURT:  Thank you.  May this witness be

18 excused?

19          MR. SCHMITZ:  Yes, Your Honor.

20          MR. JOFFE:  Yes, Your Honor.

21          THE COURT:  All right.  Then you may be

22 excused.  Thank you.  Call your next witness.

23          MR. SCHMITZ:  Your Honor, the United States

24 calls Drug Enforcement Administration agent Mark

25 Strang.

1    THEREUPON,

2                        MARK STRANG,

3    a witness, having been first duly sworn, upon his oath,

4    testified as follows:

5            THE WITNESS:  I do.

6            COURTROOM DEPUTY:  Please state and spell

7    your name for the record.

8            THE WITNESS:  My name is Mark Strang,

9    S-T-R-A-N-G.

10                       DIRECT EXAMINATION

11   BY MR. SCHMITZ:

12   Q.   Good afternoon, Agent Strang.  How are you

13   employed?

14   A.   I'm a special agent with the U.S. Drug Enforcement

15   Administration.

16   Q.   How long have you been with DEA?

17   A.   Approximately 29 years.

18   Q.   How many narcotics investigations have you been

19   involved with in your time with DEA?

20   A.   I would say hundreds.

21   Q.   As part of your job, do you conduct surveillance?

22   A.   Yes, I do.

23   Q.   Do you conduct surveillance of undercover buys?

24   A.   Yes, I do.

25   Q.   Do you participate -- facilitate controlled

1  purchases in narcotics?

2  A.   Yes, I do.

3  Q.   Is it part of your job duties to handle evidence?

4  A.   Yes.

5  Q.   Have you been trained in how to handle evidence?

6  A.   Yes, I have.

7  Q.   Did there come a time when you became involved in

8  the investigation into whether Norris Williams

9  purchased and sold heroin?

10  A.   Yes.

11  Q.   Do you recognize -- do you know what Mr. Williams

12  looks like from the surveillance you conducted of those

13  purchases?

14  A.   Yes, I do.

15  Q.   Do you see him sitting in the courtroom here

16  today?

17  A.   Yes, I do.

18  Q.   Can you please point to him and identify an

19  article of clothing?

20  A.   He's seated at the defense table with a dark suit.

21  Q.   If I refer to Norris Williams as the defendant,

22  will you know what I'm talking about?

23  A.   Yes.

24  Q.   I want to direct your attention to the role you

25  played with respect to the evidence in this case.  What

1  generally was your role with respect to the evidence in

2  this case?

3  A.   I was responsible for receiving the evidence from

4  the undercover agent, Sammy Gonzalez, and sealing it in

5  an evidence bag for submission to the southeast

6  laboratory for analysis.

7  Q.   Did you receive the heroin from Sammy Gonzalez

8  after the deal?

9  A.   I did.

10  Q.   And generally speaking, what did you do with the

11  heroin that you received after the deals?

12  A.   Well, I would place it in a DEA evidence bag and

13  seal it and write in the appropriate markings or

14  witness another agent who may do the same thing.

15       MR. SCHMITZ:  Your Honor, may I approach the

16  witness freely?

17       THE COURT:  Yes, you may.

18  BY MR. SCHMITZ:

19  Q.   Did you receive from then detective now sergeant

20  Gonzalez heroin on November 18th, 2014, that Detective

21  Gonzalez had purchased from the defendant?

22  A.   I did.

23  Q.   Please take a look at Exhibit 2A1.  Do you

24  recognize that?

25  A.   Yes.

1   Q.   What is that?

2   A.   That's a photograph of the heroin evidence that

3   was purchased on 11/18/14.

4   Q.   Is that a fair and accurate depiction of the

5   drugs, the heroin you received from Detective Gonzalez

6   on November 18th, 2014?

7   A.   Yes.

8          MR. SCHMITZ:  Your Honor, the government

9   moves for admission of Government's Exhibit 2A1.

10         MR. JOFFE:  No objection, Your Honor.

11         THE COURT:  Government's Exhibit 2A1 will be

12  introduced at this time.

13         MR. SCHMITZ:  May we publish?

14         THE COURT:  Yes, you may.

15         (Government's Exhibit Number 2A1 was admitted

16     into evidence.)

17  BY MR. SCHMITZ:

18  Q.   Again, is that the heroin that Detective Gonzalez

19  gave you on November 8th, 2014?

20  A.   Yes, it is.

21  Q.   Was it in that packaging?

22  A.   Yes.

23  Q.   All right.  Now, were you tasked with handling the

24  heroin that the defendant sold to -- that heroin that

25  the defendant had sold on November 18th?

1    A.    Yes.

2    Q.    When you received that evidence, what did you do

3    with it?

4    A.    Well, I seal it in a DEA -- what's called a

5    self-sealing evidence envelope and fill out the

6    appropriate markings.  There are two people that do the

7    sealing and the marking, so either sealed it or

8    witnessed the sealing it.  And I either filled out the

9    appropriate information that was needed or witnessed

10   that.

11   Q.    Did you maintain possession of that heroin at all

12   times from the time you got it from Detective Gonzalez

13   to the time you sealed it in that bag or witnessed it

14   sealed in that bag?

15   A.    Yes, I did.

16   Q.    All right.  I'm showing you what's been marked for

17   identification as Government's Exhibit 2.  Do you

18   recognize that?

19   A.    Yes, I do.

20   Q.    What is it?

21   A.    This is the evidence bag, the original evidence

22   bag and the heroin that we sealed in this bag on

23   November 18th, 2014.

24   Q.    Do you recognize the handwriting on that bag?

25   A.    Yes, I do.

1   Q.   Is some of that handwriting your handwriting?

2   A.   Yes.

3   Q.   Is that your name on the seal?

4   A.   Yes, it is.

5   Q.   Is that the same bag in which you sealed that

6   heroin after you received it from Detective Gonzalez on

7   November 18th, 2014?

8   A.   Yes.

9   Q.   Again, did you keep and maintain possession of

10  that heroin that Detective Gonzalez gave you at all

11  times before it was sealed in the bag?

12  A.   Yes, I did.

13  Q.   Did anyone tamper with the heroin?

14  A.   No.

15  Q.   Did anyone that you know of tamper with that bag?

16  A.   No one tampered with it.  At the laboratory the

17  forensic chemist --

18  Q.   Right, until it got to the laboratory, did anyone

19  tamper with that bag?

20  A.   No, it was sealed.  It was sealed by me and Adam

21  Heinlein, and that's the way it was sent out.

22  Q.   And where is evidence stored at DEA after you seal

23  it?

24  A.   We have a special room that's called the drug

25  evidence vault, and it's designed for storing,

1    temporary storage of drug evidence.

2    Q.   Where did that evidence go after it was placed in

3    the vault?  Where if anywhere?

4    A.   It went to the south -- the DEA southeast

5    laboratory in Miami, Florida.

6    Q.   And just one more question about Government's

7    Exhibit 2 there, that's the bag I was just asking you

8    about.  Is that bag in the same condition as when you

9    sealed it?

10   A.   Not entirely.  It's been opened and resealed.

11   Q.   Do you know as you sit here today who opened and

12   resealed that?

13   A.   That was the forensic chemist, DEA forensic

14   chemist.

15   Q.   Okay.

16   A.   I don't know which one.

17   Q.   Can you take a look at Government's Exhibit 4A1

18   that I just showed you.  What is that?

19   A.   That's a photograph of Exhibit -- DEA Exhibit 7,

20   which was the second -- or undercover purchase of

21   heroin.

22   Q.   And when you say the second undercover purchase,

23   is that the purchase that occurred on December 17th,

24   2014?

25   A.   That's correct.

1   Q.   Does that photograph fairly and accurately depict

2   the drugs as you received them from Detective Gonzalez

3   after purchased them?

4   A.   Yes.

5   Q.   From the defendant?

6   A.   Yes.

7   Q.   Did you take that picture?

8   A.   I did.

9          MR. SCHMITZ:  Your Honor, the government

10  moves for the admission of Government's Exhibit 4A1.

11         THE COURT:  Any objection?

12         MR. JOFFE:  No, Your Honor.

13         THE COURT:  Government's Exhibit 4A1 will be

14  introduced at this time.

15          (Government's Exhibit Number 4A1 was admitted

16      into evidence.)

17         MR. SCHMITZ:  May we publish?

18         THE COURT:  You may.

19  BY MR. SCHMITZ:

20  Q.   Again, is that the heroin that you received from

21  Detective Gonzalez on December 17th, 2014?

22  A.   It is.

23  Q.   Now, were you tasked with handling the heroin that

24  the defendant sold to Detective Gonzalez on

25  December 17th, 2014?

1   A.   Yes, I was.

2   Q.   When you received that evidence, what did you do

3   with it?

4   A.   Myself and task force agent Adam Heinlein sealed

5   it in a self-sealing evidence envelope.

6   Q.   Did you write your name on it?

7   A.   I did.

8   Q.   I'm showing you what's been marked for

9   identification as Government's Exhibit 6.  Do you

10  recognize that?

11  A.   I have Government's Exhibit 4.

12  Q.   Good.  I intended to give you Government's

13  Exhibit 4.  I am showing you what's been marked as

14  Government's Exhibit 4.  Do you recognize that?

15  A.   Yes, I do.

16  Q.   What is it?

17  A.   This is the self-sealing evidence envelope which I

18  sealed.  The heroin that was purchased on

19  December 17th, 2014.

20  Q.   Is that your handwriting on the bag?

21  A.   Some of it is, yes.

22  Q.   Now, there appear to be two bags.  Is your

23  handwriting on both of those bags or just one of them?

24  A.   Just on one bag.

25  Q.   Did you create the other bag, the bag that's

1   without your handwriting on it?

2   A.   I did not.

3   Q.   The bag with your handwriting on it, was that the

4   only bag that you sealed the evidence in?

5   A.   Yes.

6   Q.   Did you maintain possession of that heroin when

7   you got it from the -- from the time you got it from

8   Detective Gonzalez to the time you sealed it in that

9   bag?

10  A.   Yes, I did.

11  Q.   Is that bag in the same exact condition as when

12  you sealed it?

13  A.   No, it's not.

14  Q.   How is it different?

15  A.   It was opened at the bottom edge and resealed and

16  relabeled.

17  Q.   Do you know who did that?

18  A.   Yes.

19  Q.   Who did that?

20  A.   Senior forensic chemist Deepa Vanmali.

21  Q.   Now, after you had sealed that heroin in that bag,

22  where was that bag stored?

23  A.   Again, in the Fort Myers office temporary drug

24  storage vault.

25  Q.   Where did the sealed bag go to after it was in the

1  sealed vault in DEA?

2   A.   To the DEA southeast laboratory in Miami.

3   Q.   Now, were you tasked with handling the heroin that

4  the defendant sold to Detective Gonzalez on February

5  11th, 2015?

6   A.   Yes, I was.

7   Q.   When you received that evidence from Detective

8  Gonzalez, what did you do with it?

9   A.   Adam Heinlein, task force agent Adam Heinlein and

10  myself sealed it in a different, another self-sealing

11  evidence envelope.

12   Q.   Did you write your name on that self-sealing

13  envelope?

14   A.   I did.

15   Q.   I'm showing you what's been marked for

16  identification as Government's Exhibit 6.  Do you

17  recognize that?

18   A.   Yes, I do.

19   Q.   What is that?

20   A.   This is the evidence envelope and the drug

21  evidence from the February 11th, 2015, purchase.

22   Q.   Is that your name on the seal?

23   A.   Yes.

24   Q.   Is that your handwriting on the bag?

25   A.   Some of it.

1   Q.   Okay.   And is that the same bag in which you and

2   Detective Heinlein sealed the heroin you received from

3   Detective Gonzalez on February 11, 2015?

4   A.   Yes.

5   Q.   Did you keep and maintain possession of all that

6   heroin that Detective Gonzalez gave you before you put

7   it -- you and detective -- excuse me, you and agent

8   Heinlein sealed it in that bag?

9   A.   Yes, Gonzalez gave it to me and Heinlein, Heinlein

10  and I, and we sealed it in this bag on that date.

11  Q.   Where was that bag sealed -- excuse me, where was

12  that bag sent after it was sealed?

13  A.   It was also sent to the DEA southeast laboratory

14  in Miami for analysis and permanent storage.

15  Q.   Before it was sent there, was it stored in the DEA

16  vault?

17  A.   Yes.

18  Q.   Now, there's a second bag.  Do you recognize

19  what's in that second bag with respect to Exhibit 6?

20  A.   Yes.

21  Q.   What is it?

22  A.   It's the original packaging, the original

23  packaging that contained the heroin.

24  Q.   And is that the original packaging that Detective

25  Gonzalez -- in which Detective Gonzalez gave you the

1  heroin?

2  A.   Yes.

3  Q.   On February 11th, 2015?

4  A.   Yes.

5  Q.   Okay.  I want to direct your attention back to

6  Government's Exhibit 4.  The second bag there that we

7  talked about, the one without your handwriting on it,

8  do you recognize what's in that bag?

9  A.   Yes.

10  Q.   What is that?

11  A.   It's also the original packaging that contained

12  the heroin that was purchased on December 17th, 2014.

13  Q.   Now, I want to direct your attention to the sale

14  of heroin that occurred or attempted purchase of heroin

15  that occurred on October 2015.  Before that occurred,

16  did you surveil what was commonly referred to as a

17  flash?

18  A.   Yes.

19  Q.   What date did that flash occur?

20  A.   That was July 22nd, 2015.

21  Q.   Can you please explain for the jury what a flash

22  is?

23  A.   It's an undercover operation, usually in

24  conjunction with a reverse undercover operation where

25  law enforcement will display a controlled substance in

1    a surprise situation or unexpectedly to a suspect.

2    Q.   Why is it surprise?

3    A.   We do it in surprise for safety.

4    Q.   And what is the purpose of a flash?

5    A.   Well, there's several.  It's to show that the

6    undercover personnel is a legitimate drug trafficker,

7    it's for safety so that the people we're dealing with

8    know that we actually have access to real drugs and not

9    some fake material that could lead to the thought of a

10   rip-off or -- it's also done to build credibility in

11   the undercover scenario, to clarify and make clear what

12   we're talking about in the undercover scenario, in case

13   that code words are being used or careful language is

14   being employed.

15   Q.   Okay.  Does it put the parties on the same page

16   about what's being sold?

17   A.   Yes.

18   Q.   Were you tasked with requesting heroin to use

19   during the flash that occurred on July 22nd?

20   A.   I was.

21   Q.   Where did you request it from?

22   A.   I requested it from the northeast laboratory in

23   New York City.

24   Q.   What quantity of heroin did you request?

25   A.   I requested one kilogram of heroin in a brick

1   form.

2   Q.   Did they send you heroin?

3   A.   They did.

4   Q.   Was that the heroin that you later used in the

5   flash on July 22nd?

6   A.   It was.

7   Q.   All right.  I'm showing you what's been marked for

8   identification as Government's Exhibit 10A3.  Do you

9   recognize that, Agent Strang?

10  A.   Yes, I do.

11  Q.   What is that?

12  A.   That's the kilo of heroin that I received from the

13  northeast laboratory.

14  Q.   Is it the kilo or is it a picture of the kilo?

15  A.   It's a picture of the kilo.

16  Q.   And does that picture truly and accurately depict

17  the brick of heroin that you received and used in the

18  flash on July 22nd?

19  A.   Yes, it does.

20  Q.   And when I say you used, I mean that Detective

21  Chica used?

22  A.   Yes, it does.

23          MR. SCHMITZ:  Your Honor, we move for the

24  admission of Government's Exhibit 10A3.

25          THE COURT:  Any objection?

1          MR. JOFFE:  No, Your Honor.

2          THE COURT:  Government's Exhibit 10A3 will be

3  introduced at this time.

4          (Government's Exhibit Number 10A3 was admitted

5      into evidence.)

6          MR. SCHMITZ:  May we publish, Your Honor?

7          THE COURT:  Yes, you may.

8  BY MR. SCHMITZ:

9   Q.  So, again, does this truly -- does Government's

10  Exhibit 10A3 truly and accurately depict the brick that

11  was used in the flash on the 2nd?

12   A.  Yes, it does.

13          MR. SCHMITZ:  Your Honor, may I have a

14  moment?

15          THE COURT:  Yes.

16          MR. SCHMITZ:  Your Honor, no more questions

17  from the government.

18          THE COURT:  Mr. Joffe?

19          MR. JOFFE:  Yes, thank you, Your Honor.

20                    CROSS-EXAMINATION

21  BY MR. JOFFE:

22   Q.  Agent Strang, good afternoon, sir.

23   A.  Good afternoon.

24   Q.  Now, were you involved with the three prior

25  transactions that we saw in the beginning of this case

1  with Mr. Norris Williams?

2  A.   Yes, I was.

3  Q.   And you were involved as the receiver of the

4  narcotics that were purchased by Detective Samuel

5  Gonzalez; correct?

6  A.   Yes.

7  Q.   And once you received those items, you placed

8  those in an evidence bag; is that correct?

9  A.   Yes.

10  Q.   Okay.  And you initialled the evidence bag?

11  A.   Yes.

12  Q.   After you sealed the evidence bag?

13  A.   Well, I write -- we write our names on the

14  evidence bag before we put the seal over it.

15  Q.   Okay.  And the evidence bag goes in what you

16  define as a temporary locker; is that correct?

17  A.   Well, it's really more than a locker.  That

18  doesn't describe it.  It's a separate room which is

19  alarmed and locked and there's a drop door in it and a

20  safe in it so it's controlled access and secure.

21  Q.   Okay.  And how do those items as it relates to

22  this particular case, how does the evidentiary -- how

23  do the evidentiary items, in this case the heroin, make

24  it from your office to the southeastern laboratory

25  located in Miami, Florida?

1   A.   In this case they were sent by commercial courier

2   service.   I believe it was FedEx.

3   Q.   So the heroin that detective Samuel Gonzalez

4   purchased was sent from your office via Federal

5   Express; is that correct?

6   A.   I believe it was Federal Express.

7   Q.   Okay.   So DEA does not have its own courier

8   service that would transfer the narcotics; is that

9   correct?

10  A.   We don't have a personal service.   We use the

11  commercial services.   I started in 1987, and we've been

12  doing it that way.

13  Q.   Okay.   And in this case you're certain you used

14  Federal Express; is that correct?

15  A.   I believe that's the courier.

16  Q.   Okay.

17  A.   I'm not certain.

18  Q.   I'm sorry?

19  A.   I'm not certain.   I would have to look at the

20  documents.

21  Q.   And who is responsible from your office to make

22  sure that the items that were actually seized from

23  Mr. Williams -- or I'm sorry, that were allegedly

24  purchased from Mr. Williams actually went to FedEx?

25  A.   Well, there's one agent what's in charge of

1   shipping out in a case like this, and that's Steve

2   Duquette, agent Steve Duquette.

3   Q.   And Agent Duquette is responsible for handing the

4   packages of heroin to a Federal Express driver; is that

5   correct?

6   A.   Well, it's in a FedEx box at that point, but he

7   handles that.   That's one of his collateral duties.

8   Q.   And does Agent Duquette deliver the FedEx box of

9   heroin to a FedEx office or station?

10  A.   Yes.

11  Q.   And he drops it off; is that correct?

12  A.   Transfers custody to the FedEx people.

13  Q.   Okay.   So Agent Duquette would give it to a man or

14  woman who was at the counter at the FedEx store; is

15  that correct?

16  A.   Correct.

17  Q.   With a slip from DEA that says it's going to a

18  certain location; correct?

19  A.   Correct.

20  Q.   Okay.   And who's responsible for the care, custody

21  and/or control of those narcotics once it's in the

22  possession of Federal Express?

23  A.   Well, FedEx delivers them to the lab where it's

24  opened.

25  Q.   I understand that, but while the narcotics are in

1  the care, custody, and control of Federal Express, who

2  specifically at Federal Express, as it relates to this

3  case, are responsible for the narcotics?

4   A.   Well, there's not one particular person that's

5  responsible.  It's sealed by me in this case and when

6  it arrives in Miami they check it to make sure it

7  hasn't been tampered with and it's unbroken.

8   Q.   But once the narcotics are given to Federal

9  Express, it's no longer in your care, custody, or

10 control; correct?

11  A.   No, we gave it to Federal Express for delivery to

12 Miami.

13  Q.   Okay.  And how do you know that anyone at FedEx

14 doesn't open the box and looks at the narcotics?

15  A.   Opens the box and looks at the narcotics?

16  Q.   Yes.

17  A.   Well, the box arrives in Miami and upon arrival

18 it's inspected.  The evidence bag is inspected for any

19 tampering.  If there's tampering, we're notified.  I

20 have never been notified.  I know of no cases where

21 that's happened.

22  Q.   Okay.  And do you know why DEA uses a commercial

23 carrier to transport what are purportedly illegal

24 narcotics?

25  A.   It's an efficient system that works.

1    Q.   Okay.  And did you have a discussion with anyone

2    at the Miami laboratory to confirm that the narcotics

3    that were purportedly sold from Mr. Norris Williams to

4    detective Samuel Gonzalez arrived?

5    A.   I didn't have a discussion, no.

6    Q.   Okay.  Do those narcotics eventually get sent back

7    to you?

8    A.   They do in preparation for this trial.

9    Q.   Okay.  And are the narcotics that were now in

10   Miami get mailed back to you via Federal Express as

11   well?

12   A.   They did in this case.

13   Q.   Okay.  And you know for a fact it was Federal

14   Express; correct?

15   A.   I can't say for 100 percent without looking at the

16   documents, but I think that's what we used in this

17   case.

18   Q.   Okay.  And as part of your case file, you have all

19   the Federal Express receipts; correct?

20   A.   Yes.

21   Q.   And those are all provided to the U.S. Attorney's

22   Office; correct, as part of the chain of custody?

23   A.   The laboratory submission report has a notation as

24   to how it arrived.

25   Q.   Okay.  Well, but my question to you is the Federal

1  Express receipts, the documents, you're responsible for

2  providing those to the U.S. Attorney's Office; correct?

3           MR. SCHMITZ:  Objection, Your Honor,

4  relevance.

5           MR. JOFFE:  It goes to chain of custody, Your

6  Honor.

7           THE COURT:  I'm going to overrule.

8           THE WITNESS:  I don't know that we're

9  responsible for providing them.  If somebody needs to

10  see them, we have them.  It's also I have the reports

11  at my desk there that show which company we shipped it,

12  the label number, and the fact that these were all

13  received unbroken.

14  BY MR. JOFFE:

15  Q.   But that was all provided to the U.S. Attorney's

16  Office; correct?

17  A.   I can't say if it was or wasn't.

18  Q.   You're the case agent in this case; correct?

19  A.   Correct.

20  Q.   You're considered the lead case agent; correct?

21  A.   Partners, I would say equal.

22  Q.   Okay.  Who is the other equal partner?

23  A.   Adam Heinlein.

24  Q.   But you're the case agent, you're sitting here in

25  court; correct?

1    A.    Of course.

2    Q.    And now you're testifying; correct?

3    A.    Of course.

4    Q.    So it's your responsibility to turn those Federal

5    Express over to the U.S. Attorney's Office; correct?

6    A.    No.

7    Q.    Whose responsibility is it?

8    A.    I've not heard of that before.

9    Q.    Okay.  That certainly is an issue regarding chain

10   of custody, is it not?

11          MR. SCHMITZ:  Objection.  Calls for a legal

12   conclusion, Your Honor.

13          THE COURT:  Sustained.

14   BY MR. JOFFE:

15   Q.    In any of the cases that you've handled over your

16   almost 30 years, do you ever provide those Federal

17   Express receipts to counsel for the government?

18          MR. SCHMITZ:  Objection, relevance, Your

19   Honor.

20          THE COURT:  Overruled.

21          THE WITNESS:  I have not provided them nor

22   have been asked.

23   BY MR. JOFFE:

24   Q.    Okay.  Have you reviewed those receipts with

25   counsel for the government in this case?

1    A.    I have not.

2    Q.    Okay.  Now, you testified about a kilogram of

3    heroin that you requested from the New York Drug

4    Enforcement Administration; is that correct?

5    A.    The northeastern laboratory, yes.

6    Q.    Okay.  And that's located in New York; correct?

7    A.    Yes.

8    Q.    And how does that kilogram of heroin arrive at

9    your office?

10   A.    Again, through a commercial courier service, such

11   as Federal Express.

12   Q.    And in this particular case, which courier service

13   was used, if you know?

14   A.    I don't know off the top of my head.  Don't

15   recall.

16   Q.    Okay.  And who was responsible for weighing that

17   kilogram of heroin before it left New York?

18   A.    There's a group of personnel called the reverse

19   undercover operations custodians, and they're charged

20   with taking care of items such as this.

21   Q.    And when you say items such as this, meaning the

22   kilogram of heroin; is that correct?

23   A.    Such as heroin, we use cocaine, other drugs at

24   times.

25   Q.    Okay.  And the heroin that was Federal Expressed

1    or commercial carrier to your office was purportedly

2    seized by DEA in New York or somewhere else; is that

3    correct?

4     A.   I don't know the full history of the seizure of

5    this heroin, but I can speak typically that's how we

6    get this.

7     Q.   Okay.  And when the heroin arrives to you, do you

8    weigh it?

9          MR. SCHMITZ:  Objection, Your Honor,

10   relevance.  We haven't introduced this piece of

11   evidence.

12         MR. JOFFE:  Not yet.

13         THE COURT:  I'm overruling.  Go ahead.

14         THE WITNESS:  I don't weigh it, no.

15   BY MR. JOFFE:

16    Q.   Okay.  Does anyone in your office weigh the

17   kilogram of heroin?

18         MR. SCHMITZ:  Objection, Your Honor, and may

19   we approach?

20         THE COURT:  Yes.

21         (Bench conference was held within the

22   presence of the jury.)

23         MR. SCHMITZ:  Your Honor, the relevance --

24   the weight of this brick, this flash brick, is not

25   relevant here.  Okay?  First of all, this is beyond the

1   scope of direct examination.  I know you have already

2   overruled us on that, but the point is there's no

3   relevance to what this brick actually weighed because

4   that is not what's relevant here.  What's relevant is

5   what the defendant believed it weighed.  He didn't

6   weigh this at the meet.  What's relevant, as I said --

7   he didn't have a scale there.  What's relevant is what

8   he believed it weighed, so what it actually weighed or

9   even if it's sawdust and not heroin, it's completely

10  irrelevant.  This case is about attempt.

11          And the second argument, Your Honor, is even

12  if it was relevant, which it's not and even if he

13  weighed it, which he didn't, the relevance of the

14  weight at the time is at the time of the flash.  Okay?

15  Not afterwards.  I think what defense counsel is

16  getting at and what the evidence is going to show in

17  this case is that -- and he's already mentioned this in

18  his opening, that the defendant took some heroin out of

19  that brick before it was ultimately weighed at the lab.

20  We don't intend to call that lab analyst, we don't

21  intend to introduce how much it weighed.  But the point

22  is there's no relevance, number one, and number two, if

23  there was relevance, it's at the time of the flash

24  before heroin is taken out of that brick.

25          MR. JOFFE:  I don't really understand the

```
 1  government's objection.  Of course it's relevant.
 2  They've admitted a photograph of what purports to be a
 3  brick of heroin.  I'm entitled to a full
 4  cross-examination about the heroin.  They're bringing
 5  images of chain of custody, they're arguing amounts,
 6  weights, et cetera.  It's all relevant.
 7            MR. SCHMITZ:  Your Honor.
 8            THE COURT:  Go ahead.
 9            MR. SCHMITZ:  What's relevant here is what it
10  looked like, not what it was.  What's relevant is what
11  he thought it was, not what it actually was.
12            THE COURT:  Okay.  I'm going to overrule the
13  question.
14            MR. JOFFE:  Thank you, Judge.
15            THE COURT:  Proceed.  Overruled.
16            (Bench conference concluded and proceedings
17  continued as follows:)
18            MR. JOFFE:  Your Honor, can I ask madam court
19  reporter to read the last question?
20            THE COURT:  You may.
21            (The requested portion of the record was
22  read.)
23  BY MR. JOFFE:
24   Q.  Either prior to or after the transaction in this
25  case?
```

1   A.   As far as I know, no one weighed it prior to.  I

2   saw a photograph of it weighed after the 7/22/15 flash.

3   Q.   Okay.  And the July 22nd, 2015, surprise or flash,

4   was that conducted -- you looked like you were

5   thinking.  Go ahead.

6   A.   Was it conducted?

7   Q.   Have you finished your prior answer?

8   A.   (Witness nodded head.)

9   Q.   Okay.  The July 22nd, 2015, flash or the surprise,

10   as you reference it, did you conduct that yourself?

11   A.   Well, I was part of a group that conducted it.

12   Q.   Okay.  Were you the individual that actually met

13   with Norris Williams?

14   A.   I was not.

15   Q.   Okay.  Who was the case agent that actually met

16   with Mr. Williams?

17   A.   Well, there were two undercover DEA task force

18   personnel that met with him.  One was Victor Chica and

19   one was Edwin Pagan.

20   Q.   And did those individuals have an occasion to

21   weigh that purported kilogram either prior to or after

22   the transaction?

23   A.   Yes, Edwin Pagan was present when it was weighed

24   after the transaction.

25   Q.   And when this item was weighed after the

1    transaction, do you weigh the wrapping as well, or just

2    the purported heroin?

3    A.    I saw a picture where they weighed the whole kilo

4    with the wrapping and everything and took a photograph

5    of it.

6    Q.    Okay.  So the weighing that they did involves the

7    wrapping as well; correct?

8    A.    Yes.

9    Q.    And this July 22nd, 2015, flash was videotaped;

10   correct?

11   A.    Yes.

12   Q.    Okay.  Have you viewed that videotape?

13   A.    I have.

14   Q.    Okay.  And is it legible?

15   A.    It's good.

16   Q.    You can hear what's happening?

17   A.    Yes.

18   Q.    And there's a small cut, like a triangle that's

19   made into this purported kilogram of heroin; is that

20   correct?

21   A.    Yes, there is, during the flash it's called a

22   window that's cut into it, yes.

23   Q.    Who cuts the window into that item?

24   A.    The defendant.

25   Q.    Okay.  That's highly unusual, would that be fair

1    to say?

2    A.   Not at all.

3    Q.   Okay.  Does that not take control away from the

4    undercover agents and give it to this individual that

5    you're trying to sell an item to?

6    A.   No, it's part of the flash.  We want to see the

7    material that's inside the wrapper.

8    Q.   Okay.  But you and the undercover agents already

9    allegedly know what's inside the wrapper; correct?

10   A.   We do.

11   Q.   Okay.  And the individual that's cutting this

12   open, does this individual actually take a portion of

13   what's in there out?

14   A.   Yes.

15   Q.   And does that individual test it?

16   A.   That's the idea, yes.

17   Q.   In this case, on July 22nd, 2015, when the flash

18   occurs, does the individual purportedly being Norris

19   Williams actually test the item with a Valtox or

20   anything else?

21   A.   I didn't see that, no.

22   Q.   Okay.  And the material that's allegedly taken out

23   of that brick, where is it placed, does it disperse

24   inside the car, is it dropped, is it lost?  Where does

25   it go?

1    A.    They placed that sample in a piece of plastic it

2    looked like.

3    Q.    Who placed it in the plastic?

4    A.    The defendant and I think it was Edwin Pagan.

5    Q.    Edwin Pagan who is acting in an undercover

6    capacity as a law enforcement officer; correct?

7    A.    Yes.

8    Q.    So Officer Pagan assists Mr. Williams in placing

9    that heroin in a separate plastic container; is that

10   correct?

11   A.    I believe he did.  He was involved in it somehow,

12   maybe the defendant did himself, but that's just kind

13   of my recollection.

14   Q.    And was that a giveaway, meaning it wasn't paid

15   for at the time?

16   A.    That was a sample for testing purposes.

17   Q.    Okay.  So that's your -- that's DEA standard

18   operating procedure to provide samples free of charge

19   for potential buyers?

20   A.    In a reverse undercover operation, we're allowed

21   to provide a small sample of the product sufficient for

22   testing.

23   Q.    Okay.  And testing could be use, resale; correct?

24   A.    It's for testing.

25   Q.    What did --

1  A.   It's not for resale, absolutely, no.

2  Q.   What did Mr. Williams do with that item, do you

3  know?

4  A.   No.

5  Q.   Did you ask him what he intended to do with it?

6  A.   He said he was going to test it.

7  Q.   Okay.  And did the agents on the video ask

8  Mr. Williams how he intended to test it?

9  A.   Not that I recall.

10 Q.   Okay.  And how many grams or ounces were removed

11 from the item?

12 A.   I don't know.

13 Q.   Okay.  And did the undercover agents who were in

14 the car with Mr. Williams know how much it weighed, the

15 item that was removed, I'm sorry?

16 A.   It was a small amount sufficient for testing

17 purposes.

18 Q.   Okay.

19      MR. JOFFE:  Your Honor, I have no further

20 questions of this witness at this time.  Thank you.

21      THE COURT:  All right.  Redirect?

22      MR. SCHMITZ:  Briefly, Your Honor.  Thank

23 you.

24              REDIRECT EXAMINATION

25 BY MR. SCHMITZ:

1    Q.   Good afternoon, Agent Strang.   Why are you allowed

2    to provide a drug dealer with a sample before that drug

3    dealer is going to purchase a large quantity for a

4    large amount of money?

5             MR. JOFFE:   Objection.   Asked and answered.

6             THE COURT:   Overruled.

7             THE WITNESS:   Well, it's permitted as part

8    of -- this is called a reverse undercover operation,

9    and in these situations, I guess over the years it's

10   been determined that, you know, it's part of the

11   process of negotiating and testing of -- sampling of

12   narcotics is typically done in large scale transactions

13   and that's what happens.

14   BY MR. SCHMITZ:

15   Q.   Okay.   Now, you alluded to this before and you got

16   asked some questions about FedEx.   Is it normal to send

17   evidence via FedEx?

18            MR. JOFFE:   I'm going to object to the term

19   normal.

20            THE COURT:   Go ahead and rephrase your

21   question.

22   BY MR. SCHMITZ:

23   Q.   Is it typical for DEA to send evidence via FedEx?

24            MR. JOFFE:   Objection.   This has been asked

25   and answered.

1          THE COURT:  Overruled.

2          THE WITNESS:  Yes, it is typical, and, in

3     fact, it's used all over the country by DEA.  And when

4     I was hired in 1987, they were shipping drugs through

5     the mail.  And I thought I was surprised to learn that

6     at that time, but it works and that's what we do.

7     BY MR. SCHMITZ:

8      Q.   Would it be cost effective for DEA to operate its

9     own postal system?

10         MR. JOFFE:  I'm going to object, Your Honor,

11    this is beyond the scope of direct or cross, this is

12    not relevant, this clearly calls for speculation.

13         THE COURT:  Sustained.  Sustained.  Go ahead.

14    BY MR. SCHMITZ:

15     Q.   Would you consider the shipping of this evidence

16    to be ministerial?

17         MR. JOFFE:  Your Honor, it's not relevant

18    what he thinks.

19         THE COURT:  Overruled.

20         THE WITNESS:  Can you rephrase that for me?

21    BY MR. SCHMITZ:

22     Q.   Sure, is this an administrative duty, is this a

23    ministerial duty in terms of handling evidence?

24         MR. JOFFE:  Your Honor, I'm going to object,

25    I don't believe this witness has been qualified to

1   testify about ministerial or administrative duties

2   within the Drug Enforcement Administration.

3               THE COURT:  Overruled.

4               THE WITNESS:  It's our policy and it's used

5   all the time.

6   BY MR. SCHMITZ:

7    Q.   And what condition is the heroin in when it's

8   sent?

9               MR. JOFFE:  I'm going to object to the form

10  of the question.

11  BY MR. SCHMITZ:

12   Q.   Is the heroin sealed before it's sent?

13   A.   Yes, it is.  It's sealed in a self-sealing

14  evidence envelope.

15   Q.   And when it's received on the other end, does the

16  person who receives it determine whether that has been

17  tampered with?

18   A.   They do.

19              MR. SCHMITZ:  May I have a moment, Your

20  Honor?

21              THE COURT:  Yes.

22              MR. SCHMITZ:  No further questions, Your

23  Honor.  Thank you.

24              THE COURT:  Mr. Joffe, anything following up?

25              MR. JOFFE:  No, Your Honor.

1          THE COURT:  All right.  Agent, you may step

2     down.  Ladies and gentlemen, we're going to take our

3     afternoon recess.  Please do not discuss this case

4     amongst yourselves or with anyone else.  We'll be in

5     recess for 15 minutes so that would be 20 after 3:00.

6     Thank you.

7          (Jury out at 3:04 p.m.)

8          THE COURT:  Let the record reflect the jurors

9     are outside the courtroom.  We'll be in recess until

10    3:20.

11         (A break was taken.)

12         THE COURT:  Let the record reflect the

13    defendant is present with counsel.  You can bring the

14    jury in.

15         (Jury in at 3:20 p.m.)

16         THE COURT:  Ladies and gentlemen, did you

17    follow the Court's instructions and not discuss this

18    case amongst yourselves or with anyone else?

19         ALL JURORS:  Yes.

20         THE COURT:  Okay.  Thank you.  If you would

21    like to call your next witness, please.

22         MR. SCHMITZ:  Thank you, Your Honor.  The

23    United States calls DEA chemist Carlos Diaz.

24         THE COURT:  Sir, if you would step forward to

25    the witness stand and I'll have you turn and face the

1    clerk and she'll swear you in.  Counsel, I think

2    there's an item of evidence yet on the stand.  Thank

3    you.

4    THEREUPON,

5                          CARLOS DIAZ,

6    a witness, having been first duly sworn, upon his oath,

7    testified as follows:

8               THE WITNESS:  I do.

9               COURTROOM DEPUTY:  Please have a seat.

10   Please state and spell your name for the record also.

11              THE WITNESS:  Carlos J. Diaz, C-A-R-L-O-S,

12   D-I-A-Z.

13                     DIRECT EXAMINATION

14   BY MR. SCHMITZ:

15    Q.   Good afternoon, Mr. Diaz.  How are you employed?

16    A.   I'm employed by the Drug Enforcement

17   Administration.

18    Q.   And where are you currently employed?

19    A.   Miami, Florida.

20    Q.   How long have you been employed as a -- well, what

21   do you do with DEA?

22    A.   I'm a forensic chemist.

23    Q.   How long have you been a forensic chemist for DEA?

24    A.   Approximately 12 and a half years.

25    Q.   What are your duties as a forensic chemist for

1   DEA?

2    A.   My duties as a forensic chemist is to analyze

3   evidence, submit it into the laboratory, testify in

4   court as to those findings, and assist law enforcement

5   in the seizure of clandestine labs.

6    Q.   What education have you had to prepare for this

7   job?

8    A.   I have a bachelor's of science degree in criminal

9   justice and a bachelor of science degree in chemistry.

10   Q.   What kind of training or experience have you had

11   to prepare for this job?

12   A.   I completed an in-depth training at a southeast

13   lab which included standard laboratory operating

14   procedures, instrumentation, and analysis of controlled

15   and noncontrolled substances.

16   Q.   In the course of your duties, do you perform tests

17   that will detect and identify the presence of

18   controlled substances, including heroin?

19   A.   Yes.

20   Q.   How many times have you performed a test to

21   identify the presence of a controlled substance?

22   A.   A very rough estimate, a couple thousand.

23   Q.   Are such tests a routine part of your job?

24   A.   Yes.

25   Q.   Have you had the occasion to testify as an expert

1    in court before?

2    A.   Yes.

3    Q.   How many times?

4    A.   Over 36 times.

5         MR. SCHMITZ:  Your Honor, I would tender the

6    witness on qualifications.

7         THE COURT:  Any questions, Mr. Joffe?

8         MR. JOFFE:  No, Your Honor.

9         THE COURT:  You may proceed.

10   BY MR. SCHMITZ:

11   Q.   Thank you, Your Honor.  What is the procedure in

12   your laboratory concerning the submission of evidence?

13   A.   Evidence is submitted to the lab either through

14   Federal Express, certified mail, or hand delivered by

15   the agents.  It is put into a computerized tracking

16   system and stored in the vault.

17   Q.   What happens to it after it leaves the vault?

18   A.   I request the evidence and then the evidence

19   custodian gives me the evidence.

20        MR. SCHMITZ:  May I approach freely, Your

21   Honor?

22        THE COURT:  You may.

23   BY MR. SCHMITZ:

24   Q.   I'm showing you what's been marked for

25   identification as Government's Exhibit 2.  Do you

1  recognize that, Mr. Diaz?

2  A.   Yes, I do.

3  Q.   What is that?

4  A.   This is a heat seal evidence envelope.

5  Q.   Is your handwriting on that envelope?

6  A.   Yes, my handwriting is here and on the

7  seal on the bottom.

8  Q.   Now, did you test the material inside that

9  envelope?

10 A.   Yes, I did.

11 Q.   Is that material now in the same or substantially

12 similar condition to when you got done testing it?

13 A.   Yes, it is.

14 Q.   When did you first see that exhibit?

15 A.   I opened this exhibit on January 28th, 2015.

16 Q.   Where did you see the exhibit?

17 A.   At the southeast lab.

18 Q.   When you first saw that exhibit, in what condition

19 was it?

20 A.   This had factory seals on three sides and the

21 agent seal on the top.

22 Q.   Was it the seal broken?

23 A.   No, it was not.

24 Q.   Did it appear to be tampered with in any way?

25 A.   No.

1          MR. SCHMITZ:  Your Honor, the government

2   moves for the admission of Government's Exhibit 2.

3          MR. JOFFE:  May I voir dire the witness, Your

4   Honor?

5          THE COURT:  Yes, you may.

6               VOIR DIRE EXAMINATION

7   BY MR. JOFFE:

8   Q.   Mr. Diaz, good afternoon, sir.

9   A.   Good afternoon.

10   Q.   Did you have a safe trip from Miami?

11   A.   Yes, I did.

12   Q.   Good.  This item, Government's Exhibit Number 2,

13   arrived to you on what date specifically, January 28th,

14   2015?

15   A.   I opened it on January 28th, 2015.

16   Q.   What date did Government's Exhibit Number 2 get to

17   your lab, if you know?

18   A.   I do not know that.  I don't have that information

19   with me.

20   Q.   Okay.  Who was responsible for receiving this item

21   in your lab?

22   A.   That would be the evidence custodian.

23   Q.   Who was the evidence custodian?

24   A.   In this particular case?

25   Q.   Yes.

1   A.   I'm not sure.  It's one of three.

2   Q.   Okay.  And Government's Exhibit Number 2 was

3   delivered to the southeastern laboratory in Miami,

4   Florida, by what vehicle?  Was it Federal Express, was

5   it certified mail, was it the case agent?

6   A.   I have a copy of the study, may I refer to the

7   DEA7?

8   Q.   Certainly.

9        THE COURT:  Yes, you may.

10  BY MR. JOFFE:

11  Q.   And for purposes of the record, could you explain

12  to the members of the jury what a DEA7 is?

13  A.   DEA7 is a copy of a drug records, this is a form

14  that is submitted by the agent to the lab, and on the 7

15  it does say who received the evidence.

16  Q.   Who received it?

17  A.   Evidence custodian Claudio Fernandez.

18  Q.   And where is Claudio Fernandez located?

19  A.   At the southeast lab.

20  Q.   What date is on your DEA7?

21  A.   It says here 11/20/2014 that he signed.

22  Q.   So November of 2014; is that correct?

23  A.   Correct.

24  Q.   It was almost two months before you saw this;

25  correct?

1    A.    I opened it on January the 28th of '15.

2    Q.    Okay.  And does your DEA7, is that a report that

3    you wrote yourself?

4    A.    No. No, I didn't.

5    Q.    Who wrote that report?

6    A.    It was submitted by the agent.

7    Q.    Which agent?

8    A.    According to this the person who submitted this

9    was Adam Heinlein.

10   Q.    How do you spell the last name?

11   A.    H-E-I-N-L-E-I-N.

12   Q.    What was the date that that report was submitted?

13   A.    It states here that he signed this form on

14   11/18/2014.

15   Q.    Okay.  And was that signed in your office in

16   Miami?

17   A.    I do not know.

18   Q.    Okay.  And does your DEA7 report delineate or

19   state with a reasonable degree of specificity which

20   courier was used to send this item to your lab?

21   A.    If you can give me a second to read.

22   Q.    Sure, of course.

23   A.    I believe it was Federal Express.

24   Q.    Is there a tracking number on that DEA7?

25   A.    I believe there is, yes.

1   Q.   What is that tracking number?

2   A.   It says FE805531877981.

3           MR. JOFFE:  Your Honor, I would still object

4   to the admission of Government's Exhibit Number 2 and

5   state that the proper foundation has not yet been

6   provided for the admission of this item.

7           THE COURT:  Overruled.  Government's Exhibit,

8   are you seeking to introduce it, I believe you said?

9           MR. SCHMITZ:  Yes, Your Honor, the government

10  moves for the admission of what's been currently marked

11  for identification as Government's Exhibit 2.

12          THE COURT:  Government's Exhibit 2 will be

13  introduced into evidence at this time.

14          (Government's Exhibit Number 2 was admitted

15      into evidence.)

16          MR. SCHMITZ:  May we publish, Your Honor?

17          THE COURT:  Yes, you may.

18              CONTINUED DIRECT EXAMINATION

19  BY MR. SCHMITZ:

20  Q.   Again, Mr. Diaz, how did you receive this exhibit?

21  A.   DEA7 states Federal Express.

22  Q.   And is that some of your handwriting on there?

23  A.   Correct.

24  Q.   After you received Government's Exhibit 2, what

25  did you do with it?

1    A.   I proceeded to get a gross weight, a gross weight,

2    which is the weight of everything, packaging and

3    everything.

4    Q.   And then what did you do?

5    A.   I got a net weight.

6    Q.   Okay.

7    A.   Which is a weight of the actual substance.

8    Q.   All right.  And then what did you do with the

9    substance after that?

10   A.   I proceeded to test the substance.

11   Q.   What tests -- what if any tests did you perform on

12   the substance?

13   A.   I performed a technique called gas chromatography,

14   GC, I performed gas chromatography mass spectometry

15   GCMS, and I performed IR, infrared spectroscopy.

16   Q.   The infrared spectroscopy, what' the abbreviation

17   for that?

18   A.   IR.

19   Q.   Can you describe briefly in general terms what a

20   GCMS test does?

21   A.   It is a technique used to identify the different

22   components in a mixture.

23   Q.   And the same thing for an IR test, what is that,

24   briefly, what does that do?

25   A.   IR identifies a component in a mixture.

1   Q.   Do you regularly check the instruments that you

2   use to make sure they're working properly?

3   A.   The instruments are checked, yes, they are.

4   Q.   Is the GCMS test and the IR test, are those

5   methods that are generally accepted in the field?

6   A.   Yes, they are.

7   Q.   Are they accurate?

8   A.   Yes, they are.

9   Q.   Now, what were your conclusions based upon those

10  tests with respect to Government's Exhibit 2?

11  A.   May I refer to the notes?

12          THE COURT:   Yes, you may.

13          THE WITNESS:   Government's Exhibit 2 contains

14  heroin hydrochloride as a net weight of 13.7 grams.

15  BY MR. SCHMITZ:

16  Q.   And the net weight of -- excuse me.  Can you give

17  that to me again, a net weight of how much?

18  A.   13.7 grams.

19  Q.   What substance did it contain?

20  A.   Heroin hydrochloride.

21  Q.   And what percentage purity was it?

22  A.   25.1 percent.

23          MR. SCHMITZ:   No further questions, Your

24  Honor.

25          THE COURT:   Mr. Joffe, cross-examination?

1           MR. JOFFE:  Thank you.

2                   CROSS-EXAMINATION

3   BY MR. JOFFE:

4   Q.   Mr. Diaz, again, good afternoon, sir.

5   A.   Good afternoon.

6   Q.   You testified on direct examination about factory

7   seals on three sides; is that correct?

8   A.   Correct.

9   Q.   What is a factory seal?

10  A.   The seals that the bag comes with.

11  Q.   So when the bag is purchased by the Drug

12  Enforcement Administration, the bag is already

13  constructed with those closures; correct?

14  A.   Correct.

15  Q.   Okay.  And the final closure is the one

16  purportedly done by the case agent; correct?

17  A.   Correct.

18  Q.   Okay.  And for you to get access to the items that

19  are inside the bag, you have to open the bag; is that

20  correct?

21  A.   Correct.

22  Q.   Okay.  And when you open the bag, is there a bag

23  inside the bag in this particular case?

24  A.   There was a plastic bag inside the bag containing

25  the powder substance.

1    Q.    Okay.   And you testified on direct examination you

2    conducted a gross weight; is that correct?

3    A.    Correct.

4    Q.    Okay.   And you can read from your report, does

5    your report reflect the gross weight, which includes

6    the packaging?

7    A.    Correct.

8    Q.    What is the gross weight?

9    A.    44.6 grams.

10   Q.    Okay.   And to get the net weight, you remove the

11   substance inside that bag; correct?

12   A.    Correct.

13   Q.    And does any of the substance get retained by DEA

14   for further use?

15   A.    No.

16   Q.    Not in this particular case?

17   A.    Correct, you mean like by us, the chemist?

18   Q.    Yes.

19   A.    No.

20   Q.    Okay.   Do you know if DEA retained any of the net

21   weight material in this case?

22   A.    No.

23   Q.    Okay.   No, you don't know, or, no, it was not

24   retained?

25   A.    It was not retained.

1    Q.   And you testified on direct examination that the

2    purity was 25.1 percent.  What does that mean?

3    A.   That out of the 13.7 grams, 25.1 was heroin

4    hydrochloride.

5    Q.   And the other 79.1 percent was what?

6    A.   There could be a lot of different things, there

7    are things that are used to cut up to mix into with the

8    heroin.  We don't report those, but in my -- I did find

9    some mannitol, which is -- I did find some mannitol.

10   Q.   What is mannitol?

11   A.   Mannitol I believe is a sugar, a type of sugar.

12   Q.   Is mannitol actual sugar that was mixed with the

13   heroin?

14   A.   Mannitol is -- mannitol was mixed with the heroin.

15   Q.   Okay.  What is mannitol typically used for?

16   A.   I really don't know.  I don't know, factually, I

17   don't know.

18   Q.   Is mannitol considered illegal in and of itself to

19   possess?

20   A.   Not that I know of.

21   Q.   Okay.  Can mannitol be purchased over the counter?

22   A.   I believe so.

23   Q.   Okay.  What type of products is mannitol typically

24   found in?

25   A.   I don't know.  I really can't give you a direct

1    answer to that because I do not know.  I believe it is

2    a sugar type of product, but I'm not sure.

3    Q.   Okay.  And so the other 74.9 percent of this net

4    weight was mannitol; is that correct?

5    A.   Could be, could also be an alkaloid of the opium

6    plant, which is a different component of the opium

7    plant.

8    Q.   Okay.  You said it could be; correct?

9    A.   Correct.

10   Q.   Well, as you sit here testifying under oath, can

11   you say beyond a reasonable doubt that it actually is?

12   A.   That what actually is?

13   Q.   That the other item that's used to cut the pure

14   heroin was what you just said it was, another opium --

15   A.   What I'm stating is that this substance contains

16   heroin at a percent of 25.1 percent.

17   Q.   And my question to you is what is the other

18   74.9 percent?

19   A.   It could be a mixture of the things -- it could be

20   a mixture of different other things.

21   Q.   Okay.  Could it be a sugar?

22   A.   Possibly.

23   Q.   Could it be caffeine?

24   A.   Well, we would see caffeine.

25   Q.   Did you see --

1    A.    In this particular case, I did see very low

2    amounts of caffeine, which were not reported because

3    they were extremely low.

4    Q.    Okay.  So you did see caffeine, but it's not

5    reflected on your report; is that correct?

6    A.    Correct -- well, possible caffeine.  It was at a

7    very low level.

8    Q.    Okay.  But it's not reflected within the four

9    corners of your report; correct?

10   A.    Correct.

11   Q.    Why not?

12   A.    Because it is DEA policy that if it's at a very

13   low level, below roughly one percent, we do not report

14   it.  We don't have to report it.

15   Q.    And what percentage of the total 100 percent was

16   mannitol?

17   A.    I do not test for that.

18   Q.    Okay.  Why not?

19   A.    Because it is not required.  It is not a

20   requirement.

21   Q.    Okay.  But you know that almost 75 percent of the

22   item that you tested is not heroin; correct?

23   A.    Correct.

24        MR. JOFFE:  I have no further questions of

25   this witness at this time, Your Honor.

1              THE COURT:  Follow-up questions?

2              MR. SCHMITZ:  Just one, Your Honor.

3              THE COURT:  All right.

4                       REDIRECT EXAMINATION

5    BY MR. SCHMITZ:

6     Q.   Mr. Diaz, does a purity of 25.1 percent and a net

7    weight of 13.7 grams mean that the Government's

8    Exhibit 2 that you tested was a mixture or substance

9    containing a detectable amount of heroin?

10    A.   Correct.

11             MR. SCHMITZ:  No further questions, Your

12   Honor.

13             THE COURT:  Mr. Joffe, anything?

14             MR. JOFFE:  No, Your Honor.

15             THE COURT:  May this witness be excused?

16             MR. SCHMITZ:  Yes, Your Honor.

17             MR. JOFFE:  Yes, Your Honor.

18             THE COURT:  You may be excused.  Thank you.

19   You can call your next witness.

20             MR. SCHMITZ:  The United States calls DEA

21   chemist Deepa Vanmali.

22   THEREUPON,

23                      DEEPA VANMALI,

24   a witness, having been first duly sworn, upon her oath,

25   testified as follows:

1          THE WITNESS:  Yes, I do.

2          COURTROOM DEPUTY:  Please state and spell

3     your name for the record.

4          THE WITNESS:  Deepa Vanmali, D-E-E-P-A,

5     V-A-N-M-A-L-I.

6          THE COURT:  You may inquire.

7                    DIRECT EXAMINATION

8     BY MR. SCHMITZ:

9      Q.   Good afternoon, Ms. Vanmali.  How are you

10    currently employed?

11     A.   I'm currently employed as a forensic chemist.

12     Q.   With who?

13     A.   With the Drug Enforcement Administration southeast

14    laboratory in Miami, Florida.

15     Q.   How long have you been employed as a forensic

16    chemist for DEA?

17     A.   Approximately 12 years.

18     Q.   What are your duties as a forensic chemist for

19    DEA?

20     A.   I'm responsible for the analysis of evidence

21    that's submitted to the laboratory for the presence of

22    controlled and noncontrolled substances.  I also

23    testify in court to my findings, and occasionally

24    assist law enforcement in the seizure of clandestine

25    laboratories.

1  Q.   What education have you had to prepare for this

2  job?

3  A.   I received a bachelor of science degree in

4  forensic science with a minor in chemistry from the

5  University of Central Florida in Orlando.

6  Q.   What kind of training and experience have you had

7  to prepare for this job?

8  A.   I've had approximately seven months of on the job

9  training at the southeast laboratory, and that focused

10 on standard laboratory operating procedures,

11 instrumentation, and analysis of evidence.  I've also

12 received a month long training in Quantico, Virginia

13 which focused on DEA laboratories and procedures and

14 also throughout my 12 years at the southeast laboratory

15 I received continuing education and training.

16 Q.   In the course of your duties, do you perform tests

17 that will detect and identify the presence of

18 controlled substances including heroin?

19 A.   Yes.

20 Q.   How many times have you performed tests to

21 determine the presence of controlled substances?

22 A.   Over a thousand times.

23 Q.   Is that a routine part of your job?

24 A.   Yes, it is.

25 Q.   Have you had the occasion to be qualified as an

1  expert in court before?

2  A.   Yes, I have.

3  Q.   How many times?

4  A.   Close to 50 times.

5          MR. SCHMITZ:  Your Honor, I tender the

6  witness for qualifications.

7          THE COURT:  Mr. Joffe, any questions?

8          MR. JOFFE:  No objection, Your Honor.

9          THE COURT:  All right.  You may proceed.

10  BY MR. SCHMITZ:

11  Q.   Ms. Vanmali, what is the procedure that your

12  laboratory uses concerning the submission of evidence?

13  A.   Well, evidence is submitted to the laboratory

14  either through the mail, either through Federal Express

15  or registered mail, or it could be delivered by the

16  agent.  Once it is received, the seals are checked, the

17  information on the evidence is checked against the

18  information on the form that is submitted with the

19  evidence itself.  This form is known as the DEA7.  Once

20  that is verified, it is then assigned a unique

21  laboratory identification number, and then it's stored

22  in our secured vault awaiting analysis.

23  Q.   And then how do you actually receive that

24  evidence?

25  A.   It's actually assigned to me by my supervisor, and

1  at some point I will go to the vault and retrieve it

2  from the evidence technician.

3          MR. SCHMITZ:  Your Honor, may I approach

4  freely?

5          THE COURT:  Yes, you may.

6  BY MR. SCHMITZ:

7  Q.   I'm showing you what's been identified as

8  Government's Exhibit 4.  Do you recognize that?

9  A.   Yes, I do.

10  Q.   What is it?

11  A.   This is a DEA self-sealing evidence envelope, and

12  I recognize it by my handwriting that's on the evidence

13  label.  After I complete an analysis I filled out the

14  evidence label.  I also recognize it by the seal and my

15  handwriting on the seal that I placed at the bottom of

16  the evidence envelope after the analysis was completed.

17  And I recognize it by my handwriting on the interior

18  packaging.

19  Q.   When you receive that, was that -- there's two

20  bags there?

21  A.   Yes.

22  Q.   When you received that, was it in one bag or two

23  bags?

24  A.   It was just in one bag.

25  Q.   Was that bag that you received it in, was that bag

1    sealed?

2    A.    Yes, it was.

3    Q.    Was it factory sealed on three sides?

4    A.    Yes, it was.

5    Q.    Did it look like anybody had tampered with it?

6    A.    No.

7    Q.    That second bag, did you create that bag?

8    A.    Yes, I did.

9    Q.    Why did you create that bag?

10   A.    Fingerprint analysis requested -- was requested

11   for the packaging, so once I removed the material to be

12   analyzed from the packaging, I separated the packaging

13   and placed it into a second evidence envelope to be

14   submitted for fingerprint examination.

15   Q.    Okay.  And did you ultimately wind up cutting open

16   the sealed bag that you received?

17   A.    Yes.

18   Q.    Did you maintain control or custody or control

19   after that bag was cut open?

20   A.    Yes.

21   Q.    Did you personally seal that bag back up?

22   A.    Yes, I did.

23   Q.    Did you seal it back up before you sent it back to

24   DEA in Fort Myers?

25   A.    Yes, I actually seal it up after my analysis is

1    completed and before returning it to the vault for

2    storage.

3            MR. SCHMITZ:  Your Honor, the government

4    moves for the admission of what's been marked as

5    identification as Government's Exhibit 4.

6            MR. JOFFE:  Your Honor, I would object and

7    ask to voir dire the witness.

8            THE COURT:  You may.

9                    VOIR DIRE EXAMINATION

10   BY MR. JOFFE:

11   Q.   Is it Ms. Vanmali or Ms. Mali?

12   A.   Vanmali.

13   Q.   Ms. Vanmali, good afternoon, ma'am.

14   A.   Good afternoon.

15   Q.   The item when you received it, do you know how

16   that item got to your agency in Miami, Florida, whether

17   it was registered mail, courier, Federal Express, UPS,

18   DHL, UPS?

19   A.   Yes, I do because it's actually written on the

20   DEA7 that is submitted with the evidence itself.

21   Q.   All right.  Do you have that in front of you?

22   A.   I do not.

23   Q.   Have you reviewed the DEA7 prior to testifying

24   here today?

25   A.   Briefly, yes.

1    Q.   Do you recall from that document how that item was

2    sent to your agency in Miami, Florida?

3    A.   No.

4    Q.   Okay.  And how long was Government's Exhibit

5    Number 4 at your laboratory in Miami Florida prior to

6    the date you examined the item?

7    A.   I don't know.  I would have to actually refer to

8    the report.

9    Q.   Okay.  And that's the DEA7; is that correct?

10   A.   Just to rephrase your question, were you asking me

11   how long it was submitted to the laboratory between the

12   time it was submitted to the laboratory and analyzed?

13   Q.   Yes.

14   A.   Yes, that would be on the DEA113.

15   Q.   Okay.  Do you have that with you today?

16   A.   No, I do not.

17   Q.   Okay.  And that DEA113 would tell us the date that

18   that item was received in your lab; correct?

19   A.   Yes.

20   Q.   Okay.  And would that DEA113 also tell us the date

21   that you analyzed the substance?

22   A.   No, it will tell you the date that the analysis

23   was completed.

24   Q.   Okay.  And do you know the date that the analysis

25   was completed on this item?

1    A.    I believe it was March 6th of 2015.

2    Q.    Can you say that beyond a reasonable doubt?

3    A.    I would have to refer to the report just to make

4    sure I don't make a mistake.

5            MR. JOFFE:  May I approach the witness, Your

6    Honor?

7            THE COURT:  Yes, you may.

8  BY MR. JOFFE:

9    Q.    Ma'am, let me show you what I've been handed,

10   which is a chemical analysis report created by the

11   United States Department of Justice Drug Enforcement

12   Administration.  Why don't you tell us if this is the

13   document you need.  Okay?

14   A.    Okay.

15   Q.    Thank you.

16   A.    Okay.  So the date accepted by the laboratory was

17   December 23rd, 2014, and the date that this report was

18   prepared was March 9th of 2015.

19   Q.    Okay.  And just so we're clear, that document that

20   I've shown you is known as what?

21   A.    The DEA113.

22   Q.    So that's the moniker that DEA provides to this

23   type of document; correct?

24   A.    That is --

25   Q.    Well, DEA tends to provide numerical denominators

1  to certain documents, a DEA6 a DEA7, this is a DEA113;

2  correct?

3  A.   Yes.

4  Q.   And did you create this form?

5  A.   I did.

6  Q.   What date did you create this form?

7  A.   The date that the report was created was

8  March 9th, 2015.

9  Q.   Okay.  And is that the same date that you analyzed

10  the substance?

11  A.   No, it might have been a couple days before that,

12  before actually submitting the report.

13  Q.   Okay.  And when you analyzed the substance, do you

14  take handwritten notes?

15  A.   No, we have an electronic system now, so it's

16  actually done on the computer.

17  Q.   Okay.  So the items that are in the computer, do

18  you print those out and save those?

19  A.   I can print them out, but it's actually stored on

20  a drive.

21  Q.   Okay.  So when you go back to create the report,

22  what do you do?  Do you go back into the computer to

23  retrieve that information?

24  A.   Yes, in order to print this, I go and look up the

25  case and print the report.

1    Q.   Okay.  And you have to fill in the blanks; is that

2    correct?

3    A.   No, this has already been -- you're talking about

4    after the fact this has already been filled out, so I

5    just go ahead and look up the report, search it, and

6    print.

7    Q.   Are you required to sign that document?

8    A.   No.

9    Q.   So that report was generated by you; is that

10   correct?

11   A.   Yes.

12   Q.   Okay.  So the items were received in December; is

13   that correct?

14   A.   Yes.

15   Q.   Of 2015?

16   A.   2014.

17   Q.   '14, I'm sorry.  And were analyzed by you in March

18   of 2015; is that correct?

19   A.   Yes.

20   Q.   So approximately three months?

21   A.   Approximately, yes.

22   Q.   Okay.  And the items are stored where in your

23   southeastern laboratory in Miami?

24   A.   They're stored in our vault.  It's an evidence

25   vault where all the evidence is kept.

1    Q.   Okay.  And how does the item get to you when

2    you're ready to analyze that item?

3    A.   I request it through this electronic system, I

4    request to pick it up, and I select the date that I'm

5    going to pick it up.  It's usually that same day or the

6    very next day, and I go to the evidence technician and

7    they've already, you know, pulled the evidence for that

8    day, they fulfill the request for that day, and I'll

9    ask them, hey, can I please accept my evidence and

10   they'll give it to me.

11   Q.   Okay.  Now, that form that you're reading from,

12   the DEA 113, does that tell you how that -- how

13   Government's Exhibit 4 came to be at your southeastern

14   laboratory?

15   A.   No, not this report.

16   Q.   What report does?

17   A.   The DEA7.

18           MR. JOFFE:  Your Honor, at this point I would

19   object to the admission of Government's Exhibit

20   Number 4.  No foundation -- no proper foundation has

21   been admitted for the chain of custody or the

22   submission of this document -- or their Exhibit 4 at

23   this point.

24           THE COURT:  Overruled.  Government's Exhibit

25   Number 4 will be introduced.

1          (Government's Exhibit Number 4 was admitted

2     into evidence.)

3             CONTINUED DIRECT EXAMINATION

4  BY MR. SCHMITZ:

5   Q.   Your Honor, may we publish?

6          THE COURT:   Yes, you may.

7  BY MR. SCHMITZ:

8   Q.   All right.   Is this the heroin you tested,

9  Ms. Vanmali?

10  A.   This is the exhibit that I analyzed, yes.

11  Q.   After you received Government's Exhibit 4, what

12  did you do with it?

13  A.   I also verified the information on the evidence

14  label, just to make sure it also matched the

15  evidence -- excuse me, the information on the DEA7, I

16  checked that the seals were intact, and then I obtained

17  a gross weight of the entire package as received by me.

18  Q.   Did you perform any tests -- did you obtain a net

19  weight as well?

20  A.   I did.   I opened up the evidence envelope at the

21  bottom and I retrieved the contents and I determined

22  the net weight.

23  Q.   Did you perform any tests on the portion you

24  removed from the Government's Exhibit 4?

25  A.   Yes.

1   Q.   What tests did you perform?

2   A.   I performed gas chromatography, flame ionization

3   detection, gas chromatography mass spectroscopy, and

4   infrared spectroscopy.

5   Q.   And the first test you mentioned, can you just

6   very briefly explain what that is for the jury?

7   A.   Yes.

8   Q.   What does it test for?

9   A.   Gas chromatography, flame ionization detection is

10  a technique used to separate the components in a

11  mixture, and also it's used to determine the purity.

12  Q.   And the second test you mentioned, gas

13  chromatography?

14  A.   Mass spectrometry.

15  Q.   What generally does that do?

16  A.   It's also a separation technique, it separates the

17  compounds in a mixture, and then it's also an

18  identification technique, which allows me to identify

19  what those separated compounds are.

20  Q.   The IR test, what does that do?

21  A.   That's also an identification technique, and it's

22  also used to determine the salt form of controlled

23  substances.

24  Q.   What were your conclusions based upon those tests?

25  A.   I determined that Government's Exhibit 4 contained

1    heroin hydrochloride, cocaine and caffeine with a net

2    weight of 10.8 grams and a purity of 31.4 percent.

3    That would be the purity of the heroin.

4    Q.   Okay.   After the tests, what did you do with

5    Government's Exhibit 4?

6    A.   I placed the material that was analyzed back into

7    the original evidence envelope and the original

8    packaging that was submitted with the original material

9    was separated and placed into a second envelope for

10   fingerprint examination, and then I sealed both those

11   evidence envelopes, determined a weight after analysis

12   of the packages, and I submit it back to the evidence

13   technician for storage.

14   Q.   Is Government's Exhibit 4 in the same condition

15   today as when you last saw it?

16   A.   Yes, it is.

17   Q.   Now, does --

18   A.   Excuse me, sorry, the second envelope is not

19   because the fingerprint analysis was performed after I

20   sealed that evidence envelope.

21   Q.   Is this the second envelope?

22   A.   Yes, it is.

23   Q.   Is that what you're referring to?

24   A.   Yes.

25   Q.   And the seal on the bottom, is that your seal?

1    A.   No, the seal at the top is mine, after I place the

2    packaging in, I place the seal on the top.  And then

3    when it's handed over to the fingerprint analyst, they

4    open the envelope at the bottom and remove the contents

5    and then reseal it at the bottom.

6    Q.   Okay.  Now, does the purity of 31.4 percent and a

7    net weight of 10.8 percent mean that the substance that

8    you tested, that Government's Exhibit 4, was a mixture

9    or substance containing a detectable amount of heroin?

10   A.   Yes.

11           MR. SCHMITZ:  Nothing further, Your Honor.

12           THE COURT:  Cross-examination?

13           MR. JOFFE:  Yes, thank you, Your Honor.

14                   CROSS-EXAMINATION

15   BY MR. JOFFE:

16   Q.   Ms. Vanmali, you testified that the purity was

17   31.4 percent; is that correct?

18   A.   Yes.

19   Q.   Okay.  And were you able to determine what the

20   other 68.6 percent was?

21   A.   Well, this also contained some cocaine and

22   caffeine and there's possibly other substances that we

23   don't report and also other naturally occurring

24   substances that are usually detected in heroin samples.

25   Q.   When you say naturally detected, what type of

1   substances are naturally detected?

2   A.   For example, acetylcholine, that's not something

3   we routinely report.

4   Q.   What about mannitol?

5   A.   Mannitol also could be one of those that we don't

6   routinely report but could be present.

7   Q.   And what is mannitol?

8   A.   It's a sugar.

9   Q.   What is it typically found in?

10  A.   I don't routinely identify those, so I don't know.

11  I just know it's used as a cutting agent.

12  Q.   The mannitol?

13  A.   Yes.

14  Q.   Okay.  Is mannitol a stimulant?

15  A.   I don't know.

16  Q.   Now, let me show you what's been previously

17  admitted as Government's Exhibit 4.  Let me ask you, on

18  the right-hand corner it says 47.1 gross grams.  Do you

19  see that?

20  A.   Yes, I do.

21  Q.   Okay.  And that's a different numerical amount

22  than the gross weight after analysis, the 44.05 grams;

23  is that correct?

24  A.   Yes.

25  Q.   So the item is weighed before it's analyzed and

1   after it's analyzed; correct?

2    A.   That's correct.

3    Q.   So what's happened to the other two point some odd

4   percent grams?

5    A.   Remember this exhibit was submitted in packaging,

6   and that packaging was removed and separated for

7   fingerprint examination.

8    Q.   Okay.  The question that I want to ask is when you

9   do your analysis of the substance, does any of the

10   substance get destroyed?

11    A.   Yes, it gets used in the analysis.

12    Q.   Okay.  How many ounces or grams do you use in the

13   analysis?

14    A.   Well, according to the 113, the DEA 113, I started

15   with a net weight of 10.8 grams and my reserve weight

16   after analysis was 9.9 grams, so just under a gram I

17   used for analysis.

18    Q.   Okay.  So the actual net weight after testing is

19   9.9 grams; is that correct?

20    A.   That would be the reserve weight, yes.

21    Q.   And the other grams is destroyed; is that correct?

22   As a result of your testing?

23    A.   Yes.

24    Q.   Okay.  And are any of those grams kept by DEA for

25   future use or DNA analysis or anything like that?

1    A.   No.

2    Q.   Okay.  Who requested a fingerprint analysis, if

3    you know?

4    A.   It's on the -- the request is on the DEA7.  It's a

5    check box on the DEA7, if it's checked it means it's

6    checked for fingerprint analysis.

7    Q.   Okay.  But as you sit here today, do you know why

8    in this particular case it was requested?

9    A.   No, I do not.

10   Q.   Okay.  And as you sit here today, you don't know

11   who requested it; correct?

12   A.   No, I do not.

13   Q.   Okay.  You yourself, you were not asked to conduct

14   a fingerprint analysis; correct?

15   A.   No, I can't do a fingerprint analysis.

16   Q.   That's not what you do?

17   A.   No.

18   Q.   Okay.  Do you know if a fingerprint analysis was

19   done on this as well?

20   A.   I believe, yes, it was.

21   Q.   Do you know what the results of that was?

22   A.   No.

23            MR. JOFFE:  Your Honor, I have no further

24   questions of this witness at this time.

25            THE COURT:  Redirect?

1          MR. SCHMITZ:  Nothing from the government,

2  Your Honor.

3          THE COURT:  May this witness be excused?

4          MR. SCHMITZ:  Yes, Your Honor.

5          MR. JOFFE:  Yes, Your Honor.

6          THE COURT:  You may be excused.  Thank you.

7  Call your next witness.

8          MR. SCHMITZ:  Your Honor, the United States

9  calls DEA chemist Alexandra Gongora.

10  THEREUPON,

11                    ALEXANDRA GONGORA,

12  a witness, having been first duly sworn, upon her oath,

13  testified as follows:

14          THE WITNESS:  I do.

15          COURTROOM DEPUTY:  If you can have a seat and

16  state and spell your name for the record.

17          THE WITNESS:  Alexandra Gongora,

18  G-O-N-G-O-R-A.

19          THE COURT:  You may inquire.

20          MR. SCHMITZ:  Thank you, Your Honor.

21                    DIRECT EXAMINATION

22  BY MR. SCHMITZ:

23   Q.   Good afternoon, Ms. Gongora, how are you employed?

24   A.   I'm employed as a quality assurance specialist at

25  the Drug Enforcement Administration in southeast

1    Florida.

2    Q.   And during -- were you always employed as a

3    quality assurance specialist?

4    A.   No, I was not.

5    Q.   What were you employed as immediately before that?

6    A.   Immediately before that I was a senior forensic

7    chemist at the Drug Enforcement Administration.

8    Q.   How long were you employed as a senior forensic

9    chemist at the DEA?

10   A.   I was employed as a senior forensic chemist for

11   ten years and as a forensic chemist for seven years.

12   Q.   Were you a forensic chemist in 2015?

13   A.   Yes, I was.

14   Q.   How long -- okay.  So what were your duties when

15   you were a forensic chemist for the DEA?

16   A.   I would analyze evidence that would come into the

17   southeast laboratory, and I would testify as to my

18   findings in a court of law.

19   Q.   What education did you have to prepare for the

20   job?

21   A.   I have a bachelor of science in chemistry from

22   Florida International University, I also have a master

23   of science in chemistry from Florida International

24   University as well.  I also underwent six months of

25   training in Quantico, Virginia, in the field of

1   forensic chemistry, and I have had continuing education

2   courses yearly.

3   Q.   Okay.  In the course of your duties, do you

4   perform tests to detect and identify the presence of

5   controlled substances?

6   A.   Yes, I did.

7   Q.   Do you conduct tests to detect the presence of

8   heroin?

9   A.   Yes, I do.

10  Q.   How many times would you say you perform those

11  tests as a forensic chemist?

12  A.   I would say roughly into the thousands.

13  Q.   Is that a routine part of your job?

14  A.   Yes, it was.

15  Q.   Have you had the occasion to be qualified as an

16  expert in court before?

17  A.   Yes.

18  Q.   How many times?

19  A.   Approximately 70 times now.

20          MR. SCHMITZ:  Your Honor, I tender the

21  witness on qualifications.

22          MR. JOFFE:  No objection, Your Honor.

23          THE COURT:  You may proceed.

24  BY MR. SCHMITZ:

25  Q.   Ms. Gongora, what's the procedure that your

1   laboratory uses concerning the submission of evidence?

2    A.   Evidence is generally received in two ways, it's

3   either hand delivered by the agent or delivered by

4   Federal Express to the laboratory.  It's received by an

5   evidence custodian who logs it into our system and

6   gives it a unique identifier, and then places that

7   evidence into an evidentiary vault.

8    Q.   How do you obtain the evidence from the

9   evidentiary vault?

10   A.   It's assigned to me by my supervisor, and then I

11   request the evidence to be obtained from the

12   evidentiary vault, and the evidence custodian transfers

13   that evidence to me, to my possession.

14   Q.   Okay.

15          MR. SCHMITZ:  May I approach the witness

16   freely, Your Honor?

17          THE COURT:  Yes, you may.

18   BY MR. SCHMITZ:

19   Q.   I'm showing you what's been marked for

20   identification as Government's Exhibit 6.  Do you

21   recognize that?

22   A.   Yes, I do.

23   Q.   What is it?

24   A.   It's a self-sealed evidence envelope containing a

25   unique identifier generated by the southeast

1    laboratory, and at the bottom it has my signature and

2    seal.

3    Q.    When did you first see Government's Exhibit 4?

4    A.    I first saw Exhibit 4 on March 10th of 2015.

5    Q.    Where did you first see Government's Exhibit 4?

6    A.    I saw it at the southeast laboratory in Miami,

7    Florida.

8    Q.    What condition was Government's Exhibit 4 when you

9    first saw it?

10   A.    It was factory sealed on three sides and had the

11   agent seal at the top.

12   Q.    And there are two bags there, was it sent to you

13   in one bag or two bags?

14   A.    It was sent to me in one bag.

15   Q.    And, again, was that bag sealed when you received

16   it?

17   A.    Yes, it was.

18   Q.    Did it appear to be tampered with in any way?

19   A.    No, it did not.

20          MR. SCHMITZ:  Your Honor, the government

21   moves for the admission of Government's Exhibit 6.

22   Excuse me, did I refer to it as four, Your Honor?

23          THE COURT:  You have been.

24          MR. SCHMITZ:  I apologize.

25          THE COURT:  You may wish to reinquire.

1              MR. SCHMITZ:  I apologize.

2              THE COURT:  That's all right.

3    BY MR. SCHMITZ:

4    Q.   I have showed you what's been marked as

5    Government's Exhibit 4.  Do you -- excuse me.

6    Government's Exhibit 6.  Do you recognize Government's

7    Exhibit 6?

8    A.   Yes, I do.

9    Q.   All right.  How do you recognize that?

10   A.   It's a heat sealed evidence envelope containing my

11   signature and seal at the bottom.

12   Q.   And when did you first see Government's Exhibit 6?

13   A.   I saw it on March 10th of 2015.

14   Q.   And did you analyze the contents of Government's

15   Exhibit 6?

16   A.   Yes, I did.

17   Q.   Where did you first see this exhibit?

18   A.   It was on March 10th of 2015.

19   Q.   What was the condition of Government's Exhibit 6

20   when you first saw it?

21   A.   It was in a sealed condition.

22   Q.   There are two bags in there, was it sent to you in

23   one bag or two bags?

24   A.   It was in one bag.

25   Q.   And how was it sealed?

1    A.    It was factory sealed on three sides and had the

2    agent seal at the top.

3    Q.    Who did you receive the exhibit from?

4    A.    I received it from Rodney Brown, who is an

5    evidence custodian.

6              MR. SCHMITZ:  Your Honor, the government

7    moves for the admission of Government's Exhibit 6.

8              MR. JOFFE:  I would like an opportunity to

9    voir dire the witness, Your Honor.

10             THE COURT:  You may.

11                   VOIR DIRE EXAMINATION

12   BY MR. JOFFE:

13   Q.    Ms. Gongora, good afternoon, ma'am.

14   A.    Good afternoon.

15   Q.    This item was received by the southeastern

16   laboratory in Miami, Florida.  Was it hand delivered,

17   do you know?

18   A.    It was delivered by Federal Express.

19   Q.    And approximately what date did it arrive at your

20   address?

21   A.    February 12th of 2015.

22   Q.    And how do you know that?

23   A.    There is paperwork that accompanies every evidence

24   submission to the laboratory.

25   Q.    And you had an opportunity to review that prior to

1    testifying here today?

2    A.   Yes, I have.

3    Q.   Okay.  When did you last review it?

4    A.   Before entering into the courtroom.

5    Q.   Someone ask you to review it?

6    A.   No, it's standard procedure for me to review it.

7    Q.   Okay.

8           MR. JOFFE:  I have no further questions, Your

9    Honor.  Still maintain my objection.

10          THE COURT:  Government's Exhibit Number 6

11   will be introduced at this time.

12          (Government's Exhibit Number 6 was admitted

13       into evidence.)

14          MR. SCHMITZ:  Your Honor, may we publish?

15          THE COURT:  Yes, you may.

16             CONTINUED DIRECT EXAMINATION

17   BY MR. SCHMITZ:

18   Q.   All right, Ms. Gongora.  After you received

19   Government's Exhibit 6 -- let me take a step back.  Is

20   some of that handwriting on that package yours?

21   A.   Yes.

22   Q.   What handwriting is yours?

23   A.   From the laboratory number all the way down to the

24   portion that says resealed.

25   Q.   From the laboratory number down to the portion

1   that says resealed?

2   A.   That's correct.

3   Q.   Okay.

4       Now, did you perform any tests on

5   Government's Exhibit 6?

6   A.   Yes, I did.

7   Q.   And actually before you performed those tests, did

8   you do anything else with it?

9   A.   After determining that the seals were intact, I

10   determined a weight of the drug material.

11   Q.   Did you term a gross weight?

12   A.   Yes, I did.

13   Q.   Did you determine a net weight?

14   A.   Yes.

15   Q.   And after that, did you perform any tests on

16   Government's Exhibit 6?

17   A.   I did.

18   Q.   What test did you perform?

19   A.   A gas chromatography mass spectometry test, a gas

20   chromatography flame ionization detection test and

21   Fourier transform infrared test.

22   Q.   And do those tests test for the presence of

23   controlled substance?

24   A.   They do.

25   Q.   Do they test for the presence of heroin?

1    A.   Yes, they do.

2    Q.   Are those tests commonly used in the field?

3    A.   Yes, they are.

4    Q.   Are those tests accurate?

5    A.   Yes.

6    Q.   After your test, what did you conclude about

7    Government's Exhibit 6?

8    A.   It contained heroin and cocaine with a net weight

9    of 27.8 grams and a purity of 21.8 percent.

10   Q.   Now, is Government's Exhibit 6 in the same

11   condition today as when you saw it last?

12   A.   Yes, it is.

13   Q.   With a purity -- so with a purity of 21.8 percent

14   and a net weight of 27.8 grams, did you conclude that

15   the Government's Exhibit 2 -- excuse me, Government's

16   Exhibit 6 was a mixture or substance containing a

17   detectable amount of heroin?

18   A.   Yes, I did.

19          MR. SCHMITZ:  No further questions, Your

20   Honor.

21          THE COURT:  Mr. Joffe.

22          MR. JOFFE:  Yes, Your Honor.

23                    CROSS-EXAMINATION

24   BY MR. JOFFE:

25   Q.   Ms. Gongora, the purity was 21.8 percent; is that

1   correct?

2   A.   That's correct.

3   Q.   Do you recall as you sit here today what the other

4   78.2 percent was?

5   A.   There was also benzocaine and caffeine present,

6   and there are other cutting agents that we actually do

7   not detect with the tests we perform.

8   Q.   And benzocaine is a stimulant?

9   A.   It is what we consider an adulterant.

10   Q.   Is it a numbing agent?

11   A.   I can't answer that.

12   Q.   Okay.  And if we look at this bag, I'm going to

13   ask you to take a look at what's been admitted as

14   Government's Exhibit 6.  Do you see that on the screen?

15   A.   Yes, I do.

16   Q.   In this portion of the sticker it says 57.9TPW.

17   What does TPW mean?

18   A.   I wouldn't know, that's not my handwriting.

19   Q.   Whose handwriting is that?

20   A.   I don't know.

21   Q.   Is that a 57.9 or 51.9?

22   A.   I wouldn't be able to tell you that.  That's not

23   my handwriting.

24   Q.   And then there is a gross weight after analysis of

25   61.64 grams; is that correct?

1    A.    That's correct.

2    Q.    Is that your handwriting?

3    A.    Yes, it is.

4    Q.    Any idea why the weight here would be different

5    than the weight here?

6    A.    Yes, I had to add what is a new Ziploc plastic bag

7    in order to determine the net weight, so there is

8    actually an additional Ziploc plastic bag incorporated

9    into this exhibit.

10   Q.    Okay.  So it would be fair to say that someone

11   else wrote this down as the gross weight prior to your

12   analysis; is that correct?

13   A.    I couldn't really speculate as to that.

14   Q.    I'm not asking you to speculate.  But what's the

15   normal course of business within your lab, someone else

16   writes down this weight?

17   A.    No, that's not correct.

18   Q.    Okay.  So who wrote this on here?

19   A.    I could not tell you that.

20   Q.    Okay.  Well, why would it be written on there?

21   A.    I can't -- I did not produce that, so I can't tell

22   you why it's there.

23   Q.    I know you didn't produce it, but why would it be

24   there?

25          MR. SCHMITZ:  Your Honor, I'll object to

1    speculation.

2            THE COURT:  Speculation, argumentative,

3    sustained.

4            MR. JOFFE:  I have no further questions of

5    this witness, Your Honor.  Thank you.

6            THE COURT:  Redirect?

7            MR. SCHMITZ:  None from the government, Your

8    Honor.

9            THE COURT:  May this witness be excused?

10           MR. SCHMITZ:  Yes, Your Honor.

11           MR. JOFFE:  Yes, Your Honor.

12           THE COURT:  You may be excused.  Thank you.

13           MR. SCHMITZ:  Your Honor, may we approach

14   about scheduling?

15           THE COURT:  Yes.

16           (Bench conference was held within the

17   presence of the jury.)

18           MR. JOFFE:  So we've put on most -- the only

19   witness we intend now to call in direct -- in our case

20   in chief is going to be Victor Chica.  There's no way

21   he's going to be done by the end of the day.  He's

22   going to be, like I said, our last witness, I believe,

23   in our case in chief.  And assuming no issues get

24   raised that we need to call anybody else, so it would

25   break up his testimony.  We can start him now, but it

1    would break it up halfway through, I think, depending

2    on what the defense case is and how long cross goes.  I

3    would assume, you know, we would be able to finish by

4    tomorrow either way.  But that's just my thoughts.

5           So is the government asking that we recess

6    until tomorrow morning?  Is that what you're

7    requesting?  I just want to be clear.

8           MR. SCHMITZ:  Well, I think it would be best

9    as a scheduling matter to recess and reconvene tomorrow

10   morning.  I think we would be safe to do that is my

11   point.

12          THE COURT:  We can probably just talk about

13   some other types of things.  We can use the time

14   wisely, if we recess now.

15          MR. SCHMITZ:  Okay.

16          THE COURT:  All right.  Have him back at

17   9:00.  Any objection to that?

18          MR. JOFFE:  No, Your Honor.

19          THE COURT:  Okay.

20          (Bench conference concluded and proceedings

21   continued as follows:)

22          THE COURT:  Ladies and gentlemen, based upon

23   scheduling, I think it's probably our best time to

24   recess now.  We would not be able to complete the next

25   witness before I would need to leave you go.  So we'll

1  go ahead and recess for the day now, and I would just,

2  again, admonish you, please do not discuss this case

3  amongst yourselves or with anyone else.  We'll

4  reconvene tomorrow morning at 9:00 a.m., so please be

5  here at 9:00 a.m. and we'll start the testimony at that

6  time.  Thank you.

7              (Jury out at 4:15 p.m.)

8              THE COURT:  Let the record reflect the jurors

9  are outside the courtroom.  Counsel, you indicated that

10  at least at this point it appears you have one more

11  witness to present.  Mr. Joffe, you had listed the same

12  witnesses, basically, or indicated you have the same

13  witnesses as the government and then obviously we have

14  the potential of the defendant testifying.  I believe

15  the government did file an amended verdict form.  I

16  don't know if we want to look at that at all or if

17  there's anything that we wanted to talk about in regard

18  to that.

19              MR. LAZARUS:  Your Honor, may I just inform

20  the Court and counsel to the material change to the

21  verdict form?

22              THE COURT:  Yes, please.

23              MR. LAZARUS:  Essentially -- not essentially,

24  in fact, it only changes Count 4, Your Honor.  What we

25  did for the verdict form was we made an effort just to

1    conform our filing to the pattern jury instruction.

2    Basically as the Court is aware, the Court will very

3    likely be charging the jury that they need to determine

4    first whether or not the defendant attempted to possess

5    with intent to distribute the heroin, I'll abbreviate

6    that, if the Court doesn't mind, the heroin.  And

7    second the jury needs to decide, if they find the

8    defendant guilty of the attempt to possess with intent

9    to distribute, then the jury needs to make a

10   determination as to the weight, an additional unanimous

11   finding.

12          And so what we did was the first form we

13   filed didn't have the necessary language to explain

14   that clearly to the jury, so we took out of paragraph A

15   reference to the weight, we made paragraph A refer only

16   to the offense of knowingly attempting to possess with

17   intent to distribute the mixture or substance

18   containing heroin on that date and if they find the

19   defendant guilty on that, then they proceed to B where

20   they then have to find the weight of the mixture or

21   substance is either one kilogram or more, 100 grams or

22   more, or less than 100 grams, those being the various

23   statutory limits that are outlined, Your Honor, and so

24   we propose this.  It conforms in large part to the

25   standard pattern instruction.

1            The pattern instruction that I saw in A it
2   actually just says we find the defendant guilty of the
3   offense as charged in the indictment, words to that
4   effect, so I elaborated a little more just to make it
5   clear to the jury what they had to unanimously agree
6   upon, and then the second part, as I said, just ask
7   them to determine the weight that they unanimously
8   agree the defendant distributed.  Otherwise the way it
9   had been written they would only be finding first that
10  he attempted to possess or distribute a kilogram or
11  more, but then immediately below they were being asked
12  to decide how much weight it was.  So if they had
13  returned, for example, less than 100 grams having found
14  him guilty as written of the first one, it would appear
15  to be internally inconsistent is that's what we were
16  trying to avoid.
17           THE COURT:  Mr. Joffe, do you have any
18  comment on that?
19           MR. JOFFE:  I agree with the government, Your
20  Honor.
21           THE COURT:  Okay.  My only other question
22  then is in Count 1, Count 2, and Count 3, do we need to
23  break down whether or not -- let's see, maybe they did.
24  Like in Count 1, rather than asking A and B, would it
25  be -- or a second part of it, would it be prudent to

1  just ask question one and then ask the jury to find the

2  appropriate box or boxes not guilty, guilty of

3  possession with intent to distribute, or guilty of

4  distribution?

5         MR. LAZARUS:  In other words, just

6  consolidating A and B, Your Honor, the same questions

7  but just consolidate it?

8         THE COURT:  Yes.

9         MR. SI, we have no objection to that, Your

10 Honor.  Because otherwise in A you have -- you kind of

11 have both and not guilty or guilty, so you really don't

12 know which one, if either, or and then you go to B and

13 then you say, well, is it possession with intent to

14 distribute or distribution.

15        MR. LAZARUS:  I think it's actually a similar

16 issue that we tried to fix with Count 4, Your Honor, I

17 think the Court's point is well taken, we would request

18 that the first three counts be provided to the jury

19 more along the lines of what, Your Honor, is proposing.

20 And we can draft that if the Court would like and

21 circulate that and have that filed this evening,

22 whatever the Court's preference would be.

23        THE COURT:  All right.  Let me have the clerk

24 go ahead and give you copies of the court's proposed

25 then for that.  I didn't look at -- and maybe our

1    amendment is the same as what -- or ours is the same as

2    what your amended is, I'm not sure, but maybe you can

3    just look at this and see if you see an issue with how

4    this was done.

5            MR. JOFFE:  And, Your Honor, the Court's

6    proposed verdict form is what the Court is suggesting.

7            THE COURT:  That's what I was, now that we're

8    discussing and, again, that's something, I'm not

9    married to the idea; I just wanted to throw that out.

10           MR. LAZARUS:  Your Honor, I believe for

11   Counts 1, two and three should it perhaps read, or my

12   request would be, did knowingly possess with intent to

13   distribute or distribute, we've charged it in the --

14   there's the instruction the Court will give and forgive

15   me with that in front of me, I always flip flop them,

16   but we charge in the conjunctive and prove in the

17   disjunctive.  So even though it alleges both, we're

18   asking them only to find either or.

19           THE COURT:  Right, but we normally don't

20   change how it reads in the actual -- we usually mirror

21   the indictment, I read the instruction.

22           MR. LAZARUS:  Thank you, Your Honor, and

23   we're free to reference the instruction in our closing

24   if we think it's important.

25           THE COURT:  Yes.

```
1              MR. JOFFE:  Your Honor, page three of the
2    verdict form.
3              THE COURT:  Yes.
4              MR. JOFFE:  Number five, my client has
5    brought an issue to me, which I'll bring to the Court.
6    It seems to make sense to me that under the boxes the
7    first one is one kilogram or more of a mixture or
8    substance containing a detectable amount of heroin.  Is
9    it possible to insert a box that says one half kilogram
10   or less of a mixture or substance containing a
11   detectable amount of heroin?
12             THE COURT:  This mirrors what -- because
13   basically this is for purposes of sentencing.
14             MR. JOFFE:  Right.
15             THE COURT:  This mirrors the sentencing
16   guidelines, so that's why it was done that way.
17             MR. JOFFE:  Right.
18             MR. LAZARUS:  We would oppose that request,
19   Your Honor, for the reasons the Court stated, that the
20   defendant is free to make whatever argument you want as
21   to which box they should check, if they believe his
22   theory of the case, but we ask that jury instructions
23   conform with the law, not the argument.
24             THE COURT:  Mr. Joffe, if you want an
25   opportunity to speak more with the defendant more about
```

1    this and look at it overnight --

2              MR. JOFFE:  I understand.

3              THE COURT:  -- I just mirrored what the

4    sentencing guidelines say.

5              MR. JOFFE:  I think for purposes of the

6    record, I just want to make sure it's clear that I have

7    articulated what my client has requested, he's

8    requesting it again, I've made the request, should the

9    Court grant it, wonderful, should the Court not grant

10   it, it is what it is.  That's our request for the

11   defense.

12             THE COURT:  All right.

13             MR. JOFFE:  So if the Court chooses to do

14   that, that's the Court's discretion.

15             THE COURT:  All right.  Thank you.

16             MR. JOFFE:  But I would, I guess, object if

17   that happens.

18             THE COURT:  Okay.  I understand that this is

19   something that Mr. Williams wants.  Let me look at the

20   sentencing guidelines again, but my recollection is we

21   went ahead and listed exactly what the sentencing

22   guidelines say.  And I know what his argument is in

23   this case, obviously it's very clear that the amount is

24   what's the most important, the most controversial, if

25   you will.

1          MR. JOFFE:  That's correct.

2          MR. LAZARUS:  And, Your Honor, we would just

3    also note that those amounts that are in your proposed

4    verdict form also mirror the language in 21 U.S.C. 841.

5    And so the numbers that are here are important because

6    they trigger certain mandatory minimum sentences, so we

7    would, again, we would just ask that it remain that

8    way.

9          As to Count 4 of the indictment in paragraph

10   four, and I apologize if the Court has already answered

11   this with respect to Counts 1, 2, and 3, but the way

12   paragraph four is written on page two at the bottom, it

13   asks them to find that the defendant did knowingly

14   attempt to possess the kilogram or more and then it

15   asks for the particularized finding underneath.  What

16   we have proposed in our amended verdict form is to

17   strike the language from paragraph four, a kilogram or

18   more of, so that it would read did knowingly attempt to

19   possess with intent to distribute a quantity.

20         THE COURT:  Okay.

21         MR. LAZARUS:  And then the rest of it and

22   then the amount would follow.

23         MR. JOFFE:  I would object, Your Honor, only

24   because the way it's pled within the four corners of

25   the indictment is that it specifically says kilogram or

1    more.

2              THE COURT:  All right.  I'll look at that,

3    and then I also note that we will need to say we the

4    jury find defendant Norris Williams, and then check the

5    appropriate box because there's only one plausible,

6    you're either guilty or not guilty, and then if they do

7    that they're instructed how to move on.  And then,

8    again, it would be check the appropriate box.

9              All right.  I think I understand the

10   different objections.  Let me go ahead and look at this

11   again overnight and I'll give you the final verdict

12   form.  Do we want to look over the jury instructions

13   given the testimony at this point?

14             MR. JOFFE:  That's fine, Your Honor.

15             THE COURT:  If nothing else we can decide on

16   the ones that are clearly going to be read, and if

17   there's an issue, we can --

18             MR. JOFFE:  That's fine.

19             MR. SCHMITZ:  Your Honor, can we release the

20   witness we had?

21             THE COURT:  Yes, you may.

22             MR. SCHMITZ:  Your Honor, just so the record

23   is clear, if the defendant is going to be asking for

24   the entrapment instruction, we're going to oppose that.

25   The testimony tomorrow I believe is going to be crucial

1    in determining.

2              THE COURT:  And we won't ultimately decide on

3    that at this point.  I think we can just decide on

4    those that our standard instructions and then we can go

5    from there once the other testimony has been completed.

6    But at least it gives us kind of an idea where we're at

7    and using our time wisely today.  Under the Court's

8    proposed instructions E1 it's just the members of the

9    jury and it's my duty to instruct you.  Any objection

10   to that?

11             MR. JOFFE:  No, Your Honor.

12             MR. SCHMITZ:  None from the government, Your

13   Honor.

14             THE COURT:  The duty to follow instructions

15   and the presumption of innocence, B 2.1?

16             MR. JOFFE:  No objection, Your Honor.

17             MR. SCHMITZ:  No objection from the

18   government, Your Honor.

19             THE COURT:  All right.  Then there's B 2.2

20   and obviously that's when the defendant does not

21   testify.  So we would have to -- I think it's basically

22   the same, but the one paragraph is just changed if he

23   does testify.  So it would be something to decide on

24   yet.

25             MR. JOFFE:  If Mr. Williams chooses not to

1    testify, Your Honor, I would accept B 2.2.

2           THE COURT:  Okay.  And obviously there's an

3    instruction if he does, so we can look at that.  We'll

4    revisit that.  Definition of reasonable doubt, B 3.

5           MR. JOFFE:  No objection, Your Honor.

6           MR. SCHMITZ:  No objection, Your Honor.

7           THE COURT:  Consideration of direct and

8    circumstantial evidence, arguments of counsel, comments

9    by the Court, B 4?

10          MR. JOFFE:  No objection, Your Honor.

11          MR. SCHMITZ:  No objection, Your Honor.

12          THE COURT:  Obviously these are all the

13   standard instructions.  B 5, credibility of witnesses.

14          MR. SCHMITZ:  No objection, Your Honor.

15          MR. JOFFE:  No objection, Your Honor.

16          THE COURT:  B 6.1 is impeachment of witness

17   because of inconsistent statements.  I don't think

18   we've had that issue yet.  Or B 6.2 impeachment of

19   witness because of inconsistent statement or felony

20   conviction, we have not had that, 6.3, these are all

21   the impeachment ones, and so far 6.4, 6.5, it's really

22   just going to depend upon -- 6.7, it will just depend

23   upon many of these whether or not the defendant

24   testifies or whether or not there's any witnesses are

25   impeached because of prior inconsistent statements.  So

1   I don't think we can really decide anything on those at

2   this point.  B 7 is expert witness.

3          MR. JOFFE:  No objection, Your Honor.

4          MR. SCHMITZ:  No objection, Your Honor.

5          THE COURT:  Then there's a basic witnesses.

6   I think the prosecution, that was the government's

7   request, basic witness.

8          MR. JOFFE:  Your Honor, I would object to the

9   basic witnesses instructions.  I don't think it's

10   relevant, and I don't think it's needed.

11          THE COURT:  Are you still requesting this

12   one?

13          MR. SCHMITZ:  Yes, Your Honor, we are still

14   requesting this one.

15          THE COURT:  All right.  At this point it

16   would be my intention to leave this one out.  If

17   there's anything that comes up, we can revisit it.

18          Testimony of accomplice or co-defendant with

19   plea agreement.  Maybe I don't understand the case, S

20   1.2.

21          MR. SCHMITZ:  Your Honor, as of now we don't

22   need it.  If we put on a rebuttal case, we may need it.

23          THE COURT:  Okay.  So it's something we can

24   revisit then.  S 3, identification testimony, both

25   parties requested that.

1          MR. JOFFE:  No objection, Your Honor.

2          MR. SCHMITZ:  No objection, Your Honor.

3          THE COURT:  All right.  Note taking, S 5.

4          MR. JOFFE:  No objection.

5          MR. SCHMITZ:  No objection.

6          THE COURT:  B as in boy 8, introduction to

7     offense instructions.

8          MR. JOFFE:  No objection, Your Honor.

9          MR. SCHMITZ:  No objection, Your Honor.

10         THE COURT:  B 9.1 A, on or about, knowingly,

11    willfully, generally.

12         MR. JOFFE:  No objection, Your Honor.

13         MR. SCHMITZ:  No objection, Your Honor.

14         THE COURT:  Conjunctive charge.

15         MR. JOFFE:  Your Honor, I would object.  It's

16    not relevant.

17         THE COURT:  The case was charged using the

18    word and, so I believe it is relevant.  And the

19    government is entitled to the instruction.  Controlled

20    substances, possession with intent to distribute?

21         MR. JOFFE:  No objection, Your Honor.

22         MR. SCHMITZ:  No objection, Your Honor.

23         THE COURT:  Possession, S 6.

24         MR. JOFFE:  No objection.

25         MR. SCHMITZ:  No objection, Judge.

1          THE COURT:  S 12 is character evidence.  We

2     can't decide on that.  S 13.2 was, Mr. Joffe, were you

3     requesting that?  The government actually --

4          MR. JOFFE:  I think Mr. Barclift.

5          THE COURT:  Mr. Barclift did put it in.

6          MR. JOFFE:  Right.  I think Mr. Barclift

7     believes this is highly relevant and should be

8     included.  We should probably get Mr. Barclift down

9     here immediately, but I would agree with this

10    instruction, if there's a scintilla of evidence and I

11    think there is based upon the evidence that's been

12    presented so far.  And the government requested this.

13         THE COURT:  Clearly it must be relevant.

14         MR. SCHMITZ:  Your Honor, we're prepared to

15    argue about this, but like I said, we need more

16    evidence to come in tomorrow.  We obviously don't think

17    it applies.  It requires both inducement and a lack of

18    predisposition.  We don't think there's either here.

19         THE COURT:  Do you have any cases that you

20    want the Court to look at over the --

21         MR. SCHMITZ:  Yes, Your Honor.

22         THE COURT:  Do you want to just send those in

23    the chambers inbox?

24         MR. SCHMITZ:  Can I give you copies?

25         THE COURT:  Sure.

1          MR. SCHMITZ:  Would you prefer the e-mail,
2    Your Honor?
3          THE COURT:  No, you can give me copies.  I
4    didn't know what you had.
5          MR. SCHMITZ:  And there's actually, I think,
6    two distinct issues here, Your Honor, the cases relate
7    to one issue and that is is it legally appropriate
8    here, I think there's also a factual question here.
9          THE COURT:  Okay.  And obviously I'll allow
10   argument on that.  This will just give me an
11   opportunity to look at what you have in that regard.
12         MR. SCHMITZ:  And obviously these cases have
13   argument to go with them.  They may or may not speak
14   for themselves.
15         THE COURT:  Okay.  I just like to have an
16   opportunity to read it ahead of time.  That way when
17   you're arguing it, I -- and just finally there's B10.2
18   caution, punishment of single defendant, multiple
19   counts.
20         MR. JOFFE:  Objection, Your Honor.
21         MR. SCHMITZ:  May I approach, Your Honor?
22         THE COURT:  Yes.  10.2 to the government,
23   caution, single defendant, multiple counts.
24         MR. SCHMITZ:  No objection, Your Honor.
25         MR. JOFFE:  No objection, Your Honor.

1          THE COURT:  B 11, duty to deliberate.

2          MR. JOFFE:  No objection from the defense.

3          MR. SCHMITZ:  No objection from the

4     government, Your Honor.

5          THE COURT:  And B 12, verdict?

6          MR. JOFFE:  No objection.

7          MR. SCHMITZ:  No objection, Your Honor.

8          THE COURT:  Okay.  So then what we need to

9     finalize would be the verdict form and then whether the

10    entrapment issue applies and then obviously there's the

11    impeachment issues that may also come up and the

12    defendant testifying or not testifying.

13         Mr. Williams, I'm just going to talk to you a

14    little bit about testifying.  It's certainly not

15    something that you have to tell me at this point.  It's

16    something you can discuss with your attorney.  You do

17    have an absolute right to testify during the course of

18    your case.  On the other hand, you have an absolute

19    right not to testify.  The choice is yours.  At no time

20    can anyone force you to testify in your case.  You

21    should consult with your attorney and carefully

22    consider his advice.  However, the decision is

23    ultimately yours and it's an important decision.  If

24    you decide not to testify, then upon your request the

25    jury will be instructed that a defendant has a right

1    not to testify and the fact that you chose not to

2    testify cannot be used against you.  And I read that to

3    them in the preliminary instructions, I would again

4    read that to them in the final instructions.  So it's

5    something to think about.  I will be asking you prior

6    to -- once the government finishes their case I'll be

7    asking you during the course of your part of the case

8    if you wish to testify, so that's something you'll have

9    to let me know at that time.  All right?

10             THE DEFENDANT:  Yes.

11             THE COURT:  Anything else we need to discuss

12   at this time?

13             MR. SCHMITZ:  No, Your Honor, nothing from

14   the government.

15             MR. JOFFE:  No, Your Honor.

16             THE COURT:  All right.  Then we'll start at

17   9:00 tomorrow morning.  You can be in place maybe by

18   8:45 just in case there's anything to discuss before

19   the jury comes in.  Otherwise we'll receive them at

20   9:00.

21             MR. SCHMITZ:  Your Honor, when do you want us

22   here?

23             THE COURT:  8:45, if you can be in place,

24   just in case there's anything we need to discuss, and

25   then we'll bring the jury in right after that, right at

1    9:00.

2            Agent Strang, you are in possession of

3    Exhibits 2, 4, and 6; right?

4            AGENT STRANG:  I will be.

5            THE COURT:  And, counsel, get with the clerk

6    to make sure she has all the exhibits that were

7    introduced, correctly introduced.

8                    (Continued in Volume 2.)

9            (Proceedings were concluded at 4:41 p.m. on

10        April 6, 2016, to be resumed at 8:30 a.m. on

11        April 7, 2016.)

12   UNITED STATES DISTRICT COURT )
                                   )
13   MIDDLE DISTRICT OF FLORIDA   )

14                   **C E R T I F I C A T E**

15      I, Lori L. Bundy, Official Court Reporter for the

16   United States District Court, Middle District of Florida,

17   do hereby certify that pursuant to Section 753, Title 28,

18   United States Code that the foregoing is a true and

19   correct transcript from the stenographic notes taken in

20   the above-entitled matter by the undersigned and that the

21   transcript page format is in conformance with the

22   regulations of the Judicial Conference of the United

23   States.

24        _____/S/Lori L. Bundy_____
          LORI L. BUNDY, RMR, CRR, FPR      Date:  June 29, 2016
25        Official Federal Court Reporter